# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SAMUEL SHIPKOVITZ, ) | |
| ) | Civil Action No. 07-1053 (RCL) |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| THE WASHINGTON POST COMPANY, et al. ) | |
| ) | |
| Defendants. ) | |

## MOTION OF DEFENDANTS THE WASHINGTON POST COMPANY, WP COMPANY LLC, AND BRIGID SCHULTE FOR SUMMARY JUDGMENT

Defendants The Washington Post Company, WP Company LLC, and Brigid Schulte, through undersigned counsel, hereby move this Court for an Order, pursuant to Rule 56 of the Federal Rules of Civil Procedure, dismissing the Complaint. The grounds for this Motion are set forth in the accompanying Memorandum in Support of Motion for Summary Judgment.

Respectfully submitted,

WILLIAMS & CONNOLLY LLP

By: /s/ Kevin T. Baine
    Kevin T. Baine (Bar No. 238600)
    Jonathan Kravis (Bar No. 973780)

725 Twelfth Street, N.W.
Washington, DC 20005
(202) 434-5000

October 22, 2007

*Attorneys for Defendants The Washington Post Company, WP Company LLC, and Brigid Schulte*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| SAMUEL SHIPKOVITZ, | ) | |
| | ) | |
| | ) | Civil Action No. 07-1053 (RCL) |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| THE WASHINGTON POST COMPANY, et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM IN SUPPORT OF THE MOTION OF DEFENDANTS
THE WASHINGTON POST COMPANY, WP COMPANY LLC,
<u>AND BRIGID SCHULTE FOR SUMMARY JUDGMENT</u>**

WILLIAMS & CONNOLLY LLP
Kevin T. Baine (Bar No. 238600)
Jonathan Kravis (Bar No. 973780)

725 Twelfth Street, N.W.
Washington, DC  20005
(202) 434-5000

*Attorneys for Defendants The Washington
Post Company, WP Company LLC, and
Brigid Schulte*

October 22, 2007

## TABLE OF CONTENTS

BACKGROUND ................................................................................................ 1

    A.    The Official Action Closing the Condominium in Which Plaintiff Lived as Unfit for Human Habitation .................................................... 2

    B.    Plaintiff's Lawsuit Against Arlington County ...................................... 2

    C.    The Challenged Post Articles ............................................................... 3

ARGUMENT .................................................................................................... 4

I.    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S LIBEL CLAIM ............................................................... 4

    A.    The Law Favors Dismissal of Libel Claims at the Earliest Possible Stage ..................................................................................................... 4

    B.    The Alleged Defamatory Statements Are Not False ............................. 5

        1.    Statements Regarding the Condition of the Condominium ....... 6

        2.    The Alleged Implication that Plaintiff Is a "Hoarder" ............... 9

        3.    Other Allegedly Defamatory Statements ................................. 12

    C.    The Post Articles Are Protected by the Fair Report Privilege. ............ 14

II.    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S INVASION OF PRIVACY CLAIM. ..................................... 16

CONCLUSION ............................................................................................... 18

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Abur v. Republic of Sudan*, 437 F. Supp. 2d 166 (D.D.C. 2006)....................................14

*Bartnicki v. Vopper*, 532 U.S. 514 (2001) ...................................................................17

*Brasslett v. Coda*, 761 F.2d 827 (1st Cir. 1985) ...........................................................10

*Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087 (4th Cir. 1993)......................................11

*Dorsey v. National Enquirer, Inc.*, 973 F.2d 1431 (9th Cir. 1992)..................................5

*Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496 (1991)................................. *passim*

*Mastro v. Potomac Electric Power Co.*, 447 F.3d 843 (D.C. Cir. 2006),
    *cert. denied*, 127 S. Ct. 1140 (2007) ....................................................................4

*McBride v. Merrell Dow & Pharms. Inc.*, 717 F.2d 1460 (D.C. Cir. 1983)...................5

*Moldea v. N.Y. Times Co.*, 22 F.3d 310 (D.C. Cir. 1994)...............................................6

*Paul v. News World Comm'ns*, No. 01 CA 917, 2003 WL 23899002 (D.C. Super. Ct.
    Sept. 15, 2003) ....................................................................................................10

*Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767 (1986) ......................................5

*United States v. Brown*, 503 F. Supp. 2d 226 (D.D.C. 2007) ........................................14

*Walker v. Johnson*, 501 F. Supp. 2d 156 (D.D.C. 2007) ...............................................14

*Washington Post Co. v. Keogh*, 365 F.2d 965 (D.C. Cir. 1966)......................................5

*Weyrich v. New Republic, Inc.*, 235 F.3d 617 (D.C. Cir. 2001) ......................................5

*White v. Fraternal Order of Police*, 909 F.2d 512 (D.C. Cir. 1990) ................11, 12, 15

### STATE CASES

*Beeton v. District of Columbia*, 779 A.2d 918 (D.C. 2001) ............................................4

*Blodgett v. University Club*, 930 A.2d 210 (D.C. 2007)................................................16

*Clawson v. St. Louis Post-Dispatch, LLC*, 906 A.2d 308 (D.C. 2006)..........................10

iii

*Guilford Transport Industrial, Inc. v. Wilner*, 760 A.2d 580 (D.C. 2000) .............................11, 12

*Harrison v. Washington Post Co.*, 391 A.2d 781 (D.C. 1978) .....................................................16

*Kendrick v. Fox Television*, 659 A.2d 814 (D.C. 1995) .................................................................5

*Kitt v. Capital Concerts, Inc.*, 742 A.2d 856 (D.C. 1999) .....................................................16, 17

*Phillips v. Evening Star Newspaper Co.*, 424 A.2d 78 (D.C. 1980).......................................14, 15

## MISCELLANEOUS

Randy O. Frost & Tamara L. Hartl, *A Cognitive-Behavioral Model of Compulsive Hoarding*, 34 Behav. Res. Ther. 341 (1996).......................................................................9

Restatement (Second) of Torts (1977)...........................................................................................16

## BACKGROUND

*Pro se* plaintiff Samuel Shipkovitz has asserted libel and invasion of privacy claims against The Washington Post Company, WP Company LLC (collectively "The Post"), and one of The Post's reporters, Brigid Schulte.  The claims are based on two articles reporting, among other things, that Arlington County officials had locked plaintiff out of the Arlington condominium in which he was living, based on violations of the Virginia Fire Prevention and Building Codes, and that plaintiff had filed an unsuccessful lawsuit challenging the County's actions.  Plaintiff alleges that the articles falsely described the condition of the condominium— essentially, that it was so filled with paper, boxes, bags and debris that fire and building code officials deemed it unfit for human habitation.  Plaintiff also complains that the articles falsely portrayed him as a "hoarder"—a term generally understood to mean a person who acquires and retains items of limited or no value, to the point that they take over the person's living space.

This is a frivolous case, and it is appropriately resolved on a motion for summary judgment, for at least two reasons, more fully explained below:

First, plaintiff cannot establish that any of the statements he challenges is false. Photographs taken by Arlington County officials on the day that the apartment was closed off establish beyond dispute that the conditions of the apartment were precisely as they were described in Ms. Schulte's articles.  Interviews with county officials and others, including the plaintiff himself, confirmed those conditions.  And it is beyond dispute that the conditions captured in the photographs establish a classic case of "hoarding."

Second, The Post articles were accurate reports of the actions of Arlington County officials and the legal proceedings initiated by the plaintiff complaining of those actions.  As such, they are protected by the common law privilege recognized in the District of Columbia to report on official acts and proceedings.

A.    <u>The Official Action Closing the Condominium in Which Plaintiff Lived as Unfit for Human Habitation</u>

Beginning in December 1996, plaintiff lived as a tenant in his friend Stephen Crossan's condominium. Defs.' Stmt. of Material Facts Not in Dispute ¶ 1 (Oct. 22, 2007) ("Facts"). Sometime thereafter, Mr. Crossan was arrested for felony arson, found not guilty by reason of insanity, and committed to a mental health facility. *Id.* ¶ 2. According to plaintiff, Mr. Crossan began staying at the condominium while on leave passes from the facility. *Id.* As part of this arrangement, members of the Arlington County Program Assertive Community Treatment Team (PACT) would periodically visit Mr. Crossan, to ensure his mental stability. *Id.* During one of these visits, PACT member Sharita Hughes became concerned about the condition of the condominium. *Id.* ¶ 3. Ms. Hughes relayed these concerns to the fire marshal, and on October 20, 2005, Deputy Fire Marshal Samuel K. Grierson and building code inspector Richard Freeman inspected the condominium. *Id.* Photographs taken during that inspection are attached to this motion as Exhibits 4A-LL. As a result of that inspection, violation notices and a placard declaring the condominium "Unfit for Human Habitation" were posted on the condominium door, the door was bolted, and admission to the condominium was prohibited until further authorization from inspection officials. *Id.* ¶ 5.

B.    <u>Plaintiff's Lawsuit Against Arlington County</u>

On October 24, 2005, plaintiff filed suit in the United States District Court for the Eastern District of Virginia against a number of Arlington County officials and other defendants challenging the condemnation of the condominium. *Crossan v. County of Arlington Manager*, No. 05-CV-1219 (E.D. Va.); Facts ¶ 6. In his Amended Complaint, plaintiff alleged *inter alia* that the October 20, 2005 inspection and closing of the condominium violated the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution and constituted intentional business interference. Ex. 9; Facts ¶ 6. Plaintiff requested damages and an injunction

2

allowing him back into the condominium, requiring the Arlington County defendants to obtain

court permission before conducting another inspection, and instructing the Arlington County

Department of Human Services to maintain its clients' confidences.  *Id.*

       On June 22, 2006, the court granted the Arlington County defendants' motion for

summary judgment.  Ex. 12; Facts ¶ 21.  The court ruled that (1) the "unrebutted evidence is that

the" October 20 inspection was lawful, Ex. 12, at 7; (2) there was "no evidence" to support

plaintiff's intentional business interference claim, *id.* at 8; (3) there was "no basis" to grant

plaintiff's request for an injunction, *id.* at 5-6; and (4) plaintiff's request for damages from the

condominium's security company was based on "pure speculation" and was without "evidentiary

support," *id.* at 9.

       C.     **The Challenged Post Articles**

       While plaintiff's Virginia lawsuit was pending, he contacted Washington Post

reporter Brigid Schulte numerous times asking her to write a story on the case.  Facts ¶ 7.  Ms.

Schulte eventually agreed.  In the course of writing her story, Ms. Schulte interviewed plaintiff

several times, spoke with numerous other sources, and conducted extensive research on the

psychological phenomenon known as "hoarding."  *Id.*  After she had completed the story but

before it was published, Ms. Schulte repeatedly attempted to contact plaintiff to verify the

quotations that would be attributed to him.  Plaintiff did not return Ms. Schulte's calls.  *Id.* ¶ 18.

       Ms. Schulte's first article, "Fighting to Remain Engulfed in Junk:  As Task Forces

Move in, Hoarders Strike Back in Court," appeared in The Post on June 18, 2006.  Ex. 1; Facts ¶

19.  The article reported on the events of October 20, 2005, plaintiff's subsequent lawsuit, the

work of the Arlington County "hoarding task force," and the phenomenon of hoarding generally.

Accompanying the article was a photograph of Mr. Crossan's condominium taken on October

20, 2005 by the inspectors (Ex. 4-S), which had been attached as an exhibit to the Arlington

County defendants' summary judgment motion in plaintiff's Virginia lawsuit. Mr. Shipkovitz had e-mailed a copy of this photograph to Ms. Schulte, who had also viewed it in the public court file at the Eastern District of Virginia courthouse. Facts ¶ 20.

Ms. Schulte's second article, "Hoarder's Eviction Was Legal, Judge Says," appeared in The Post on July 27, 2006. Ex. 2; Facts ¶ 22. This article reported on the June 22 summary judgment ruling in plaintiff's Virginia lawsuit and, like the June 18 article, quoted directly from materials in the court file. *Id.*

## ARGUMENT

### I.     DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S LIBEL CLAIM.

Under D.C. law, to prevail on a defamation claim the plaintiff must demonstrate

(1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm.

*Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 858 (D.C. Cir. 2006) (*quoting Beeton v. District of Columbia*, 779 A.2d 918, 923 (D.C. 2001)), *cert. denied*, 127 S. Ct. 1140 (2007). Plaintiff's claim fails because the statements that he challenges were not false, and because the statements were privileged reports of the official actions of Arlington County officials and the judicial proceedings initiated by plaintiff against those officials.

### A.     The Law Favors Dismissal of Libel Claims at the Earliest Possible Stage.

The D.C. Circuit has recognized that libel claims are an attack on speech, and that the mere pendency of a libel suit can have a seriously inhibiting effect upon free speech. It has therefore emphasized the importance of early dismissal of baseless claims:

4

> Libel suits, if not carefully handled, can threaten journalistic
> independence.  Even if many actions fail, the risks and high costs
> of litigation may lead to undesirable forms of self-censorship.  We
> do not mean to suggest by any means that writers and publications
> should be free to defame at will, but rather that suits—particularly
> those bordering on the frivolous—should be controlled so as to
> minimize their adverse impact upon press freedom.

*McBride v. Merrell Dow & Pharms. Inc.*, 717 F.2d 1460, 1466 (D.C. Cir. 1983); *see also*

*Washington Post Co. v. Keogh*, 365 F.2d 965, 968 (D.C. Cir. 1966) ("In the First Amendment

area, summary procedures are even more essential.  For the stake here, if harassment succeeds, is

free debate. . . .  Unless persons, including newspapers, . . . are assured freedom from the

harassment of lawsuits, they will tend to become self-censors.").  For these reasons, "defamation

actions should be disposed of at the earliest possible stage of the proceedings if the facts as

alleged are insufficient as a matter of law to support a judgment for the plaintiff."  *Dorsey v.

Nat'l Enquirer, Inc.*, 973 F.2d 1431, 1435 (9th Cir. 1992).

     **B.**    **The Alleged Defamatory Statements Are Not False.**

     In a defamation action, "the plaintiff has the burden of proving that the challenged

statements are both false and defamatory."  *Kendrick v. Fox Television*, 659 A.2d 814, 819 (D.C.

1995); *see also Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776 (1986) (private

figure libel plaintiff bears burden of proving falsity when publication is on a matter of public

concern).  Moreover, the plaintiff cannot meet his burden of proving falsity by pointing to slight

inaccuracies that do not affect the substantial truth of the challenged articles.  As the Supreme

Court has explained, "[m]inor inaccuracies do not amount to falsity so long as 'the substance, the

gist, the sting, of the libelous charge be justified.'"  *Masson v. New Yorker Magazine, Inc.*, 501

U.S. 496, 517 (1991) (citation omitted); *see also Weyrich v. New Republic, Inc.*, 235 F.3d 617,

627 (D.C. Cir. 2001) (emphasizing that "to be actionable, the story must be materially false," and

that it is not enough to show that the author has "merely hyperbolized" or "provided colorful

rhetorical description"); *Moldea v. N.Y. Times Co.*, 22 F.3d 310, 318 (D.C. Cir. 1994) ("Slight inaccuracies of expression are immaterial provided that the defamatory charge is true in substance." (quotations omitted)).  Under these standards, defendants are entitled to summary judgment, as plaintiff cannot show that the statements at issue are substantially false.

> 1.     **Statements Regarding the Condition of the Condominium**

Plaintiff's principal contention is that The Post articles inaccurately described the condominium in which he resided.  In particular, plaintiff complains of the following statements:

- Plaintiff "slept on top of his stuff on the floor under a blanket decorated with racing cars," Compl. ¶ 17.C;

- "[T]here were boxes in the bathtub," *id.* ¶ 17.D;

- The condominium, "from floor to ceiling, was crammed with 'rubbish, debris, paper, boxes, bags and all manner of containers,'" *id.* ¶ 17.E;

- "The kitchen was unusable," *id.* ¶ 17.F;

- A mental health worker visiting Mr. Crossan "became alarmed at the massive amount of junk in the condo—paper, boxes, bags, newspapers, trash—and called the fire marshal," *id.* ¶ 20.B.

The problem with plaintiff's contention is that the undisputed facts as developed in plaintiff's Virginia lawsuit show that every one of these statements is true or substantially true. In that lawsuit, the Arlington County defendants attached to their motion for summary judgment a series of photographs taken by the inspectors who visited the condominium on October 20, 2005.  Those photographs are attached to this motion as Exhibits 4A-LL, together with the affidavits (also filed with the Arlington County defendants' summary judgment motion) attesting

that they accurately depict the condition of the condominium as of October 20, 2005 (a fact that plaintiff did not contest in his summary judgment response in that case). Exs. 5-8; Facts ¶ 4.

These photographs conclusively demonstrate that The Post's report of the condition of the condominium is substantially true. Exhibits 4EE and 4II clearly show a mattress, blanket, and pillow buried amidst piles of newspapers, boxes, storage bins, cables, and office supplies.[1] *Compare* Compl. ¶ 17.C. Exhibit 4BB clearly shows "boxes in the bathtub".[2] Compl. ¶ 17.D. Exhibits 4A and 4B clearly show that the kitchen was in fact "unusable," Compl. ¶ 17.F—the counters and sink are covered with boxes and the stovetop is barely visible amid the clutter. And Exhibits 4C-4V and 4AA-4LL clearly show that the condominium was in fact "crammed with 'rubbish, debris, paper, boxes, bags and all manner of containers,'" Compl. ¶ 17.E.

Plaintiff's assertion that there were "no bags, other than merchant bags," and that there was "no trash" in the condominium, Compl. ¶ 20.B, is belied by these photographs. Exhibit 4A shows numerous plastic bags littered throughout the kitchen and opened cans and bottles piled up in the sink; Exhibit 4H shows paper and plastic bags filled with what appears to

---

[1] In his June 20, 2006 e-mail to Ms. Schulte, plaintiff contends that the "blanket was over a Tempurpedeic-clone memory foam mattress, and nothing was below it, i.e. there were no items under, over or in any way involved." Compl. Ex. B. The contention that Ms. Schulte's article was inaccurate because plaintiff slept *around* his stuff on the floor (as the photographs clearly show) rather than "on top of his stuff on the floor" is at best a minor inaccuracy that cannot support a defamation claim. *See Masson*, 501 U.S. at 517.

[2] Plaintiff's contention that the June 18, 2006 article "falsely implies that" the boxes in the bathtub were his, Compl. ¶ 17.D, is unsupported by anything in the article. The article says nothing about who owns the boxes, and indeed makes clear that at least some of the items in the condominium belonged to Mr. Crossan. Ex. 1. Moreover, even if the article implied that the boxes in the bathtub belonged to plaintiff—and even if they did not—that detail is immaterial. It is undisputed that most of the other items in the condominium belonged to plaintiff. And "the gist, the sting" of the article—that plaintiff lived in a condominium rendered uninhabitable by the accumulation of those things—is "justified." *Masson*, 501 U.S. at 517 (quotations omitted).

be paper; Exhibit 4N shows plastic Target bags filled with toiletries; and Exhibit 4R shows a corner of the condominium stacked with lamps, boxes, papers, a phone, a computer, etc.  Taken together, these photographs demonstrate that plaintiff cannot possibly prove that the articles' statements regarding the condition of the condominium are false.

Indeed, plaintiff himself confirmed to Ms. Schulte during interviews that the condominium was a mess.  As reported in the June 18, 2006 article, plaintiff told Ms. Schulte, "So I have five printers . . . .  So I have piles of books, piles of newspapers. . . .  This is America. There's no such thing as the neatness police."  Ex. 1; Facts ¶ 11.  During his interviews with Ms. Schulte, plaintiff also made a number of other statements about the condition of the condominium to the same effect.  For example, plaintiff told Ms. Schulte that a friend had recently said of him, "OK, Sam's a slob we all know that.  But he doesn't deserve this," referring to plaintiff's eviction from the condominium.  Facts ¶ 12.  Similarly, plaintiff admitted that the condominium "look[ed] like the back office of Jones Day."  Facts ¶ 13.[3]

In sum, there is no genuine issue as to the condition of the condominium in which plaintiff lived—and no basis upon which The Post's descriptions could be found to be materially false.

---

[3] Notwithstanding these admissions, plaintiff quibbles that he did not "admit[ ] that his place was a mess," Compl. ¶ 17.B, as reported in the June 18, 2006 article.  But the statements quoted above certainly amounted to an admission that the condominium was "a mess."  If there is a difference between an admission that plaintiff is a "slob" who kept "piles" of books and newspapers in his apartment, and an admission that the apartment was a "mess," it is too slight to support a defamation claim.  *See Masson*, 501 U.S. at 517.

### 2.    The Alleged Implication that Plaintiff Is a "Hoarder"

Plaintiff also alleges that the articles falsely suggest that he is a "hoarder." *Id.* ¶ 19.[4]  The undisputed evidence shows, however, that plaintiff cannot demonstrate that this alleged implication is false.  Both the photographs taken by the Arlington County inspectors and plaintiff's own statements to Ms. Schulte during interviews demonstrate that plaintiff meets the common understanding of "hoarding."

According to WebMD, a popular health website, you are engaging in what is commonly known as "hoarding" "[w]hen your junkaholic behaviors involve acquiring and keeping objects that appear to have limited if any value, and they begin to take over your living space."  Richard Trubo, *When People Hoard*, Health & Balance (WebMD 2003) (Ex. 14).[5]  The photographs show that the state of the condominium on October 20, 2005 unquestionably fits that definition.  There are newspapers, lamps, office supplies, old computer equipment, and other items "that appear to have limited if any value" everywhere, and the rooms are filled with bags, boxes, and other items that "take over" the "living space" in the condominium.  As the article explained, county officials accurately described the scene in their court filings:

> Only a 15-inch path ran through the two-bedroom condominium [plaintiff] shared with a roommate, county officials wrote in court papers.  The rest, from floor to ceiling, was crammed with "rubbish, debris, paper, boxes, bags and all manner of containers." . . . The kitchen was unusable:  The floor and counters were covered with legal documents from one of his cases.  "If one were to actually use the stove or oven," the county wrote, "it would certainly [engulf] the unit in flames."

---

[4] Neither of the articles states explicitly that plaintiff is a hoarder.  However, for purposes of this motion, defendants assume that the articles could reasonably be read to imply that plaintiff is a hoarder.

[5] The commonly accepted definition of "hoarding" in the psychological research literature is to the same effect:  "Hoarding has been defined as the 'acquisition of and failure to discard possessions that appear to be useless or of limited value.'"  Randy O. Frost & Tamara L. Hartl, *A Cognitive-Behavioral Model of Compulsive Hoarding*, 34 Behav. Res. Ther. 341 (1996) (Ex. 15).

Ex. 1 (final alteration in original) (*quoting* Ex. 10, at 3). That is a classic description of hoarding.

Plaintiff simply cannot deny that his behavior met the common understanding of hoarding. Indeed, in a less guarded moment he conceded as much. As Ms. Schulte reported in the June 18, 2006 story, after taking Ms. Schulte on a shopping trip to the Super Dollar Store to purchase a single telephone cord—and proceeding to purchase three telephone cords, an electric shaver, reading glasses, tools, and a jar of pickles—plaintiff described himself as "[h]oarding again." Facts ¶ 14; Ex. 1.

Plaintiff now complains that the term "hoarder" is associated with the collection of "open food, waste, pet, pet matter, vegetation or wreaths, trash, or any living matter." Compl. ¶ 9. But that suggestion finds no support in the common understanding of the term. *See Paul v. News World Comm'ns*, No. 01 CA 917, 2003 WL 23899002, at *9 (D.C. Super. Ct. Sept. 15, 2003) ("Using the 'ordinary meaning' of words is . . . the correct standard when determining the truth or falsity of statements." (quoting *Brasslett v. Coda*, 761 F.2d 827, 841 (1st Cir. 1985))). Most importantly, there is nothing in either article to imply that there was any such organic waste in the condominium. In deciding whether the challenged statements are defamatory, "the publication must be considered as a whole, in the sense in which it would be understood by the readers to whom it is addressed." *Clawson v. St. Louis Post-Dispatch, LLC*, 906 A.2d 308, 313 (D.C. 2006) (citation omitted). Considering the articles "as a whole," there is no false implication that organic waste was the problem.

Plaintiff further alleges that the June 18, 2006 article implies that he is mentally ill. The article, however, does not so state. To the contrary, it says that "researchers have just begun to study [hoarding] and its association with mental illness, brain dysfunction and obsessive-compulsive disorders." Ex. 1. There is obviously a world of difference between

saying that researchers have "begun to study" the association of certain behavior with mental illness and saying that people who engage in that behavior are in fact mentally ill. And the law of libel does not permit a plaintiff to blur such distinctions by alleging libel by implication, especially where (as here) the underlying factual statements are true.

"In entertaining claims of defamation by implication, courts must be vigilant not to allow an implied defamatory meaning to be manufactured from words not reasonably capable of sustaining such meaning." *White v. Fraternal Order of Police*, 909 F.2d 512, 519 (D.C. Cir. 1990). To maintain a claim of defamation by implication, a plaintiff must show not only that a defamatory inference "might reasonably be drawn from [the] materially true communication," but also that "the author . . . has done something *beyond the mere reporting of true facts* to suggest that the author . . . intends or endorses the inference." *Id.* at 520 (emphasis added). In other words, the challenged language "must not only be reasonably read to impart the false innuendo, but it must also affirmatively suggest that the author intends or endorses the inference." *Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580, 596 (D.C. 2000) (quotations omitted); *see also Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092-93 (4th Cir. 1993) (same).

As explained above, there is nothing inaccurate about The Post's description of plaintiff's living conditions. Nor is there anything alleged to be inaccurate about the statement that researchers were studying the association between hoarding and mental illness. *See* Ex. 15 (Frost & Hartl, *supra* note 5). The gist of this truthful reporting is that the association between hoarding and mental illness is unclear—or, to put it another way, that it is an open question whether one who hoards useless possessions should be considered mentally ill. Readers are free to draw their own conclusions, if they wish, but the holding of *White* and *Guilford* is that the conclusions they draw are their own—not the publisher's—in the absence of affirmative evidence in the articles themselves that the publisher endorses a particular conclusion. *White*,

11

909 F.2d at 519-20; *Guilford*, 760 A.2d at 596. There is no affirmative evidence in The Post's articles that The Post "endorse[d]" the conclusion that plaintiff is mentally ill. *White*, 909 F.2d at 520. To the contrary, The Post article was careful not to endorse any conclusions about the the association between hoarding and mental illness.

In sum, plaintiff cannot maintain a claim for defamation based upon an alleged implication that is true—that he is a hoarder—or upon an implication that The Post did not affirmatively endorse—that he is mentally ill.

### 3.    Other Allegedly Defamatory Statements

The additional statements of which plaintiff complains are also substantially true:

First, plaintiff challenges the statement in the June 18, 2006 article that "he works sporadically and has had long periods of unemployment." Ex. 1; Compl. ¶ 17.A. This statement is confirmed by plaintiff's own Amended Complaint in the Virginia lawsuit, filed on March 10, 2006, which alleged that plaintiff had "been out of business since October 20, 2005." Am. Compl., *Crossan v. County of Arlington Manager*, No. 05-CV-1219 (Ex. 9) ¶ 66. Plaintiff also verified this fact two months later in a May 16, 2006 interview with Ms. Schulte, in which he told her that he had "basically not worked since October 24," 2005. Facts ¶ 9.[6]  In another interview, plaintiff explained to Ms. Schulte that he did not "have a job right now," because of "the way the law profession works—people [who are] older [are] not looked kindly upon because of [the] pyramid." *Id.* ¶ 8. In this interview, plaintiff explained that he was "having a

---

[6] Plaintiff complains that the June 16, 2006 article overlooked the fact that he was employed by a law firm as of October 20, 2005. The fact that plaintiff was employed in October 2005, however, does not make the challenged statement, published eight months later, false. Even if plaintiff was working on October 20, 2005, he told Ms. Schulte in May 2006 that he had not worked since October 24. Moreover, in his interviews with Ms. Schulte prior to the publication of the June 16, 2006 article, plaintiff specifically asked her *not* to mention his previous employment with the law firm in the article. Facts ¶ 9.

hell of a time getting a job right now even with temp agencies," and that his age (sixty) was "like the kiss of death for getting a job." *Id.* Finally, plaintiff also told Ms. Schulte that he'd had a number of jobs off and on over the years, and that he was doing only short-term contract attorney work at the time he was locked out of the condominium. These statements in plaintiff's own filings and in his interviews with Ms. Schulte demonstrate that plaintiff will not be able to prove the falsity of the statement in the June 18, 2006 article regarding his employment history.

Second, plaintiff challenges the statement in the June 18, 2006 article that "Crossan's family hired a lawyer, refused to allow [plaintiff] back into the condominium and hired a moving company to haul his things to a storage facility in Fairfax County, where they still sit," as well as a similar statement in the July 27, 2006 article. Exs. 1, 2; Compl. ¶¶ 17.H, 20.C. Plaintiff does not dispute the substantial truth of these statements. He alleges simply that it was Mr. Crossan's *brother*, not any other relatives, who took the action described, and that a home improvement and painting contractor, not a moving company, hauled away plaintiff's things. Compl. ¶¶ 17.H, 20.C. But these alleged discrepancies do not affect the substance of the statements. "Minor inaccuracies do not amount to falsity so long as the substance, the gist, the sting, of the libelous charge be justified." *Masson*, 501 U.S. at 517 (internal quotations omitted). There is no question that the gist of The Post's report was accurate—that a member of Mr. Crossan's family hired a lawyer, refused to allow plaintiff into the apartment, and had his belongings hauled to a storage facility. Whether it was Mr. Crossan's brother or other family members who took that action, and whether it was a "moving" company or a "home improvement" company that hauled away his belongings, is immaterial.

Third, plaintiff challenges the statement in the June 18, 2006 article that his court filings in the Virginia lawsuit were "typed single-space or handwritten on 100 percent recycled paper." Ex. 1; Compl. ¶ 17.I. Plaintiff says that this statement is "mostly false," because only

one pleading was handwritten and none was printed on recycled paper. In fact, however, it is beyond dispute that several of plaintiff's pleadings in the Virginia lawsuit were either "typed single-space or handwritten," as The Post reported. Facts ¶ 17; *see* Exs. 9, 11. And there is nothing defamatory about the statement that court filings were printed on recycled paper.

Finally, plaintiff challenges the truth of a quotation in the July 27, 2006 article from defendant Mary Curtius, an Arlington County spokeswoman—that "[e]very count [of plaintiff's Virginia lawsuit] was found to be without merit." As the Eastern District of Virginia's memorandum opinion granting the Arlington County defendants' summary judgment shows, however, this statement is true. That court found no evidence to support any of plaintiff's claims, and granted summary judgment on all counts. Facts ¶ 21; Ex. 12.[7]

### C.    The Post Articles Are Protected by the Fair Report Privilege.

Even if some of the underlying descriptions of plaintiff's apartment were materially false, The Post's publication of those descriptions was privileged as a fair and accurate report of official actions and proceedings. This privilege applies to "reports of proceedings before any court," as well as to "reports of any official . . . action taken by any officer or agency of government." *Phillips v. Evening Star Newspaper Co.*, 424 A.2d 78, 88 (D.C. 1980). To fall within the privilege, the report must be "(a) accurate and complete, or a fair abridgement of what has occurred, and (b) published for the purpose of informing the public as

---

[7] Plaintiff contends that "[a]ccusing an attorney of filing papers that are 'without merit' is a serious accusation." Compl. ¶ 20.A. That is simply untrue. Courts (including this Court) find claims to be "without merit" or "meritless" all the time. *See, e.g.*, *United States v. Brown*, 503 F. Supp. 2d 226, 235 (D.D.C. 2007) ("The defendant's arguments are without merit and should be denied."); *Walker v. Johnson*, 501 F. Supp. 2d 156, 175 (D.D.C. 2007) ("Dr. Walker's contention that the letter did not create the appearance of an official statement by the EPA is without merit."); *Abur v. Republic of Sudan*, 437 F. Supp. 2d 166, 176 (D.D.C. 2006) (plaintiff's assertion "meritless"). Plaintiff appears to be confusing a finding that a claim is "without merit" (which is hardly a "serious accusation") with a finding that a claim violates Federal Rule of Civil Procedure 11 (which is serious indeed).

to a matter of public concern." *Id.* (quotations omitted). The privilege applies to news reports of an official action or proceeding so long as the "news reports are presented in such a manner that the average reader would be likely to understand the communication to be a report on—or summary of—an official document or proceeding." *White*, 909 F.2d at 527.

The Post articles here were privileged in two respects: they reported not only on the official action of County officials in closing the condominium for violations of fire and building codes, but also on the judicial proceedings initiated by plaintiff challenging those actions. The lead paragraph of the first article reported the action of County officials in condemning the condominium as "Unfit for Human Habitation." Ex. 1. The article proceeded to describe the formation of the "newly reconstituted hoarding task force in Arlington" and the lawsuit filed by plaintiff in the Eastern District of Virginia complaining that the County's actions violated his civil rights. *Id.* It was in the context of the reporting on these official actions and judicial proceedings—matters of obvious public interest and concern—that the descriptions of plaintiff's apartment were presented. Indeed, The Post provided not only a "fair abridgement" of the County's findings concerning the condition of the apartment, it quoted directly from the County's pleadings, as follows:

> Only a 15-inch path ran through the two-bedroom condominium [plaintiff] shared with a roommate, county officials wrote in court papers. The rest, from floor to ceiling, was crammed with "rubbish, debris, paper, boxes, bags and all manner of containers." . . . The kitchen was unusable: The floor and counters were covered with legal documents from one of his cases. "If one were to actually use the stove or oven," the county wrote, "it would certainly [engulf] the unit in flames."

Ex. 1 (final alteration in original) (quoting Ex. 10, at 3). As explained above, plaintiff's challenge to the truth of these statements is squarely contradicted by the undisputed evidence. But even if the County's descriptions were false, The Post had a privilege to publish a "fair

abridgement"—even better, a direct quotation—of the County's findings and contentions.  Facts ¶¶ 15-16; *see* Ex. 10, at 3.  It also had a privilege to report on the outcome of plaintiff's lawsuit—that "[e]very count was found to be without merit."  Ex. 2.

## II.    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S INVASION OF PRIVACY CLAIM.

Plaintiff attempts to state a claim for false light invasion of privacy—a tort that is similar to the tort of defamation and is subject to essentially the same defenses.  *Blodgett v. Univ. Club*, 930 A.2d 210, 223 (D.C. 2007).  It requires:  "(1) publicity (2) about a false statement, representation or imputation (3) understood to be of and concerning the plaintiff, and (4) which places the plaintiff in a false light that would be offensive to a reasonable person."  *Kitt v. Capital Concerts, Inc.*, 742 A.2d 856, 859 (D.C. 1999) (*citing* Restatement (Second) of Torts § 652E (1977)).  Plaintiff alleges that defendants engaged in false light invasion of privacy by "portray[ing]" him "as an unemployed unemployable professional with 'mental illness, brain dysfunction and obsessive-compulsive disorder,'" and by publishing a photograph of the condominium that he himself e-mailed to Ms. Schulte (*see* Ex. 15) and that appeared in the public court file in the Eastern District of Virginia.  Compl. ¶ 25.[8]

This claim fails for the same reason that plaintiff's defamation claim fails:  he cannot establish that anything The Post reported was substantially false.  There is no allegation

---

[8] Count Two of the Complaint alleges "invasion of privacy" through "false light" only, and not the tort of "disclosure of private facts."  Plaintiff could not possibly establish the elements of disclosure of private facts, both because there was nothing "private" about the underlying facts once County officials made them the subject of official action, and because the condition of plaintiff's apartment and that official action had become matters of legitimate public concern. *See* Restatement (Second) of Torts § 652D cmt. b (1977).  Indeed, plaintiff himself injected those facts into the public realm by filing a lawsuit against Arlington County officials alleging civil rights violations, asking a Post reporter to write a story about his situation, sitting for multiple interviews and providing a photograph of his apartment.  *See Harrison v. Washington Post Co.*, 391 A.2d 781, 784 (D.C. 1978) ("[T]here is no protected privacy interest in preventing the further publicity of what" a plaintiff "himself left open to the public eye.").

that the published photograph misrepresented the condition of the apartment. And, as explained above, the articles do not "state[], represent[] or imput[e]" that plaintiff is mentally ill. *Kitt*, 742 A.2d at 859. Rather, the June 18, 2006 article reports that "researchers have just begun to study [hoarding] and its association with mental illness . . . ." Ex. 1. The article does not say that any such association necessarily exists or has been established.[9]

Finally, plaintiff alleges in his Complaint that the photograph accompanying the June 18 article was "illegally taken," Compl. ¶ 25, apparently referring to his contention that the Arlington County inspectors' October 20, 2005 entry into the condominium was unlawful. That allegation, even if true, would not support an invasion of privacy claim against The Post, which did not enter the apartment or take the photograph. *See Bartnicki v. Vopper*, 532 U.S. 514, 535 (2001) (information lawfully acquired by media from source that obtained the information unlawfully is protected by the First Amendment). Indeed, plaintiff himself sent this photograph to Ms. Schulte, *see* Ex. 15, so it is difficult to see how plaintiff could complain about the publication of the photograph with Ms. Schulte's story.

Even if, however, the question whether the photograph was taken during a lawful entry into the condominium were relevant, that question was already decided against plaintiff in his lawsuit against Arlington County. In that case, *Crossan v. County of Arlington Manager*, the court concluded that "[t]he unrebutted evidence is that the" Arlington County inspectors who took the photographs "performed a lawful inspection of the Condo." Ex. 12, at 7. Plaintiff is collaterally estopped from raising the issue again in this litigation by arguing that the photographs taken by the inspectors were somehow unlawful.

---

[9] Far from invading plaintiff's privacy, Ms. Schulte agreed to plaintiff's request not to report several facts that he wanted to keep private, including his age and his employer on October 20, 2005, and not to publish a photograph of him, because he was sensitive about his appearance. *See* Facts ¶ 9.

17

## <u>CONCLUSION</u>

For the foregoing reasons, defendants' motion for summary judgment should be granted.

Respectfully submitted,

WILLIAMS & CONNOLLY LLP

By: <u>/s/ Kevin T. Baine</u>
    Kevin T. Baine (Bar No. 238600)
    Jonathan Kravis (Bar No. 973780)

725 Twelfth Street, N.W.
Washington, DC  20005
(202) 434-5000

October 22, 2007

*Attorneys for Defendants The Washington Post Company, WP Company LLC, and Brigid Schulte*

18

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| SAMUEL SHIPKOVITZ, | ) | |
| | ) | |
| | ) | Civil Action No. 07-1053 (RCL) |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| THE WASHINGTON POST COMPANY, et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

Pursuant to Local Rule 56.1, Defendants The Washington Post Company, WP Company LLC (collectively "The Post"), and Brigid Schulte, by and through counsel, hereby set forth the following material facts as to which they contend there is no genuine issue:

1.    Beginning in December 1996, plaintiff lived as a tenant in his friend Stephen Crossan's condominium.  Compl. ¶ 7.

2.    Sometime thereafter, Mr. Crossan was arrested for felony arson, found not guilty by reason of insanity, and committed to a mental health facility.  *Id.*  Mr. Crossan stayed at the condominium while on leave passes from the mental health facility, *id.*, and as part of that arrangement members of the Arlington County Program Assertive Community Treatment Team ("PACT") periodically visited Mr. Crossan to ensure his mental stability.  Aff. of Sharita Hughes (Ex. 5); Mem. Op., *Crossan v. County of Arlington Manager*, No. 05-1219, at 2 (E.D. Va. June 28, 2006) ("*Crossan*") (Ex. 12).

3.    A PACT representative visiting the condominium on October 6, 2005 became concerned about the condition of the condominium and relayed her concerns to the fire

marshal. *Id.* On October 20, 2005, Deputy Fire Marshall Samuel K. Grierson and building code inspector Richard Freeman inspected the condominium. *Id.*; Ex. 12 (Mem. Op., *Crossan*), at 3.

4.      Photographs taken during that inspection are submitted as Exhibits 4A-LL. These photos truly and accurately depict the condition of the condominium on October 20, 2005. Aff. of Samuel K. Grierson (Ex. 6); Aff. of Richard A. Freeman (Ex. 7); Aff. of Stephen Crossan (Ex. 8).

5.      As a result of this inspection, violation notices and a placard declaring the condominium "Unfit for Human Habitation" were posted on the door of the condominium, and admission to the apartment was prohibited until further authorization from inspection officials. Compl. ¶ 8; Ex. 6 (Grierson Aff.); Ex. 7 (Freeman Aff.); Ex. 12 (Mem. Op., *Crossan*), at 3.

6.      On October 24, 2005, plaintiff filed suit in the United States District Court for the Eastern District of Virginia against Arlington County officials and others. *Crossan v. County of Arlington Manager*, No. 05-CV-1219 (E.D. Va.). In his Amended Complaint, a copy of which is submitted as Exhibit 9, plaintiff claimed that the inspection and closing of the condominium violated the Fourth, Fifth and Fourteenth Amendments to the United States Constitution and constituted intentional business interference. Am. Compl., *Crossan* (Ex. 9) ¶¶ 60-67. Plaintiff requested damages and an injunction allowing him back into the condominium, requiring the Arlington County defendants to obtain court permission before conducting another inspection, and instructing the Arlington County Department of Human Services to maintain its clients' confidences. *Id.* ¶¶ 54, 55, 64, 67, 73.

7.      While plaintiff's Virginia lawsuit was pending, he contacted Washington Post reporter Brigid Schulte numerous times, asking her to write a story about the case. Decl. of Brigid Schulte (Ex. 3) ¶ 3. Ms. Schulte proceeded to interview plaintiff several times. She also

spoke with numerous other sources and conducted extensive research on the psychological

phenomenon known as "hoarding." *Id.* ¶ 4.

        8.     During an interview with Ms. Schulte prior to the publication of the first

of the two articles that are the subject of this suit, plaintiff told Ms. Schulte that "one of the

reasons I don't have a job right now [is] the way the law profession works—people [who are]

older [are] not looked kindly upon because of [the] pyramid."  In this interview plaintiff also said

he was "having a hell of a time getting a job right now even with temp agencies," and that his

age (sixty) was "like the kiss of death for getting a job." *Id.* ¶ 5.

        9.     During a May 16, 2006 interview with Ms. Schulte, plaintiff told her that

he had to "pay in advance" for a deposition he was conducting in his suit against Arlington

County because he was "not a regularly practicing attorney."  In this interview, plaintiff

explained that he had "basically not worked since October 24."  He also expressly asked Ms.

Schulte not to include in her story his age or the fact that, on the day Arlington County officials

visited the condominium, he had been working as a contract attorney for the D.C. law firm

Howrey & Simon. *Id.* ¶ 6.  Plaintiff also asked Ms. Schulte not to publish a photograph of him

along with her article. *Id.*  Ms. Schulte agreed to these requests. *Id.*

        10.    During an interview with Ms. Schulte, plaintiff explained that he had had a

number of jobs off and on over the years, and that when he was locked out of the condominium

he was doing short-term contract attorney work. *Id.* ¶ 7.

        11.    During an interview with Ms. Schulte, plaintiff described the condition of

the condominium in which he had lived as of October 20, 2005 in these words:  "So I have five

printers . . . .  So I have piles of books, piles of newspapers. . . .  This is America.  There's no

such thing as the neatness police." *Id.* ¶ 8.

12.    During an interview with Ms. Schulte, plaintiff told her that a friend had told him, "OK, Sam's a slob, we all know that.  But he doesn't deserve this," referring to Arlington County's response to the condition of the condominium.  *Id.* ¶ 9.

13.    During an interview with Ms. Schulte, plaintiff said, "did my apartment look like the back office of Jones Day?  Yeah, so what?"  *Id.* ¶ 10.

14.    On one occasion, Mr. Shipkovitz took Ms. Schulte to a storage unit where he kept some of his belongings.  During that trip, they stopped at a Super Dollar Store on Columbia Pike so that he could purchase a telephone cord.  At the store, Mr. Shipkovitz purchased three telephone cords, an electric shaver, reading glasses, tools, and a jar of pickles.  Referencing these purchases, Mr. Shipkovitz described himself as "hoarding again."  *Id.* ¶ 11.

15.    On October 27, 2005, Arlington County filed an Opposition to Plaintiff's Request for Temporary Restraining Order and Permanent Injunction in connection with plaintiff's Virginia lawsuit.  In that filing, a copy of which is submitted as Exhibit 10, the County stated that its employees entered the condominium on October 20, 2005, and found "that there was rubbish, debris, papers, boxes, bags and all manner of containers and variety of materials piled and strewn from floor to ceiling in every room of the apartment except the bedroom where Mr. Crossan slept."  Ex. 10, at 3 (emphasis omitted).

16.    In its October 27, 2005 opposition, the County wrote that the "photos" of the condominium taken on October 20, 2005 and attached to this motion as Exhibit 4 "also clearly reveal that the kitchen is unusable" and that "if one were to actually use the stove or oven," it "would certainly engulf the unit in flames."  Ex. 10, at 3.

17.    On June 2, 2006, plaintiff filed in the *Crossan* case a handwritten Transmittal of First Draft of Proposed Jury instructions, a copy of which is submitted as Exhibit 11.

18.    Ms. Schulte wrote a story based on her interviews with plaintiff, the court filings in his lawsuit, and other research. Before the story was published, Ms. Schulte repeatedly attempted to contact plaintiff to verify the quotations that would be attributed to him, but plaintiff did not return Ms. Schulte's calls. Ex. 3 (Schulte Decl.) ¶ 12.

19.    On June 18, 2006, *The Washington Post* published Ms. Schulte's article, "Fighting to Remain Engulfed in Junk: As Task Forces Move in, Hoarders Strike Back in Court." Ex. 1. The article reported on the events of October 20, 2005, plaintiff's subsequent lawsuit, the work of the Arlington County "hoarding task force," and the phenomenon of hoarding generally.

20.    Accompanying the June 18 article was a photograph of plaintiff's apartment, taken by the inspectors on October 20, 2005. Ms. Schulte received this photograph from plaintiff, who e-mailed it to her prior to the publication of the June 18 article. *See* Ex. 15. Ms. Schulte also saw this photograph in the public court file at the Eastern District of Virginia courthouse. Ex. 3 (Schulte Decl.) ¶ 14.

21.    On June 22, 2006, the United States District Court for the Eastern District of Virginia granted the Arlington County employee defendants' motion for summary judgment in plaintiff's Virginia lawsuit. In its opinion, a copy of which is submitted as Exhibit 12, the court ruled that: (1) the "unrebutted evidence is that the" October 20 inspection was lawful, Ex. 12, at 7; (2) there was "no evidence" to support plaintiff's intentional business interference claim, *id.* at 8; (3) there was "no basis" to grant plaintiff's request for an injunction, *id.* at 5-6;

and (4) plaintiff's request for damages from the condominium's security company was based on "pure speculation" and was without "evidentiary support," *id.* at 9.

22.    On July 27, 2006, *The Post* published a second article by Ms. Schulte, entitled "Hoarder's Eviction Was Legal, Judge Says."  Ex. 2.  This article reported on the June 22 summary judgment ruling in plaintiff's Virginia lawsuit and quoted directly from the parties' pleadings and the judge's order in that case.

Respectfully submitted,

WILLIAMS & CONNOLLY LLP

By: /s/ Kevin T. Baine
     Kevin T. Baine (Bar No. 238600)
     Jonathan Kravis (Bar No. 973780)

725 Twelfth Street, N.W.
Washington, DC  20005
(202) 434-5000

October 22, 2007                    *Attorneys for Defendants The Washington Post Company, WP Company LLC, and Brigid Schulte*

6

## **CERTIFICATE OF SERVICE**

I, Jonathan Kravis, hereby certify that on this 22nd day of October, 2007, I caused

copies of the foregoing Motion for Summary Judgment, Memorandum in Support of Motion, and

Statement of Material Facts Not in Dispute to be served on the following via First Class Mail:

Samuel Shipkovitz
5829 Nicholson Street
Pittsburgh, PA 15217

Ara L. Tramblian, Deputy County Attorney
2100 Clarendon Boulevard, Suite 403
Arlington, VA 22201

           /s/ Jonathan Kravis
           Jonathan Kravis (D.C. Bar No. 973780)

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| SAMUEL SHIPKOVITZ, | ) | |
| | ) | |
| | ) | Civil Action No. 07-1053 (RCL) |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| THE WASHINGTON POST COMPANY, et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**INDEX OF EXHIBITS**

Brigid Schulte, "Fighting to Remain Engulfed in Junk:  As Task Forces Move in, Hoarders Strike Back in Court," Wash. Post, June 18, 2006 ............................................................ 1

Brigid Schulte, "Hoarder's Eviction Was Legal, Judge Says," Wash. Post, July 27, 2007 .......... 2

Declaration of Brigid Schulte ............................................................................ 3

Photographs of Stephen Crossan's condominium taken on October 20, 2005 (filed under seal) .. 4

Affidavit of Sharita Hughes (filed under seal) ............................................................ 5

Affidavit of Samuel K. Grierson (filed under seal) ...................................................... 6

Affidavit of Richard A. Freeman (filed under seal) ...................................................... 7

Affidavit of Stephen Crossan (filed under seal) .......................................................... 8

Amended Complaint, *Crossan v. County of Arlington Manager*, No. 05-CV-1219 (E.D. Va. Oct. 24, 2005) ........................................................................................ 9

Opposition to Plaintiff's Request for Temporary Restraining Order and Permanent Injunction, *Crossan v. County of Arlington Manager*, No. 05-CV-1219 (E.D. Va. Oct. 27, 2005) ...................................................................................... 10

Transmittal of First Draft of Proposed Jury Instructions, *Crossan v. County of Arlington Manager*, No. 05-CV-1219 (E.D. Va. June 2, 2006) ........................................ 11

Memorandum Opinion, *Crossan v. County of Arlington Manager*, No. 05-CV-1219 (E.D. Va. June 22, 2006) ................................................................................... 12

E-mail from Samuel Shipkovitz to Brigid Schulte (June 2, 2006) plus attachment .................... 13

Richard Trubo, *When People Hoard*, Health & Balance (WebMD 2003) ................................... 14

Randy O. Frost & Tamara L. Hartl, *A Cognitive-Behavioral Model of Compulsive Hoarding*, 34 Behav. Res. Ther. 341 (1996).................................................................. 15

# EXHIBIT 1

FOCUS - 1 of 1 DOCUMENT

Copyright 2006 The Washington Post

# The Washington Post

## washingtonpost.com

The Washington Post

June 18, 2006 Sunday
Final Edition

**SECTION:** A Section; A01

**LENGTH:** 1455 words

**HEADLINE:** Fighting to Remain Engulfed in Junk;
As Task Forces Move In, Hoarders Strike Back in Court

**BYLINE:** Brigid Schulte, Washington Post Staff Writer

**BODY:**

Sam Shipkovitz came home late one evening to the swank Waterford House high-rise condominium building on Crystal Drive, where he'd lived for eight years, to find the door to his unit bolted shut. A bright yellow fire marshal's condemnation placard was fastened over the peephole: "Unfit for Human Habitation."

That was in October. He hasn't lived there since.

Four days after he was locked out of Unit 314, Shipkovitz filed suit against Arlington County officials in federal court claiming that the eviction violated his civil rights. It was among the first suits of its kind. "So I have five printers. . . . So I have piles of books, piles of newspapers," Shipkovitz said. "This is America. There's no such thing as the neatness police."

But there is a newly reconstituted hoarding task force in Arlington. And in an increasingly dense urban environment, officials say, there is simply no room for what may have been overlooked in the past as eccentric collecting.

These days, task force members say, public safety has to trump civil rights. The conflict will be decided by the courts, as hoarding task forces become more aggressive and people such as Shipkovitz fight back.

Shipkovitz is a patent attorney, though he works sporadically and has had long periods of unemployment. He also has a doctorate in electrical engineering; his dissertation was titled "Automated Pattern Recognition of Irradiated Chromosomes." He admits that his place was a mess. Yes, he slept on top of his stuff on the floor under a blanket decorated with racing cars. And yes, there were boxes in the bathtub.

But county officials saw something far more extreme.

Only a 15-inch path ran through the two-bedroom condominium Shipkovitz shared with a roommate, county officials wrote in court papers. The rest, from floor to ceiling, was crammed with "rubbish, debris, paper, boxes, bags and all manner of containers."

The closets were jammed with heavy power tools  --  Shipkovitz said he used to run a construction business on the side. The bumper of an old Mustang, its steering wheel and one of its bucket seats lay in the living room. Those belonged to his roommate, he said. The kitchen was unusable: The floor and counters were covered with legal documents from one of his cases. "If one were to actually use the stove or oven," the county wrote, "it would certainly [engulf] the unit in flames."

Fighting to Remain Engulfed in Junk; As Task Forces Move In, Hoarders Strike Back in Court The Washington Post
June 18, 2006 Sunday

Capt. Tom Polera, Arlington's assistant fire marshal and a member of the task force, is not concerned about neatness. He cares about whether firefighters and paramedics can get into a home such as Shipkovitz's and then, more importantly, get out.

In the past year and a half, Arlington's hoarding task force has dealt with 34 cases. And, according to court documents, it has locked 18 people out of their homes. The properties of 10 suspected hoarders await Polera's inspection.

"There's a fine line between someone's freedom, the whole 'king of your own castle' thing, and when they're jeopardizing the safety of themselves and others," Polera said. "There's no doubt in my mind we would either injure or kill a number of firefighters."

Local officials have been struggling with the issue as they find that compulsive hoarders are everywhere. Hoarding task forces are springing up in increasingly crowded jurisdictions throughout the country.

In New York recently, a man was trapped in his apartment for two days after piles of paper fell on him. In Maryland, a woman's children were taken away because her house was packed. In Arlington last year, officials estimate, five fires were associated with hoarding. And in Alexandria, a hoarder died in 2004 when his cigarette ignited piles of trash.

Shipkovitz lived in a building with 68 units on 18 floors.

"We take a more aggressive approach in multi-family settings," said Rob Dejter, a Montgomery County code enforcement official and part of the county's Working Group on Hoarding. "Someone out on a two-acre parcel is very different from someone in a condominium, rental apartment or townhouse who has rotting meat, roaches, organic waste, mice, rats and bacteria that can become airborne."

The hoarders found by the task forces include lawyers, doctors, professors, government officials. They feel compelled to acquire stuff and are unable to organize it and incapable of throwing anything away.

Though researchers have just begun to study this behavior and its association with mental illness, brain dysfunction and obsessive-compulsive disorders, they estimate that 1.4 million Americans -- and that might be a gross underestimation -- cannot stop themselves.

In the past, hoarders were rarely found out. They were discovered only if someone complained to authorities. The officials who investigated had few options. "All we could do was put people on the street," said Mike Conner, former chief fire marshal in Alexandria.

When Alexandria sheriff's deputies wheeled a wailing 83-year-old hoarder out of her apartment in an office chair in 1997 and dumped her and 40 years' worth of newspapers on the side of the street, Conner figured there had to be a better way. So he enlisted fire and building code inspectors and mental health, geriatric and social workers into a task force.

Once members began sharing information, they discovered that there were far more hoarders than they thought. Then, last year, news broke of Ruth Kneuven, the "cat lady" who hoarded nearly 500 living and dead cats, and hoarding complaints in the Washington region went through the roof.

Shipkovitz, who had moved into his friend Steve Crossan's condominium in December 1996, was turned in by a social worker visiting Crossan who called the fire department.

Most task forces try to work with hoarders, though the help is often refused. So, many hoarders are evicted.

In some instances, task force members give hoarders time to clean up. But in cases in which they deem the danger imminent, such as in Shipkovitz's, they immediately lock the doors, condemn the property, cut the utilities and evict the hoarder. Residents, some of whom decamp to hotels, shelters, friends' houses or their cars, can generally return during daylight hours to dig themselves out. But they cannot sleep there.

Arlington fire inspectors opened the condominium once a week for up to five hours to allow Shipkovitz to clean up. Progress was slow. After six weeks, Crossan's family hired a lawyer, refused to allow Shipkovitz back into the condominium and hired a moving company to haul his things to a storage facility in Fairfax County, where they still sit.

"As long as we see progress, we work with them," said Pat Walker, an Alexandria Fire Department inspector and member of the hoarding task force. "If not, that's when we get firm. Sometimes we have to give them an hour to get out. It's all on a case-by-case basis."

Fighting to Remain Engulfed in Junk; As Task Forces Move In, Hoarders Strike Back in Court The Washington Post
June 18, 2006 Sunday

That, legal scholars say, is a problem. Deciding who gets evicted and when is a subjective call. And that could lead to inconsistent enforcement, which is a civil rights violation.

"What constitutes unlawful messiness as opposed to acceptable messiness is very much in the eye of the beholder," said Jonathan Turley, a constitutional law scholar at George Washington University. "If you end up with a Felix Unger inspector, most every college student would be declared a hoarder."

Henry St. John Fitzgerald, former assistant U.S. attorney in Virginia and a friend of Shipkovitz's, is rallying advocates of private property rights to his cause. "Sam Shipkovitz is a hoarder. . . . But that's not the county's business," he said. "Locking him out -- that's government interference."

Fairfax County Supervisor Penelope A. Gross (D-Mason) has pushed the Metropolitan Washington Council of Governments to devise a regional hoarding plan. She concedes that lockouts and forced cleanups are intrusive. "This is still evolving," she said. "And it's a whole lot better than leaving it alone like it used to be, where people would die in their hoarding houses because nobody knew."

Shipkovitz's court filings are typed  single-space or handwritten on 100 percent recycled paper. In brackets, he writes asides such as "Presently staying in moldy basement apartment -- have to fight cat for a sofa to sleep on."

Crossan lives alone in the cleaned-out condominium, able to sit for the first time in a chair in the living room with a clear view of the pool. "It feels empty," he said.

On a recent balmy evening, during a visit to his storage unit, Shipkovitz passed a Super Dollar Store on Columbia Pike and had to stop. He needed a 25-foot telephone cord. He bought three. And an electric shaver. And reading glasses. And tools. And a jar of pickles.

"Hoarding again," he said.

**LOAD-DATE:** June 18, 2006

# EXHIBIT 2

Hoarder's Eviction Was Legal, Judge Says The Washington Post July 27, 2006 Thursday

Copyright 2006 The Washington Post

# The Washington Post

# washingtonpost.com

The Washington Post

July 27, 2006 Thursday
Final Edition

**SECTION:** Metro; B09

**LENGTH:** 675 words

**HEADLINE:** Hoarder's Eviction Was Legal, Judge Says

**BYLINE:** Brigid Schulte, Washington Post Staff Writer

**BODY:**

Sam Shipkovitz first railed against what he called Arlington's "neatness police" when officers declared his condo a fire hazard because it was crammed with too much of his stuff. They locked him out. So he sued the Arlington County hoarding task force in federal court, saying his civil rights were violated.

Now, a federal judge has dismissed his case.

County officials, stung by the publicity Shipkovitz's hoarding case generated, hailed the decision. "Every count was found to be without merit," Arlington spokeswoman Mary Curtius said.

The case was always a little unusual.

It all started in 1996. That's when Shipkovitz, who has a PhD in electrical engineering as well as a law degree and was working as a patent lawyer, moved into the Crystal City condominium owned by his friend Stephen Crossan. Crossan, a patent examiner, had just been found not guilty by reason of insanity of an arson charge and was committed to a state mental institution.

He was released in 2004 and came back to the condo to live with Shipkovitz. Mental health workers visited Crossan daily. It was one of those workers who in October became alarmed at the massive amount of junk in the condo -- paper, boxes, bags, newspapers, trash -- and called the fire marshal.

In his lawsuit, Shipkovitz contended that when the fire inspectors showed up Oct. 20, they were trespassing. Shipkovitz wrote that Crossan had opened the door only for the mental health social worker and didn't realize what was happening.

"They didn't have a warrant. My room had 'No Trespassing' signs," Shipkovitz said. "So even if they had permission, which they didn't, they didn't have any permission to go into my bedroom."

The county countered that Crossan willingly opened the door to the inspectors. U.S. District Judge Claude M. Hilton, in his June 22 order, agreed: "There is no evidence that they engaged in any misconduct or violated any law while performing said inspection."

Shipkovitz's case has generated considerable publicity as cities and counties become more densely crowded and local officials see hoarding not as private, eccentric behavior, but as a public nuisance. While taking depositions, Shipkovitz discovered that, including himself, the Arlington hoarding task force had locked 18 people out of their homes in the past year.

Hoarder's Eviction Was Legal, Judge Says The Washington Post July 27, 2006 Thursday

Task force officials, who are becoming more aggressive in dealing with hoarders as the area becomes more urbanized, say huge accumulations of junk are a fire hazard. But property rights advocates have declared that enforcement is uneven at best and invasive at worst.

In the past, hoarders were found out only when someone called to complain. Now, task force members -- officials who work in fire prevention, code inspection and mental health and elder care -- are often on the lookout for hoarders. To confirm their suspicions, they have to ask for a homeowner's permission to go inside. If they are refused but have sufficient evidence, they can get a search warrant from a magistrate.

In his lawsuit, Shipkovitz also charged county officials with "intentional business interference" for locking him out of the condo and keeping him from his patent attorney business. However, fire marshals allowed Shipkovitz into the condo four or five times for a total of 17 hours, Hilton wrote.

By December, Crossan's family had become involved, asking fire marshals to stop letting Shipkovitz in. In February, the family hired a moving company to relocate Shipkovitz's junk to two storage units.

Hilton ruled that any complaint Shipkovitz may have about his business being hurt should be addressed to Crossan, the owner of the condo, not the county.

Since Oct. 20, when the fire marshal ordered the locks changed and the condo condemned, Shipkovitz has been staying at a warehouse he owns in the District or living with a friend who has collecting issues of his own. "He doesn't want anyone to know where he lives," Shipkovitz said. "He's afraid he'll be raided, too, and end up on the street. He knows my life has been destroyed."

**LOAD-DATE:** July 27, 2006

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SAMUEL SHIPKOVITZ,                    )
                                      )
                        Plaintiff,    )        Civil Action No. 07-1053 (RCL)
                                      )
            vs.                       )
                                      )
THE WASHINGTON POST COMPANY, et al.   )
                                      )
                        Defendants.   )
_____)

## DECLARATION OF BRIGID SCHULTE

I, Brigid Schulte, hereby declare as follows:

1.      I am a reporter for The Washington Post.  I have been a reporter for The Post since May 24, 1999.

2.      I am the author of the two articles that are the subject of this dispute: "Fighting to Remain Engulfed in Junk:  As Task Forces Move in, Hoarders Strike Back in Court," which appeared in The Post on June 18, 2006; and "Hoarder's Eviction Was Legal, Judge Says," which appeared in The Post on July 27, 2006.

3.      I began working on these articles after receiving numerous phone calls from Samuel Shipkovitz requesting that I write a story about him.

4.      In researching these articles, I interviewed Mr. Shipkovitz several times both in person and by phone, spoke with numerous other sources, conducted extensive research on the psychological phenomenon known as "hoarding," and reviewed the public court file in *Crossan v. County of Arlington, Manager*, No. 05-CV-1219 (E.D. Va.).

5.      During my interviews with Mr. Shipkovitz, he made a number of

statements that confirm the facts reported in my articles. For example, in one of these interviews Mr. Shipkovitz told me that "one of the reasons I don't have a job right now" is "the way the law profession works," in that "older" people are "not looked kindly upon because of" the "pyramid" structure of the profession. In this same interview, Mr. Shipkovitz also said he was "having a hell of a time getting a job right now even with temp agencies," and that his age (sixty) was "like the kiss of death for getting a job."

6.     During another interview with me conducted on May 16, 2006, Mr. Shipkovitz told me that he had to "pay in advance" for a deposition he was conducting in the *Crossan* lawsuit because he was "not a regularly practicing attorney." In this interview, Mr. Shipkovitz told me that he had "basically not worked since October 24," a fact that was corroborated by several of the pleadings I read in the *Crossan* case file. In this interview, Mr. Shipkovitz expressly asked me not to include in my articles his age or the fact that, on the day he was removed from the condominium, he had been working as a contract attorney for the D.C. law firm Howrey & Simon. Mr. Shipkovitz also asked me not to publish a photograph of him along with the article, because he was sensitive about his physical appearance. I honored these requests.

7.     During an interview with me, Mr. Shipkovitz explained that he had had a number of jobs off and on over the years, and that when he was locked out of the condominium he was doing short-term work as a contract attorney.

8.     During another interview with me, Mr. Shipkovitz described the condition of the condominium in which he was living prior to October 20, 2005 in these words: "So I have five printers . . . . So I have piles of books, piles of newspapers. . . . This is America. There's no such thing as the neatness police."

2

9.      During another interview with me, Mr. Shipkovitz told me that a friend had told him, "OK, Sam's a slob, we all know that. But he doesn't deserve this," referring to Arlington County's closing of the condominium.

10.      During another interview with me, Mr. Shipkovitz said, "did my apartment look like the back office of Jones Day? Yeah, so what?"

11.      On one occasion, Mr. Shipkovitz took me to a storage unit where he kept some of his belongings. During that trip, we stopped at a Super Dollar Store on Columbia Pike so that Mr. Shipkovitz could purchase a telephone cord. At the store, Mr. Shipkovitz purchased three telephone cords, an electric shaver, reading glasses, tools, and a jar of pickles. Referencing these purchases, Mr. Shipkovitz described himself to me as "hoarding again."

12.      Prior to the publication of the June 18, 2006 story, I repeatedly attempted to contact Mr. Shipkovitz by telephone to verify the quotes that would be attributed to him in the story. Mr. Shipkovitz did not return my calls.

13.      During all of my interviews with Mr. Shipkovitz, I took handwritten or typed notes. Exhibit __ to Defendants' Motion for Summary Judgment is a true and correct copy of excerpts of my typed notes of my interviews with Mr. Shipkovitz.

14.      A photograph of the condominium in which Mr. Shipkovitz was living was published with the June 18, 2006 article. I obtained that photograph from Mr. Shipkovitz, who sent it to me in an e-mail. I also viewed this and other photographs in the *Crossan* public court file.

15.      I reviewed the pleadings in the *Crossan* public court file. Several of Mr. Shipkovitz's filings were printed on 100% recycled paper. At least one of his pleadings was handwritten.

3

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct, to the best of my knowledge, information and belief.

Executed at _Alexandria, VA_, this _22_ day of October, 2007.

Brigid Schulte

4

# EXHIBIT 4
## Photographs filed under seal

# EXHIBIT 5

Affidavit filed under seal

# EXHIBIT 6

Affidavit filed under seal

# EXHIBIT 7

Affidavit filed under seal

# EXHIBIT 8

## Affidavit filed under seal

# EXHIBIT 9

FILED

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

2006 MAR 10  A 11: 18

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

Stephen C. Crossan,                          )
c/o 1200 Crystal Drive                       )
Arlington, VA 22202                          )
                                             )
and                                          )
                                             )       CIVIL RIGHTS
Samuel Shipkovitz,                           )       REAL PROPERTY RIGHTS
P.O. Box 2961                                )
Arlington, VA 22202                          )
                                             )       42 U.S.C. 1983
and                                          )
                                             )
Anthony Sabo,                                )
P.O. Box 2961                                )
Arlington, VA 22202                          )
                                             )
                                             )
            Plaintiffs,                      )
                                             )
    v.                                       )
                                             )       Civil Action No. 05-1219 (CH-LO)
Ron Carlee, County of Arlington Manager      )
2100 Clarendon Blvd.                         )
Arlington. VA 22201                          )
and                                          )
Sharita Hughes, Arl. Hlth.1715 N. Geo. Mason Dr. )
                                             )
and                                          )
                                             )
S, Keith Grierson,                           )
2100 Clarendon Blvd. #810                    )
Arlington, VA 22201                          )
                                             )
and                                          )
                                             )
Dana Wilson,                                 )
2100 Clarendon Blvd., 6th Flr.               )
Arlington, VA 22201                          )
                                             )
and                                          )
                                             )
Richard Freeman,                             )

EXHIBIT

F

301 N. Park Drive       /2100 Clarendon Blvd.        )
Arlington, VA 22203                                  )
                                                     )
and                                                  )
                                                     )
Robert Speck,                                        )
1501 Crystal Drive, c/o office                       )
Arlington, VA 22202                                  )
                                                     )
and                                                  )
                                                     )
Chas. E. Smith Management. Inc.,                     )
Serve: Matthew Hause, Reg. Agent                     )
2345 Crystal Drive                                   )
Arlington, VA 22202                                  )
                                                     )
and                                                  )
                                                     )
Philip Almeida,                                      )
1200 Crystal Drive, #512                             )
Arlington, VA 22202                                  )
                                                     )
and                                                  )
                                                     )
WATERFORD HOUSE UNIT OWNERS ASSN.,                   )
aka WATERFORD HOUSE CONDOMINIUM                      )
        ASSN.                                        )
Serve:                                               )
                                                     )
and                                                  )
                                                     )
Black Ice Security Services, Inc.,                   )
Serve: Steven Collins, Reg. Agent                    )    FIRST AMENDED COMPLAINT
10610 Main Street                                    )
Fairfax, VA 22030                                    )
                                                     )
and                                                  )
                                                     )
John Doe 1[ Black Ice employee-alleged guard]        )
                                                     )    PERMANENT INJUNCTION SOUGHT
            Defendants.                               )
                                                     )

## DRAFT1---- FIRST AMENDED COMPLAINT

### Parties

1.    Plaintiff Stephen Crossan is an adult domiciliary of Virginia and title owner of a condominium unit at 1200 Crystal Drive, Arlington, VA 22202. Stephen was adjudged NGRI by the Circuit Court of Arlington County in 1996 and was under the control of the Arlington County Human Services Department and the Commonwealth of Virginia during the dates of relevance.

2.    Plaintiff Samuel Shipkovitz is an adult domiciliary of Pennsylvania and the tenant of the above condominium. Shipkovitz also has a written option to purchase the unit. Mr. Shipkovitz's property was seized as described below.

3.    Plaintiff Anthony Sabo is an adult domiciliary of Virginia. Mr. Sabo's property was seized as described below.

4.    Defendant Sharita Hughes is the person appointed by said Arlington Human Services Department to monitor Mr. Crossan. She was told by Shipkovitz that Mr. Crossan, when there, was the guest of Tenant Shipkovitz

5.    Defendant S. Keith Grierson is the Deputy Fire Marshall of Arlington County who trespassed into the unit allegedly at the instruction of Defendant Hughes, and despite the previous communication about a year before that they could not enter without a court order, had an already prepared (i.e. before even entering) false Code Violation Notice posted, which did not mention the "Fire Marshall" nor "CONDEMNED", nor any fire code violations, in ordinary print contained a notice not to enter the unit, did not contain a "cure date" nor any court date or appeal procedures, but said notice only stated cluttering and alleged minor plumbing issues related to a toilet flush mechanism [Lie 1] , a false claim that the kitchen sink did not work [Lie 2- kitchen has 2 sinks, 1 works fine, the drain of the other one connected to the disposal falsely claimed to not work [drain covered by Crossan with duct tape so as to prevent further damage to disposal], ordered seizure of the Plaintiffs' properties and had the first two Plaintiffs "banned" from the entire condominium building property as described below, despite their real property interests.

5A. Defendant Dana Wilson is a building inspector for Arlington County who trespassed into the unit on October 20, 2005 with Mr. Grierson. and forged the signature of his supervisor, J. DeJesus when he falsely signed her name to the placard/stay-out notice which he maliciously placed at the same time as his entrance (predetermined stay-out). Mr. Wilson also filed 7 malicious criminal complaints against Mr. Crossan for alleged building code violations, several of which were completely fabricated [perjury by Wilson], and others exaggerated, in retaliation to this lawsuit. In any event, no "cure letter" or "cure period" preceded the filing of the charges and his entry was without warrant or permission and constitute serious violations of Plaintiffs' 4th Amendment rights and thus preclude the valid institution of criminal charges..

5B Defendant Richard Freeman is the building inspector for Arlington County who is the "head" of the Arlington County "hoarders task force". Mr. Freeman bragged that he had done the same as he did to Plaintiffs to 14 others in the October 1st-20th [2005] period (alone).

As to Shipkovitz, Defendants Wilson, Freeman and Grierson ignored the "NO TRESPASSING" signs on both doors leading to Shipkvitz's bedroom, had no warrant, had no permission obviously to enter, and intentionally trespassed into Shipkovitz's bedroom to conduct an illegal search, take photographs without permission, thus invading his privacy, and seized the

3

room as part of the unit seized. They also changed the locks to the unit to prevent entry by Shipkovitz. There is no statutory or other legal authority permitting state actors, municipal workers to change a resident's locks on his doors.

5C. Defendant Ron Carlee is the County Manager for Arlington County. The County Manager is the chief executive officer of the County and is the executive hired by the governing body of the County, the Board of County Supervisors (ala Shirley Park Holding Co.). Mr. Carlee was served with the original complaint on October 24, 2005. was represented by County Attorney DiMatteo, and with knowledge did not and has not disbanded the "hoarders task force", an unlawful governmental policy and/or custom, and had knowledge specifically with regard to the "hoarders task force" existence and acts, and with regard to the unlawful acts of Defendant Hughes acting as a trojan horse in bringing in the "hoarders task force" into the unit WITH HER, the task force having a pre-printed stay-out/placard with them proving that no objective inspection was to occur.

Plaintiffs, by counsel, had communications with County Supervisor Jay Fissette who then had various meetings and communications with Carlee. Carlee has yet failed to order the disbandment of the "hoarders task force", order the removal of the placard and the resetting of the locks to the unit back to their original cylinder pins, which the "hoarders task force" without any legal authority changed to ensure that only they could get into the unit. Mr. Fissette's assistant Bonnie stated on Jan. 12, 2006 that Carlee had full knowledge of the "hoarders task force" and that the matter was being handled in Carlee's office. On Jan 13th, 2:15PM, Cartlee's assistant Judy Densel stated that the matter, including the involvement of Ms. Hughes (volunteered by her) was in his office and that someone would get back to Plaintiff Shipkovitz. Mr. Carlee was also the person to whom Plaintiffs appeal of the building inspectors stay-out notice/placard and later Fire Code appeal letter were sent to. No response has ever been received as to these appeals.

5D. Defendant DiMatteo, a County [civil] Attorney, stated that she was not going to allow Plaintiffs back into the unit, claiming that Mr. Crossan's *criminal* defense attorney (as to the building code violation charges) ordered it. Plaintiff Shipkovitz is Mr. Crossan's present civil attorney, and Ms. DiMatteo is not a Commonwealth's attorney, and thus has no reason to meet with any alleged criminal defense attorney or to countermand Mr. Crossan's specific instructions in writing, which she received a copy by hand delivery, that instructs that organized removal of objected-to items to be performed in cooperation with Mr. Grierson is to continue. It is believed that this wholesale removal threat was made by Grierson, etal. And DiMatteo on October 28, 2005, and thus she is the primary actor as to such unlawful threat of conversion and theft of Tenant Shipkovitz's personal property. Further, Ms. DiMatteo has repeatedly and inappropriately, and in contradiction to her representation to this Court that she would not going to meet with Crossan without his civil counsel Shipkovitz again, met with Mr. Crossan attempting to unethically avoid the lawyer-client representation relationship, making various implied threats, including against Shipkovitz.

After the hearing of January 6, 2006, she stated in the anteroom that she was having all of Plaintiff's Shipkovitz's personal property removed from the unit by a contractor. Plaintiff Shipkovitz reminded her that Shipkovitz was the tenant, and so-declared in writing numerous

4

times by Crossan, and that any removal of anything from the unit was a criminal act [conversion, theft].

5E. Defendant Board of Supervisors of Arlington County is the governing body of the County, and employs the County Manager as its chief executive officer.

6.    Defendant Robert Speck is the Community Manager of 1200 Crystal Drive, The Waterford Condominium, who, unlike apartment buildings which CESMI owns via Archstone-Smith or otherwise is owned by third parties,is not in charge, but as a condominium, reports to the Chairman and President of the Board of Directors, who was not involved according to said President, but said Speck allegedly followed the orders of said Defendant Grierson in allegedly changing the locks of the Crossan unit and their magnetic building entry/garage cards, in violation of Plaintiffs' real property, constitutional and civil rights.

7.    Defendant Chas. E. Smith Management, Inc., a Virginia corporation, is the employer/principal of said Defendant Speck.  Plaintiff Shipkovitz had represented various employees and tenants of this Defendant in the 1980s and various outrageous forms of retaliation against Shipkovitz are of record in various forums.  Unrelated but similarly, Plaintiff Crossan, as a clear manic-depressive was arrested and/or harassed on several occasions by this Defendant for mere conduct which would constitute odd behavior.

8.    Defendant Philip Almeida, believed a Virginia domiciliary, is allegedly the Waterford House Unit Owners Association Board of Directors' Board member who agreed to and/or authorized the changing of the locks of said unit thus preventing those persons with property rights to the unit from entering, ban the first two Plaintiffs from the building, and allegedly authorized the hiring of Black Ice Security Services, Inc. to employ guards to prevent the Plaintiffs or anyone from entering the unit or changing the lock back. Almeida and Shipkovitz have been at odds over the years primarily over building financial mismanagement and Almeida's constant stalking and intermeddling of Shipkovitz's activities.

8B. Defendant Waterford House Unit Owners Association aka Waterford House Condominium Association is the governing body of the condominium association and the owner of the common elements of the building.

9.    Defendant Black Ice Security Services, Inc., a Virginia corporation, was the employer/principal of Defendant John Doe 1 who assaulted Plaintiff Shipkovitz and interfered in and prevented Plaintiff Shipkovitz's efforts to hire a locksmith.

10.    Defendant John Doe 1, a white male about 50 years of age, about 5'9 ", wearing a suit containing a belt side pocket believed to contain a weapon believed to be a gun, who physically came to the unit on the 3d floor, assaulted Shipkovitz and threatened that he would prevent anyone from changing the locks back.  He also interfered in Shipkovitz's phone call from the Concierage Desk to a locksmith by stating in a loud voice that the unit "was condemned" and he would prevent it. A second guard from that employer soon showed up in a black uniform with the company logo, was clearly a body builder who sauntered around the lobby and Plaintiff Shipkovitz making clear by his uniform, appearance and movements that he would do violence to Shipkovitz and would back up John Doe 1.

5

## Jurisdiction

15.    This action comes under the jurisdiction of this court by invoking constitutional violation rights as arise under the 4th Amendment to the Constitution against unlawful searches and seizures, the 5th Amendment rights to property, the 14th Amendment against due process and other violations of civil and other rights by State actors. As to Shipkovitz, Defendants Wilson, Freeman and Grierson ignored the NO TRESPASSING signs on both doors leading to Shipkvitz's bedroom, had no warrant, had no permission obviously to enter, and intentionally trespassed into Shipkovitz's bedroom to conduct an illegal search, take photographs without permission, and seized the room as part of the unit seized. They also changed the locks to the unit to prevent entry by Shipkovitz. There is no statutory or other legal authority permitting state actors, municipal workers, to change a resident's locks on his doors.

16.    This action comes under the jurisdiction of this court as the state actors violated the Plaintiffs' rights to due process, and the avoidance of unlawful searches and seizures as guaranteed by 42 U.S.C. 1983, and the 4th, 5th and 14th Amendments to the Constitution.

17.    Other causes of action against Defendants Black Ice, John Doe 1, Almeida, Speck, Chas. E. Smith Management, Inc. ("CESMI") and come under the ancillary_ jurisdiction of causes primarily involving federal question and other federal rights violations.

## Venue

20.    This case is properly venued in this Court as all of the known acts occurred in Arlington, Virginia.

## Background

21.    Plaintiff Crossan was a Patent Examiner whose mental and medical problems caused him to leave his position. He was terminated for six weeks of unexcused absence while in an extreme bipolar condition. Prior to that Crossan had met Plaintiff Shipkovitz at Crystal Houses and the USPTO and they became good friends. Crossan earned a B.S. and M.S. in Chemical Engineering; Shipkovitz had an earned B.S., M.S., and Ph.D. in Electrical Engineering and had earned a J.D. while teaching Electrical Engineering. Plaintiff Shipkovitz was often invited to Crossan's MENSA parties and they went together to various single events. Crossan's condition deteriorated and he began doing bizarre acts. Upon Crossan, after being charged with felony arson for allegedly setting a fire in his condominium unit, being adjudged NGRI by the Arlington Circuit Court, and his brother John assisting Steve in his affairs, both invited Shipkovitz to become the tenant of the unit as it was clear that Steve would be committed for a long indefinite amount of time and otherwise the unit would be vacant and Stephen would be forced to pay real estate taxes, condo fees, utilities and other expenses. Stephen's belongings were collected and moved to the second bedroom by a mover employed by John. A written lease was executed between owner Crossan and Tenant Shipkovitz as was a Limited Power of Attorney authorizing Shipkovitz to act on his behalf as to anything involving the unit, and Shipkovitz moved in.  Years passed.

22.    Approximately sometime over a year ago Crossan began getting day and week passes from the State Mental Health Hospital NVMHI and began a process of staying in the second bedroom during said passes. Such process was authorized by the Commonwealth of

6

Virginia Commissioner of Health, Forensics Review Panel (NGRI Section) and the Arlington County Human Services Dept. became his wardship. They in turn appointed Defendant Hughes as his monitor and who came to the unit to observe Crossan taking his required pills and then leave. Shipkovitz remained the Tenant and Stephen was his guest during such stays. This legal relationship was made known to Defendant Hughes and others on several occasions. Defendant Hughes and perhaps others unknown about a year or so ago called the Arlington County Code Enforcement Dept. complaining of Shipkovitz's having boxes of office supplies, office equipment, project files, and plastic drawers containing same in the living room. Despite Plaintiff's Shipkovitz's objections, a Deputy Fire Marshall, name not recollected at this time, entered the property, looked over the unit and listed 3 minor items to complete by a certain date, including placing a second smoke detector above the second bedroom door. The toilet was repaired and the "second sink" issue was dropped. This over a year ago matter was completed, reinspected, approved, and the matter was closed.

23.     Crossan was recommitted to the Virginia Hospital Center Psychiatric Ward several months ago, approximately early May, 2005, after allegedly stalking a woman in the building and was released several weeks later to be back on his monitoring program.

24.     During this period from the last inspection of a year ago, no additional items were added to the bedrooms or bathroom. Plaintiff did obtain about 15 closed boxes of noncombustible items, including printer supplies, printer, light fixtures, a rated steel door frame, 2 2-drawer file cabinets, about 14 plastic drawers which were previously owned by another resident of the building (that person not known to have been bothered by Arlington County), and other non-food and generally noncombustible items that were awaiting movement by others to be moved to where they were to be used outside of Virginia (Shipkovitz has severe sciatica and is under medical orders not to lift more than 15 pounds). None of these items blocked access or egress and were in the living room primarily stacked arranged in a row against the desk on the wall next to the bedrooms/bathrooms. The other side of the living room had been arranged into a "Sam's computer/office area" and a "Steve's computer/office/sofa/chair area" that had been approved about said year or two ago. Nothing was added to these areas except the door frame parts which were awaiting movement( they have been subsequently removed).

25.     As stated above and unrelated, both Shipkovitz and Crossan had independently become enemies of Defendant CESMI, and various actions of record had occurred. Numerous residents of their apartment buildings leave to purchase condominium to escape their repressive and sometimes ridiculous reasons to harass tenants. Plaintiff Shipkovitz once represented a tenant who was threatened with eviction merely because his car was a commercial cab. Plaintiff Crossan purchased the subject condominium after having lived in the Crystal Houses apartment complex and got tired of the general bad treatment tenants get.

26.     Approximately October 5-8th, 2005 (once during this period), Defendant Hughes asked when the additional items would be removed from the living room and kitchen (kitchen having new files re: two ongoing cases). Shipkovitz told her, and she knew as a fact from before, that these items in the living room and some in the kitchen were not staying, but that the persons who agreed to move them had run into financial emergencies and would do the moving when they had got caught up with their urgent bills, such as their rent. Shipkovitz told her that her entry was conditioned on her agreement of confidentiality as to the apartment. Plaintiff Sabo was

7

a friend of Shipkovitz who asked Shipkovitz to assist him on some technical legal matters, patent matters, and computer laptop operating system etc. issues and would do the move in partial return. Plaintiff Sabo entrusted Shipkovitz with his laptop and physical materials and software which were also additional items to the area. All of these additional items were added with the approval of Crossan. Defendant Hughes was told by Shipkovitz that they would be removed as soon as feasible and that under no circumstances was anyone permitted to enter the unit except her, as strictly Steve's medical monitor, without a court order. Shipkovitz went so far as to ask her if she could provide a van and perhaps helper if there was any speed issue as to removal. She said there was no speed issue and that the removal by friends when they could was acceptable.

27.    On October 20, 2005 without warning to Shipkovitz or Crossan and as described above and as at best presently known, Defendant Hughes arrived WITH Defendant Grierson and two others, one believed an inspector Dana Wilson, the other S.K. Grierson, with an an apparently pre-prepared Code violation Notice containing no mention of "Fire Marshall", fire code violations, nor the word "CONDEMNED", but merely contained a rehash of the old allegations, which were put into sheet protectors, and a head sheet which in not-otherwise noticeable type contained a statement that no one was to enter the unit ("stay out notice") and posted. Plaintiffs repeat that said sheets, to the best of their recollections, contained no mention of "Fire Marshall", fire code, or "CONDEMNED". The sheets did not contain either a "cure date" by which violations could be cured, nor a "court date", nor even an appeal reference or procedure. Shipkovitz arrived at approximately 9:30 P.M., attempted to open the door, but the locks had been changed.

28.    Plaintiff Shipkovitz seeing same, and having since being a teenager dealing with handling building code issues as to property of relatives, specifically looked for mention of said terms, cure date, appeal procedure, or court date, and seeing none came to realize that the Notice was clearly unconstitutionally violative and also that his property and the property of the other Plaintiffs had been seized without due process of law. Shipkovitz's bedroom had "NO TRESPASSING" signs on both of the doors. Entering said bedroom without warrant nor Shipkovitz's permission was clearly a violation of the 4th Amendment prohibition on unreasonable searches and seizures. It was later learned that Defendants Wilson, Freeman and Grierson trespassed into said room (See Va. Code 18.2-91and 18 U.S.C. 242) Due to the dead battery of his cel phone, Shipkovitz went to the Concierage Desk to call a locksmith he knew[1].

29.    At said desk was a person never seen before, John Doe 1, who pretended to be waiting for another resident. As Shipkovitz began the call, after having an argument about using the phone, he informed Shipkovitz that he was "Security" and that he was there to prevent Shipkovitz from changing the locks back to openable. During the telephone conversation with

---

[1] Desk clerk Selma, has made many enemies of residents, including Plaintiffs by her busybody acts. This includes her reporting to girlfriend No. 2 as she entered the building that the resident had a girlfriend No. 1. When resident Manuel reported such outrageous conduct demanding that disciplinary action be taken, their wars started. Mr. Manuel was a former boss of Plaintiff Shipkovitz over 15 years ago, and they maintain their friendship. When Manuel got in the process of divorce and wished to move, Shipkovitz suggested a unit in the building. By the "building ban", Plaintiff is forced to find lodging elsewhere, despite having friends in the building. Selma knew of the friendship which exacerbated the situation; she is a habitual liar and troublemaker who should have been fired long ago. Shipkovitz avoids her and has never had an argument with her, but reported her actions to her supervisor.

the locksmith John Doe 1 stated in a loud voice that the unit "WAS CONDEMNED" and that he would not permit the locks to be changed back. The unit had not been "CONDEMNED" and such false statement of fact stated to a third party to obtain a benefit constitutes slander and the threat perhaps extortion. Given such, the locksmith declined to come. Plaintiff went up to the unit. This time said John Doe 1 followed Shipkovitz came on the elevator and got off right behind him.. He then got in Plaintiff Shipkovitz's face in a threatening manner and during said assault stated that he was there to prevent Shipkvitz from changing the locks back or otherwise getting back into the unit.

Plaintiff called condominium Board of Directors Chairman and President George Poole who stated that he had nothing to do with it and only knew about the situation after the fact when he came into the building and the Arlington and CESMI Defendants were in the lobby. Poole, the legal CEO of the condominium, stated that he never agreed to the changing of the locks.

30.    Plaintiff Shipkovitz then called Crossan on his cell phone who repeatedly stated that Sharita did this on her own and he had nothing to do with it. He also stated that she, not he, brought them in, and she had met with others and the whole matter had been planned by her, perhaps with others.

Further, as reported Defendant Hughes removed Crossan from his bedroom and the unit and forced him to move to a group home for mental patients near Skyline/Baileys Crossroads/Falls Church.

31.    Plaintiff Shipkovitz, at this point in fear for his life, called the Arlington Police to have John Doe 1 removed as a trespasser. John Doe 1 made a cel phone call and soon a muscle bound thug-looking male about 25 years old, who is believed called "Jason", with a "Black Ice Security" uniform arrived and started walking around the lobby. When the Police arrived they spoke with John Doe 1, apparently a retired Police officer, and basically ignored Plaintiff Shipkovitz. Plaintiff Shipkovitz attempted to discuss the matter with the Police, especially the difference between a condo with appurtenant property rights, and an apartment building, but they did not understand. John Doe 1 stated, apparently, that he was "Security" with the building and that Shipkovitz must leave. This was approximately 10 PM. The Police then ordered Plaintiff Shipkovitz to leave and a person Shipkovitz called came and they left. At approximately 1 AM, Shipkovitz called the building and the desk clerk stated that the Black Ice persons were still there.

31.    The next morning in the faint hope that municipal persons of some legal knowledge would resolve the issue, come up with a "cure date" and otherwise comply with basic constitutional rights, Plaintiff Shipkovitz went to the Arlington Code Enforcement Office and had a pleasant conversation with a Mr. Adams, a Code supervisor. Plaintiff Shipkovitz then went to his supervisor, a Sean Kelly, and they began a professional-like conversation about the matter, and who stated that Mr. Grierson was controlling the matter. Within minutes, and without any even potential cause, two Arlington Police officers came to the conversation and began making totally fabricated claims that Shipkovitz had a confrontation with Adams. Luckily, Mr. Kelly agreed orally that Shipkovitz had been peaceful and professional about the matter, and they attempted to continue the meeting but these Policemen would not leave and started conversations about Plaintiff Shipkovitz on their Police radios. One demanded that Shipkovitz provide his ID, date of birth, and social security number. His ID had been in another

9

of his pants in the unit and thus had been illegally seized. His social security number, is by federal law, nondisclosable and was not disclosed. This made this particular Policeman quite angry. Soon Defendant Grierson arrived at the meeting and what he had to say was, at best, shocking.

32.     Grierson stated that they had indeed come at the invitation of Hughes, and that they had taken photos of everywhere in the unit, thus confirming the illegal search of Shipkovitz's bedroom. Thus, even as to Shipkovitz, they had conducted a nonconsensual warrantless search in violation of the 4th Amendment. Hughes had met Plaintiff Shipkovitz at the unit perhaps as many as 50 times and knew beyond a shadow of a doubt that Shipkovitz was the Tenant paying full rent, with Crossan being there as his guest when Crossan was there pending completion of his wardship or the like, and that Shipkovitz's matters were private and not to be disclosed as a condition for access.

Defendants Freeman and Wilson and their Code Enforcement Section and the Hughes' Dept. Of Social Services are units that report to the County Manager. It is also believed that the Fire Dept. also reports to the County Manager.

Hughes, an Arlington employee, apparently not having the required "social worker license" was none-the-less employed by the Arlington Dept. Of Social Services, under the control of County Manager Ron Carlee, in a health services role as part of the "PACT Team" monitoring mental patients who were de-institutionalized. She as part of the policy of the County and the PACT Team reported to various law enforcement officials various matters which she learned of while dealing with her charges as part of her job and never obtained any consent, yet alone informed consent, of her patients prior to her reporting claimed criminal/building code /"hoarding" "violations" to law enforcement. As a result of Hughes' reports to law enforcement, Mr. Crossan was thereafter the subject of seven criminal cases filed by Mr. Wilson in the Arlington General District Court. That this was a policy of Arlington County can be concluded as a result of Huhes admitting on October 28, 2005 that she had reported other patients to the Arlington "hoarder task force" headed by Defendant Freeman, which includes Mssrs. Wilson and Grierson.

Ms. Hughes was also in conflict to her duties as a health care worker when she operated as a trojan horse, who when Mr., Crossan opened the door to let her in as her regular social worker entry, she brought in the others of law enforcement behind her.

Pursuant to *Ferguson, et al. v. City of Charleston, et al.*, 532 U.S. 67, No. 99-936 (arch 21, 2001), Hughes acts as a health care worker (she does not have the required "social worker" license or any health care license), but actually operating as an informant to law enforcement as part of her job and as part of the County's policy to prosecute "hoarders" [Isn't this whole concept of going after messy persons having quantities of nondangerous materials ridiculous?] eliminates any qualified immunity she might have claimed.

Similarly, the County's **policy** and **custom** [see *Monnell* and *Ferguson* U.S. Supreme Court cases] of going after "hoaders" as if they were murderers or criminals also prevents the members of the "hoarders task force", that is, Wilson, Grierson and Freeman from claiming any form of immunity. In fact in mid-November, 2005, Grierson stated to Shipkovitz , in response to his inquiry as to regaining access to "cure", that they had locked out many residences of alleged "hoarders" and had movers move the residents' personal property involuntarily out of their residences.

"hoarders" and had movers move the residents' personal property involuntarily out of their residences.

That there was bad faith become clear when Grierson began discussing the "plastic numbered drawers" [containing toiletries] stacked on the right side of the bathroom sink. This had been approved by the previous Fire Marshall over a year before. Grierson admitted that they had pictures of the same area from the previous inspection. That these could not be the subject of code violations is clear as other residents have built equivalent built-in drawer/cabinets on opposite sides of the long sink counter. These pictures were apparently taken in secret, since when Plaintiff Shipkovitz was in attendance at the first year+-ago inspection, he had prohibited the taking of pictures and did not see any then being taken. Grierson began stating claimed "clutter" violations of areas that had been approved the previous time and were unchanged since That there was no doubt as to bad faith became clear when Grierson admitted that he and others had gone down to the garage to inspect Shipkovitz' vehicle, that is, an area totally unrelated to the claimed violations of the condo unit.                   Grierson also admitted that he had gone into Shipkvitz' bedroom despite "NO TRESPASSING" signs on the doors, and no court order or warrant. Grierson demanded that Shipkovitz remove all items near the bedroom window. Shipkovitz informed him that that had no logical basis as the windows had been designed to not open. It was later learned that Wilson and Freeman were also [unlawfully] there.

33.    Grierson then also admitted that he had spoken with Defendant Speck and that they had agreed to change the locks. Speck is a mere "community manager" of the condo with no power to make such decisions. The unit is a condo unit, not an apartment, and thus the occupant is the only person with any authority to change the unit's locks. No known statute permits changing the locks of a residence. As stated above, Board Chairman and President George Poole, the chief executive officer, denies making such authorization. Speck admitted in a phone call on Friday Oct. 21, 2005 (afternoon) that he had e-mails and that other Board members were involved. The Board member that Plaintiff Shipkovitz had had disputes with is Defendant Almeida.

34.    Despite Shipkovitz' best efforts at persuasion, Grierson refused to provide entry to the unit, revoke the "stay-out" notice (which was not from him but from Code Enforcement, who stated that Grierson was in charge) nor provide a "cure date" to remediate, thus making compliance impossible, nor a court date. Instead he stated that the unit had been the "13th hoarder case this month" and that they respond to informants, i.e. go into homes without search warrants or any form of legal notice. They also refused to provide Shipkovitz with a copy of what had been posted claiming that they only provide it to the owner ( who obviously could not receive it by mail there as he had been, in effect, re-committed). The fact that Shipkovitz was the Tenant is a matter of record as the lease was on file with the condominium board when executed as per the condo rules and was also in the possession of CESMI, its office agent, as it became the subject of yet another adversarial action between CESMI and Shipkovitz. Therefore, there should be no doubt that Shipkovitz is the known legal Tenant with a possessory interest, and entitled to be involved.. Another Arlington County Building Inspector at the meeting, Mr. Freeman, informed Shipkovitz that the Fire Marshall has the power to immediately have people arrested on felonies (implied for clutter or "hoarding") and to lock people out from their units. When Shipkovitz pointed out that this case is not involved with a

11

missing floor area, or anything more than alleged clutter of office supplies, office equipment, construction items, 2-drawer metal file cabinets, other drawers, and other normally noncombustibles, and such could not rise to such level of serious criminal treatment, Grierson retorted that he has a responsibility to protect the firefighters from fires. Mr. Freeman stated that he was head of the Arlington "hoarders task force" and that this incident against the Plaintiffs was the 14th such action from Octpober 1st to October 20th.

As pointed out by former Deputy U.S. Attorney for the Eastern District of Virginia Henry St. John FitzGerald, Shipkovitz's long-time mentor and friend, who may enter this case if necessary, modular plastic drawers, sold by Target and the like are sold by retailers only after passing any and all required safety tests, and thus can not legally be denied by a Fire Marshall, as presently known. No legal definition of "clutter" has been provided. Plaintiffs believe that this is taking "fire prevention" to unreasonable and illegal extremes. Neither Crossan nor Shipkovitz smoke or drink, so any oblique mere nil possibilities has no honorable extension to the situation here. There are no dangerous materials such as gasoline stored there. The unstated real motives behind the "stay-out" and the changing of the locks, needs to be discovered and those involved made liable.

35.    At the end of the meeting Grierson offered only a 5-minute escorted entry to obtain toiletry and clothes. He also stated that Plaintiffs could not enter the unit to remediate, but that the County hired "contractors" to "clean out" the units of alleged "hoarders", and move the items into "storage" at the homeowners' involuntary expense. A homeowner/tenant could work with said contractors, but could not do the work themselves. The other Inspector stated that there were no appeal rights.

36.    The same 2 Policemen were still in the room, and when Shipkovitz agreed to the 5-minute pickup (as he had all his belongings there, clothes, underwear, toothbrush, etc.), and went out of the room, he was escorted out by the same Policemen. They informed Shipkovitz that in order for him to go to the unit, Shipkovitz could not go with the Inspectors, but instead would have to be handcuffed in their Police car-- else he would have to wait for Monday. The end result being that for a mere claim of clutter, Plaintiffs' belongings had been seized, he had been locked out of his local business, and in order to even get a 5-minute chance of retrieving any of them, he would have to agree to be in handcuffs by the Police.

How much more outrageous conduct could there be for ordinary citizens merely having, in someone's opinion, extra boxes in a living room and kitchen?


N37.   In a discussion with County (civil ) Attorney Ms. DiMatteo on January 12, 2006 in which Shipkovitz informed her of Crossan's condition and of Shipkovitz intent to withdraw to which she orally consented, she THEN admitted that she had been in the unit with criminal defense attorney Mr. Yeager the week before and was involved in a joint decision to ignore Shipkovitz's tenancy and possessory rights, not file an unlawful detainer action, ignore two instruction letters by Crossan to have the objected-to items removed in an organized fashion in cooperation with Mr. Grierson, and was going to remove _all_ of Shipkovitz's belongings (i.e. not only the County-objected-to items) and move them to storage. Ms. DiMatteo stated that she was preparing a Motion To Disqualify Shipkovitz. As described below, she intentionally acted to create a future

12

conflict to which Shipkovitz would have to withdraw later anyhow. Her acts to create a conflict are outrageous.

A. Shipkovitz called Crossan who stated that criminal attorney Yeager had met with civil attorney DiMatteo several times and that despite Crossan telling him to follow his wishes, Yeager was insisting on this unlawful planned entry and wholesale conversion of Shipkovitz's (and Sabo's) items. Crossan seemed unable to deal with the stress of this situation and seemed unable to make any sense. During such phase fle also may present an undue risk to public safety as his public history demonstrates (setting fires, turning on hot water valves everywhere, stalking women, wearing masks, propositioning desk clerks).
Steve also confirmed that Ms. DiMatteo had been in the unit with Mr. Yeager despite her representation to this Court, after she was first caught making direct contact to a known represented person, that she would not again meet with Crossan without Shipkovitz's permission and presence. Ms. DiMatteo is not a Commonwealth (criminal) Attorney and her meeting Crossan with Yeager regarding the _civil_ matters, for which Shipkovitz is Crossan's attorney, is believed at best improper and yet another instance of overzealous inappropriate behavior.

B. Steve also stated that Yeager had forced him to sign a Power of Attorney. He believes it was a general power of attorney. Such is inappropriate for any attorney. Shipkovitz was issued a written Limited Power of Attorney in 1996 when Crossan was committed (to Central State Mental Facility) dealing only with the condominium unit and his pro rata vote proxy. It has not been revoked.

C. It is thus clear that DiMatteo, in her excessively eager desire to win in this case, and despite not being a Commonwealth attorney, has by her combination with Yeager to not follow Crossan's written instructions, has _intentionally_ created a future conflict of interest, and to end a 15 year friendship for no real purpose, which neither Crossan nor Shipkovitz wanted. To avoid even any appearance of impropriety, Shipkovitz deems these recent facts as additional reasons why the instant motion to withdraw as Crossan's counsel is necessary. Intentionally causing a conflict of interest between Plaintiffs where none existed, as well as intentional infliction of mental distress (Ms. DiMatteo received the Crossan instruction letter and thus knew what was desired, and thus was intentionally attempting to interfere and create a conflict ) should subject Ms. DiMatteo to an appropriate sanction

D. However, under these extreme efforts to win their cases, it is Shipkovitz's position that a _guardian ad litem_ need be appointed for Crossan, and that such person not have any involvement in any of Steve's cases so that such guardian may be completely objective.

N38. At the telephonic F.R. Civ. P. 16(b) conference on December 28, 2005, County (civil) Attorney DiMatteo stated that she had had multiple email communications with criminal defense attorney Yeager, apparently someone she knew, including that day. On the date of the original return on the General District Court case, Mr. Crossan had stated that Mr. Yeager had met Ms.DiMatteo and several building inspectors in the courtroom hall. She is not a Commonwealth Attorney or involved in the General District Court action. Her motives and actions in involving herself in the criminal case, where she had no legal role, and where the assigned Commonwealth Attorney was not involved, were then baffling. Such communication

13

in toto between Civil attorney DiMatteo and criminal attorney Yeager now appears that she intended to attack Shipkovitz. despite the stated written desires and instructions of client Crossan to cure by the cooperation of Deputy Fire Marshall Grierson in having systematic removal of objected-to items.   The threat to remove objected-to items wholesale and move them to storage was an early threat by her.  Shipkovitz had, to his knowledge,  never met or known her before this case.  While there appears to be some form of bad blood between DiMatteo and attorney Kramer, Shipkovitz's association with Ms. Kramer has been strictly platonic for more than 15 years.  The viciousness and abnormal processing of nondangerous building code alleged violations with no "cure letter", etc., but an instantaneous "stay-out" notice and the unlawful changing of the locks has an obvious malicious but no practical purpose.

On January 18, 2006, Shipkovitz was informed that Grierson was in the building seeking information and witnesses  that he could use to "prosecute" Shipkovitz, including  claims that the [cheap] padlock put on the unit to prevent his belongings from being converted as threatened by DiMatteo and Yeager was a criminal fire code violation.  Several days before Grierson had stated to Mr. Sabo that he "had orders" and was "out of the loop", and that DiMatteo "was in charge".

N39.   The Arlington County Manager Ron Carlee had knowledge of the "hoarders task force". He is liable in addition to inspector defendant Dana Wilson and "hoarder task force head" Richard Freeman , and Deputy Fire Marshall Grierson, as the known acts of the "hoarder task force" in going to person's residences and making searches without warrant or permission, and issuing "stay-out notices"/placards preventing them from entering their own residences by the normal procedure of a "cure letter" with a reasonable time period in which to remediate any alleged violations, and the totally unlawful changing of their locks, which has absolutely no statutory authority and is an unlawful seizure per se was a

matter of official policy", or

"implements or executes a policy statement, ordinance, regulation, or decision officially adopted or promulgated by those whose edicts or acts may fairly be said to represent official policy.  In addition, local governments such as Arlington County, like every other 1983 "person" may be sued for constitutional deprivation visited pursuant to governmental **"custom" even though such custom has not received formal approval through the government's official decision-making channels"**

*Monnell v. Dept. of Social Services* [NY], 436 U.S. 658, 56 L. Ed. 2d 611, 98 S. Ct. 2018 (1978),]

The use and bragged history of the "hoarders task force" as stated by Freeman bragging that they had don the same to 14 others in the October 1st-October 20th [2005] period alone certainly by its volume  constitutes a governmental custom and makes said County, County Manager, Freeman, Wilson, Hughes, Grierson and DiMatteo liable.

N39. Ms. Hughes, allegedly Crossan's social worker [she has no required license], further violated her obligation of confidentiality when she, as a part of the requirement of her health

14

professions job (and thus liable and not immune) told building inspector Dana Wilson Mr. Crossan's confidential social security number, date of birth, weight, hair color, etc. which she had in her confidential files. This unlawfully disclosed information was inserted into the seven criminal complaints Wilson maliciously filed against Mr. Crossan for the alleged building code violations. Several of the claimed violations, such as the allegations about the toilet and kitchen sink, are just plain made up and perjuriously sworn to by Wilson. Ms. Hughes had stated that she had reported "hoarders" before to the Arlington "hoarders task force". Therefore, this admission of repeated informing of alleged criminal acts as part of her health professions position and thus pattern of conduct (ala Ferguson v. City of Charlotte) makes her, her chain of command, the County Manager Ron Carlee, and the County liable with no immunity. As the hoarder task force defendants have admitted that they did the same to 14 others just in the Oct. 1- Oct. 20 period alone, there can be no doubt that this constitutes a "governmental custom" ala

## COUNT ONE- IRREPARABLE INJURY- PERMANENT INJUNCTION SOUGHT

50.    The Plaintiffs incorporate the above paragraphs by reference as if fully repeated herein.

51.    Plaintiff Shipkovitz, a Virginia attorney and Registered Patent Attorney, has all of his local business matters physically located in the unit, including books, day books, computers, printers, PACER information, and files, *including legal matters having deadlines*, which unless the code violation "stay-out"notice, not signed or issued by the Fire Marshall despite his involvement, is revoked by court order, will result in serious legal consequences to Plaintiff Shipkovitz and to his clients.

52.    Plaintiff Shipkovitz has patent and construction law projects which cannot be performed without access to his files, computers, printers, books, etc. Plaintiff, at best, will lose his clients and the resulting destruction of Plaintiff's business can only be avoided by access to same, which can only be achieved by the court's issuance of an injunction revoking the stay-out order, and specifically permitting Plaintiff Shipkovitz to conduct his business at the unit.

53.    Plaintiff Shipkovitz has also accepted temporary positions with large law firms which usually last only several weeks. As a result of having to take two mornings off to deal with this case, he was terminated on October 24, 2005 and has not worked since. Defendants are responsible for his loss of earnings. It is normal procedure to find new ones by e-mailing one's resume to various legal temp agencies and advising of one's availability. Plaintiff's resume is only on the computer located at the unit, part of the property effectively seized in violation of Plaintiff's 4th Amendment rights. Again, Plaintiff can not even obtain any meaningful work without his office belongings, books, etc. in the unit. Because Plaintiff Shipkovitz missed the mornings of October 21st and October 24th to deal with this matter, he was terminated the evening of the 24th. Defendants are responsible for the loss of earnings from Oct. 25th to the present.

54.    As the Arlington municipal Defendants apparently have no sense of shame or respect for basic constitutional rights, but merely, at best, ignore any challenges to their power, it is respectfully requested that a permanent injunction be issued against these defendants specifically and against the Arlington County Manager Carlee, and his subordinates: the Arlington County Fire Marshall , Director of Code Enforcement, and Director of the Human

15

Services Department, revoking the posted notice, and specifically ordering them to obtain a court order before issuing any "stay out " notice, and specifically requiring any and all notice of violations not involving true emergencies, such as a missing floor, exposed structural wood where combustibles are closeby, etc, to have a reasonable "cure date" permitting the homeowner to cure the issue by himself. ( In Pennsylvania, all building code violation notices have at least a 30-day "cure date").  and to order the Human Services Dept. to order its employees to maintain the confidences of their clients and conditions of entry, as licensed nurses, licensed social workers, and the like are required to do, but in this case totally and blatantly ignore. Plaintiff Shipkovitz will separately file charges against Defendant Hughes requesting an investigation and revocation of her license.

55.    As an initial request before trial, Plaintiffs move for a Temporary Restraining Order and Preliminary Injunction, F.R.Civ.P. 65, ordering Defendants to permit Plaintiffs in the unit until trial.  As stated elsewhere, Plaintiffs neither smoke nor drink, and are older professional settled citizens who just want to do their thing and be left alone.  As Plaintiff Shipkovitz has been made homeless for no valid reason , they need to be ordered to permit him in and as per above, do nothing without a court order; and Plaintiff Crossan forced back into the mental health provider network, it is respectfully requested that an independent (i.e. not associated with any municipal government agency) licensed medical monitor/licensed social worker be appointed to replace Hughes, and Crossan be also be permitted back, as long as he does not have manic symptoms, i.e  stalking anyone, turning on hot water valves everywhere he goes, wearing masks, etc.  There is no real harm to the County but tremendous harm to the Plaintiffs if the "stay out notice", having no procedural due process safeguards, and no real basis for claiming any form of emergency, is not revoked. As is believed clear by the above facts, Plaintiffs believe that they will win on the merits, and certainly the balance of harm test requires that Plaintiffs who are extremely harmed by Defendants conduct, but Defendants  lose nothing if their acts are revoked. This paper is being prepared at a friend's house without benefit of any books, merely recollection of law so it is-not of usual or expected quality, as could be expected under the circumstances.

## COUNT TWO- VIOLATIONS OF PLAINTIFES' 14th, 5th, and 4th AMENDMENT RIGHTS AND OF 42 U.S.C. 1983 AS TO THE STATE ACTORS:  DAMAGES CAUSED BY ACTIONS OF DEFENDANTS HUGHES, GRIERSON, WILSON, FREEMAN, SPECK AND CESMI: INVASION OF PRIVACY, TRESPASS

60.    The Plaintiffs incorporate the above paragraphs by reference as if fully repeated herein.

61.    Plaintiffs Crossan and  Shipkovitz had all of their property seized in violation of the 4th Amendment. Plaintiff Shipkovitz had large NO TRESPASSING signs on both doors to his bedroom which Defendnats Grierson, Wilson and Freeman entered without permission nor warrant, and thus constituted an unlawful search in violation of the 4th Amendment.  It was facilitated by Defendant Hughes who let them in.  Under the common law "felony murder rule", Defendant Hughes is equally guilty of these violations as she brought them in intentionally. Plaintiff Sabo had his computer property seized in violation of his constitutional rights.

16

No notice of hearing or any paper had been issued before the acts of October 20, 2005. No search was conducted in compliance with the 4th Amendment, but merely a "raid" on the basis of the illegal disclosure of confidences held by the County's appointed "licensed" social worker Hughes [she has none]. No letter, yet warrant or court order preceded the "raid". Mr. Crossan has executed a Declaration that he did not give anyone permission to enter except Hughes and that they (Grierson, Wilson, Freeman) came WITH HER, as she apparently was operating as a trojan horse in bringing in the Arlington Building Inspectors, "hoarders task force" and Deputy Fire Marshall right behind her WITH HER. . Ms. Hughes further unlawfully disclosed the confidences of patient Crossan when she provided Mr. Crossan's social security number, date of birth and physical description (height, eye color, etc. ) to Mr. Wilson, which he maliciously used by putting such confidential information, which she obtained as part of her job, on each and every one of the 7 criminal complaints he filed against Mr. Crossan. Ms. Hughes, even after the inital hearing on October 28, 2005, continued to violate her duty of confidentiality by such disclosures. Further, Ms. Hughes does not hold any license from the Virginia Health Professions Board, yet alone the required "social workers" license which she is required to have as she monitors medicinals to Mr. Crossan. That the matter is a set up is clear by the posting of the stay-out code violations posting <u>simultaneous</u> with the "raid". The issuance of code notices usually requires a review of a supervisor and the computer input and computer generated printout. In the instant case, the notice was alrwady prepared before entry and was simultaneously posted at entry. Said notice was basically a copy of a list of alleged violations issued a year before which had a cure period, which was then met and satisfied. The plumbing items listed were old and false – the toilet had been repaired over a year ago and was working at least the day before.

Ms. Hughes admitted after the hearing of October 28th that she had brought in the "hoarders task force" on other of her clients. Ms. Hughes, on information and belief, was reporting alleged building code, alleged fire code, and other alleged criminal activity to law enforcement as a part of her job duties. Upon information and belief, Arlington County has a policy and in fact custom of having social workers report alleged criminal violations to law enforcement. The locks were changed by the civil conspiracy of Grierson, Wilson, Freeman, Hughes, Speck and CESMI and, upon information and belief, Defendant Almeida, and they need be held jointly and severally liable.

62.    Virginia's civil conspiracy statutes, 18.__ 1-599, 600 provides for damages for civil conspiracy as does the common law. The defendants have invaded Plaintiffs' privacy and the municipal Defendants have trespassed into the unit. Shipkovitz's bedroom had large notices stating "POSTED- NO TRESPASSING" on the doors. They have destroyed his business.

63.    Plaintiff Shipkovitz has been made homeless and deprived of his living. He is forced to depend on the goodness of friends for lodging, who reasonably expect compensation one way or another.

Defendants, jointly and severally need be held responsible for Plaintiff Shipkovitz' loss of earnings/business and also for lodging at the federal per diem rate multiplied by the number of days he is denied entry.

Defendants, jointly and severally, need be held responsible for damages to Plaintiff Shipkovitz's business which by the unlawful changing of the locks, stay-out and totally inexplicable building

17

banning order (thus even preventing him from staying with other resident friends), and the hiring of armed guards to prevent Plaintiffs' entry, will necessarily result in the destruction of Plaintiff's business and earnings, and possible Bar action, even though he is not at fault. Additionally, they need be held liable for the invasion of privacy, trespasses, damages caused by the necessary damages which will result if Plaintiff Shipkovitz can not complete the tasks, legal and otherwise, which he had previously committed himself to, and for those lost earnings damages caused by his inability to take on new ones or obtain employment [resume in seized unit].

64. Plaintiffs request judgment in an amount to compensate them for their sufferings and losses, including of lodging, food, lost earnings, etc., and for punitive damages to punish the Defendants for their egregious unlawful conduct in an amount to deter them from doing such acts again, such amount is suggested to be Five Hundred Thousand Dollars ($500,000) each. As stated before, Grierson stated that this was the "14th hoarder case this month", which implies that there are at least 13 other persons in similar circumstances, and an unknown number of previous victims of their unlawful unconstitutional conduct.

## COUNT THREE- INTENTIONAL BUSINESS INTERFERENCE -COMPENSATORY DAMAGES, CONSEQUENTIAL DAMAGES ; PUNITIVE DAMAGES

65. The Plaintiffs incorporate the above paragraphs by reference as if fully repeated herein.

66. Despite the institution of this lawsuit, the Arlington Defendants (Carlee, Wilson, Hughes, Freeman, Grierson, DiMatteo) have refused and continue to refuse to permit access to the unit, have refused to change the lock cylinders back to their original setting, despite notice that the changing of the locks was not authorized under any statute or legal authority of any sort. Further, Mr. Grierson supervised the removal of all items considered an egress issue, and thus such has not been a further claimed basis for any lock-out since mid-November. Also see Va. Code 18.2-599, 600. Plaintiffs Shipkovitz, a Registered Patent Attorney, has been out of business since October 20, 2005. Plaintiff Sabo, an inventor whose inventions cover both the trades and national security devices, has had certain confidential materials and software, etal. locked in the unit under the illegal seizure. (Mr. Sabo meets regularly with representatives of the U.S. DARPA , U.S. Secret Service, and others).

67. As a result, Plaintiffs Shipkovitz and Sabo demand compensation from the Arlington Defendants, jointly and severally, for this intentional business interference in the form of compensatory damages and consequential damages as proven, and punitive damages as the court believes just and due.

## COUNT   FOUR: ASSAULT, SLANDER, FALSE IMPRISONMENT, BUSINESS INTERFERENCE BY DEFENDANTS BLACK ICE AND JOHN DOE1 :SPECK CESMI PRINCIPALS

70. The Plaintiffs incorporate the above paragraphs by reference as if fully repeated herein.

71. As stated above, the hiring of Black Ice and John Doe1 was not by the Chairman

18

and President of the condominium, the proper officer of the condominium having the power and authority to act for the condominium as its chief executive officer, nor by any known resolution of the Board of Directors, but was, upon information and belief, the *ultra vires* act of Defendants Almeida and Speck. As stated above, Speck's principal, Defendant CESMI, has been at odds and/or litigation with both primary Plaintiffs going back decades. Defendant CESMI had overt malice when it hired any guard, and additionally if ordered by Board resolution , it did not hire its normal guard service, Securitas, but instead hired Defendant Black Ice, which upon recent inquiry, information and belief, is involved in various nefarious weapons and violence related matters, including violence in Iraq and elsewhere. The hiring of violence-prone individuals seems to be their *forte*. As could have been expected and foreseeable, their hiring of Black Ice/John Doe 1 to assault Plaintiff Shipkovitz , prevent him from changing the unlawfully-changed door lock to the unit or otherwise entering, following him in close pursuit to the 3d floor and standing in front of him/assault at the door entry, and slandering Plaintiff Shipkovitz as stated above to prevent Shipkovitz from employing a locksmith and otherwise being able to conduct business was predictable and occurred. Preventing someone from going where they desire and have property rights to go is believed a form of false imprisonment, which JohnDoe1 perpetrated.

72.    As a result, Defendants Black Ice, John Doe 1, Speck and CESMI need be held jointly and severally liable for their tortious acts. For the assault, Defendants herein named should be liable in the statutory amount and compensatory damages as proven and, to attempt to prevent such egregious acts by them in the future, that they be adjudged liable for punitive damages in an amount not less than Seven Hundred Fifty Thousand Dollars ($750,000) each or as the court sees just and correct.

73.    For the slander which John Doe stated to the third party locksmith to prevent the changing of the locks, specifically that the place "WAS CONDEMNED", a publication of false statement of fact to a third party, ( which it is believed he repeated to the Police) and he would prevent the services of a locksmith, compensatory damages as proven at trial should be awarded, and exemplary damages against Black Ice and John Doe1 need be an additional Seven Hundred Fifty Thousand Dollars ($750,000) each. The corporate charter of Black Ice needs to be revoked. CESMI and Speck may also be jointly and severally liable.


WHEREFORE, Plaintiffs move for judgment for the causes stated, and additionally request that, as appropriate, attorneys fees, costs and expenses be awarded against named defendants


A jury trial is demanded.

Respectfully submitted,

Samuel Shipkovitz
Plaintiff *pro se*/Attorney for
Crossan and Sabo
P.O. Box 2961
Arlington, VA 22202

January 20, 2006



19

## AFFIDAVIT OF RON CARLEE

I, Ron Carlee, do attest and swear that the following is true and accurate:

I am the County Manager of Arlington County, Virginia.

I have and have had no personal knowledge of the incident alleged to have happened on October 20, 2006 involving the home of Stephen Crossan. I received a copy of the Complaint filed in *Crossan, et al. v. County of Arlington Manager, et al.* Civil Action No. 05-cv-1219 and reviewed the allegations against me.

With regard to the allegations, I am aware of the existence of the Hoarding Task Force, but its function is merely to provide an opportunity for the Department of Human Services, Building Code Enforcement and the Fire Department to communicate about cases involving "hoarding" or extreme accumulation and in so doing facilitate the better provision of assistance and help to those living in these conditions, those suffering from mental health conditions which may have caused them to hoard items, and to assist those who live in proximity to those dwellings by providing protection from fire and other community hazards.

The Hoarding Task Force does not engage in investigations as a unit. The Task Force was formed to encourage interdepartmental communication and coordination. The Hoarding Task Force, moreover, has no independent authority and those participating on the Task Force are governed by the policies and requirements of their respective departments – not the Task Force. There is no Hoarding Task Force policy which has been adopted by the County Manager or the Arlington County Board.

_____
Ron Carlee

**COMMONWEALTH OF VIRGINIA**

**COUNTY OF ARLINGTON, to-wit:**
Subscribed and sworn to before me this _4th_ day of _May_____, 2006.

Notary Public _Antoinette Copeland_

My commission expires: _6-30-06_

EXHIBIT
G

1

## GENERAL PROVISIONS

### § 8-1. Repeal of conflicting ordinances.

Be it ordained that the ordinance entitled Chapter 8 of the Code of Arlington County, Virginia, an ordinance generally known as the Fire Prevention Code, adopted July 1, 1992, is hereby repealed July 11, 1998, and the following new Chapter 8 is enacted and recodified as follows effective July 11, 1998.

(Ord. No. 98-23, 7-11-98)

### § 8-1.1. Enforcement of Virginia Statewide and Arlington County Fire Prevention Codes.

The County of Arlington shall enforce the Virginia Statewide Fire Prevention Code promulgated by the Board of Housing and Community Development of the Commonwealth of Virginia pursuant to Section 27-98 of the Code of Virginia. The provisions of the Virginia Statewide Fire Prevention Code and the Fire Prevention Code of the County of Arlington, Virginia, shall be enforced by the chief fire marshal or by his duly authorized representatives.

(Ord. No. 98-23, 7-11-98)

### § 8-2. Chief fire marshal, assistant fire marshal(s) and deputy fire marshal(s)--Creation of offices.

The office of the county fire marshal is hereby established. The county manager shall appoint a chief fire marshal, assistant fire marshal(s) and such deputy fire marshal(s) as he may deem necessary. The chief fire marshal is also the "code official" as this term is used in the Virginia Statewide Fire Prevention Code.

(Ord. No. 98-23, 7-11-98)

### § 8-2.1. Same--Oath of office.

The chief fire marshal, assistant fire marshal(s) and deputy fire marshal(s) shall, before entering upon their duties, take an oath before any officer authorized to administer oaths to faithfully discharge the duties of their office.

(Ord. No. 98-23, 7-11-98)

### § 8-3. Establishment of the Arlington County Fire Department.

The County Board of Arlington County hereby establishes pursuant to Virginia Code Section 27-6.1, a fire department known as the Arlington County Fire Department. This fire department shall be the only one officially recognized to operate within Arlington County, Virginia. Where the fire department is referred to in this chapter this reference shall include the volunteer fire departments of the Arlington County Fireman's Association.

(Ord. No. 98-23, 7-11-98)



EXHIBIT
H

## § 8-4. Response of equipment.

All fire apparatus and emergency medical equipment responding within Arlington County to a fire or emergency medical incident within the jurisdiction shall be under the control and direction of the fire chief or his designee.

(Ord. No. 98-23, 7-11-98)

## § 8-4.1. Exceptions.

(a)  Any duly dispatched fire or emergency medical equipment from another city, town or county which merely passes through Arlington County or is merely bringing a patient to receive medical services within Arlington County.

(b)  Any private ambulance service certified to do business within the Commonwealth of Virginia.

(Ord. No. 98-23, 7-11-98)

## § 8-5. Fire and medical incident command.

All fire and medical emergencies occurring in Arlington County shall be the responsibility of the ranking officer of the Arlington County Fire Department.

(Ord. No. 98-23, 7-11-98)

## § 8-6. Establishment of fire department standards governing participation.

The fire chief shall establish standards, rules and regulations to promote the objectives of the fire department, within the laws of the commonwealth and county ordinances, and shall govern all county employees and other persons participating in fire fighting activities and emergency medical operations.

(Ord. No. 98-23, 7-11-98)

## § 8-6.1. Employment eligibility.

(a)  In order to determine whether, in the interest of public welfare and safety, an applicant for fire department employment may have a record of past criminal conduct that is incompatible with the nature of employment in the fire department, the fire chief or his/her designee shall request from the Virginia Central Criminal Record Exchange a criminal record check of each applicant for employment whose anticipated duties or responsibilities will involved, (i) access to public records or to personal information,(ii) accountability for public funds, (iii) entry into secured areas outside of working hours, (iv) law enforcement and investigations conducted under the color of law, (v) right of entry onto private property, or (vi) assistance to the elderly or disabled. Such applicant shall submit to fingerprinting by the Arlington County Sheriff or other agency designated by the fire chief and provide descriptive information as required by the sheriff or other agency. Applicant criminal record checks will be based onfingerprint comparison.

(b)  The fire chief or his/her designee shall review the applicant's criminal history record to determine whether the conviction record, if any, of the applicant is compatible with the nature of employment. Such criminal history record information obtained shall be considered confidential and shall be used solely to assess eligibility for public employment and shall not be

disseminated to any person not involved in the assessment process.

(Ord. No. 00-24, 10-21-00)

## § 8-7. Damage or injury to fire department vehicles, equipment or personnel.

It shall be unlawful for any person to damage or deface or attempt to damage or deface any fire department vehicle or equipment, or to injure, or attempt to injure or conspire to injure fire department personnel while such personnel are in performance of duties.

(Ord. No. 98-23, 7-11-98)

## § 8-8. Unlawful boarding or tampering with fire department vehicles.

It shall be unlawful for any person without authorization from the officer in charge of the vehicle to cling to, attach himself to, climb upon or into, board or swing upon any fire department vehicle, to manipulate, tamper with, remove or destroy any lever, valve, switch, starting device, brake, pump or any equipment, protective clothing, or tool or any part of such fire department vehicle.

(Ord. No. 98-23, 7-11-98)

## § 8-9. Invalidity.

If any part, section, subsection, clause or phrase of this ordinance is for any reason declared unconstitutional or otherwise invalid, such decision shall not affect the validity of the remaining portion of this chapter which shall remain in effect as if this chapter had been passed without the unconstitutional or otherwise invalid part, section or subsection, sentence, clause or phrase.

(Ord. No. 98-23, 7-11-98)

## § 8-10. Additional fire prevention regulations to supplement the Virginia Statewide Fire Prevention Code.

The Fire Prevention Code for the County of Arlington shall be read in conjunction with the current edition of the Virginia Statewide Fire Prevention Code. The regulations set forth in the Virginia Statewide Fire Prevention Code are hereby supplemented with the following fire prevention regulations, which are divided into articles to coincide with the chapters of the current edition of the BOCA National Fire Prevention Code, and which are intended to add to and be read in harmony with the corresponding sections of the Virginia Statewide Fire Prevention Code.

(Ord. No. 98-23, 7-11-98)

## § 8-10.1.1. Title.

These regulations as set forth herein shall be known as the "Fire Prevention Code of the County of Arlington, Virginia," and are herein referred to as such or as "this Code."

(Ord. No. 98-23, 7-11-98)

## § 8-10.1.2. Inspection by others.

The chief of the fire department may designate such other persons as he deems necessary to make fire safety inspections. Such persons shall use this code and the Virginia Statewide Fire Prevention Code as the basis for such inspections.

(Ord. No. 98-23, 7-11-98)

## § 8-10.1.3. Impersonation and solicitation by use of the Arlington County Fire Department's name.

It shall be unlawful for any unauthorized person to use a badge, uniform or any other credentials so as to gain access to any building, marine vessel, vehicle or premises or to otherwise falsely identify himself as the fire marshal, code official or his designated representative. The use of the name of the Arlington County Fire Department for any purpose of solicitation or to imply that any solicited funds shall be used for the Arlington County Fire Department is forbidden and shall be subject to the penalties of this code.

(Ord. No. 98-23, 7-11-98)

## § 8-10.1.4. Delegation of duties and powers.

The fire marshal of Arlington County shall have concurrent authority in the City of Falls Church in the absence of the City of Falls Church fire official to the extent permitted by the City of Falls Church and by agreement between the City of Falls Church and the County Board of Arlington County. The fire chief shall have the authority to agree to the terms under which the county fire marshal shall perform such functions in the City of Falls Church.

(Ord. No. 98-23, 7-11-98)

## § 8-10.1.5. Investigation of fires.

The fire marshal shall investigate, or cause to be investigated, every fire or explosion occurring within the county. The fire marshal shall also investigate, or cause to be investigated, the possession or manufacture of explosive devices, substances and fire bombs within the county, attempts or threats to commit such offenses, and false alarms relating to such offenses or to fires or explosions. The fire marshal shall take charge immediately of the physical evidence and, in order to preserve that evidence relating to the cause or origin, may prevent access by any person to such building, structure, or premises until such evidence has been properly processed. The county police department, upon request of the county fire marshal, shall assist in the investigation as needed. The results of any investigation shall be forwarded by the fire marshal to the commonwealth's attorney for proper disposition.

(Ord. No. 98-23, 7-11-98)

## § 8-10.1.6. Powers.

The fire marshal, assistant fire marshals and authorized deputy fire marshals, appointed pursuant to Title 27 of the Code of Virginia, shall have the powers of a member of the county police, sheriff or law-enforcement officer authorized by general law. The fire marshal, assistant fire marshals and authorized deputy fire marshals are responsible for the investigation or prosecution of all offenses involving fires, arson, fire bombings, bombings, attempts or threats to commit such offenses, false alarms relating to such offenses, possession and manufacture of explosive devices, substances and fire bombs, storage, use and transportation of hazardous materials and hazardous waste, environmental crimes; or any other offenses involving fire or fire safety or the calling or summoning of fire or rescue equipment without just cause, in violation of the Code of Virginia, 1950, as amended, or the Code of Arlington County, and regulations under these codes, and other criminal or civil offenses arising out of or incidental to the investigation of the enumerated offenses.

The fire marshal, assistant fire marshals and authorized deputy fire marshals shall have the authority to exercise all those powers described in sections 27-34.2 and 27-34.2:1 of the Code of Virginia, 1950, as amended.

The police powers granted in this section shall not be exercised by any fire marshal until such person has met the requirements of Sections 27-34.2 and 27-34.2:1 of the Code of Virginia, 1950, as amended.

(Ord. No. 98-23, 7-11-98)

## § 8-10.1.7. Summoning a fire marshal.

The fire department officer-in-charge of any fire, explosion or incident scene shall immediately summon the fire marshal or his designated representative to such scene to investigate the circumstances involved where such circumstances require investigation as outlined in section 8-10.1.5. of this Code.

(Ord. No. 98-23, 7-11-98)

## § 8-10.1.8. Local board of appeals.

A person cited for violation, when aggrieved by a decision or interpretation by the local fire marshal made under the provisions of either the Arlington County Fire Prevention Code or the Virginia Statewide Fire Prevention Code, may appeal to the board of appeals upon the grounds and in the manner set forth in the Virginia Statewide Fire Prevention Code.

(Ord. No. 98-23, 7-11-98)

## § 8-10.1.8.1. Members of the local board of appeals.

In accordance with the Virginia Statewide Fire Prevention Code, the local board of appeals shall consist of at least five (5) members who are qualified by experience and training to rule on matters pertaining to building construction and fire prevention. All appointments to the local board of appeals shall be made by the Arlington County Board. The members of the local board of appeals shall be appointed to serve four (4) year terms. The local board of appeals shall elect its own officers including a chairman and vice chairman.

The local board of appeals shall operate in accordance with the applicable provisions of the

Administrative Process Act, Section 9-6.14:1 through Section 9-6.14:25, of the Virginia Code of 1950 as amended.

(Ord. No. 98-23, 7-11-98)

## § 8-10.1.9. Notification of the fire department.

In any building, structure or premise subject to inspection under any provision of this code, when a fire, or evidence of there having been a fire, is discovered that has resulted in property damage or is of a suspicious nature indicating the possibility of arson or of recurrence, even though it has apparently been extinguished, it shall immediately be reported to the chief of the fire department or his designee. This shall be the duty of the owner, manager or person in control of such building at the time of discovery. This requirement shall not be construed to forbid the owner, manager or person in control of said building from using all diligence necessary to extinguish such fire prior to the arrival of the fire department.

(Ord. No. 98-23, 7-11-98)

## § 8-10.1.10. Permits and fees.

A permit shall constitute permission to store, manufacture, or handle materials, or to conduct activities in accordance with this code and the Virginia Statewide Fire Prevention Code and shall not be construed as authority to avoid compliance with any of the provisions of either code. Permits shall remain in effect until revoked or for such period of time specified on the permit. Permits are not transferable from one person, business, location or address to another. All fees associated with said permit(s) shall be paid in full prior to issuance of same.

(Ord. No. 98-23, 7-11-98)

## § 8-10.1.11. Fees.

Permits and fees as required by this article or the Virginia Statewide Fire Prevention Code shall be set forth in Table 8-10.1.11. No permit required by the Fire Prevention Code shall be valid until the prescribed fee has been paid to the Treasurer of Arlington County.

TABLE INSET:

| Section | Table 8-10.11.1. Permit and Fee Description | Permit/ Inspection Required | Permit Fee |
|---------|---------------------------------------------|------------------------------|------------|
| F-402.3. | Candles in assembly & educational occupancies | Yes | N/A |
| F-403.4. | Open burning | Yes | $85.00 |
| F-404.2. | Remove paint with torch | Yes | 85.00 |
| F-601.4. | Assembly & educational occupancies | Yes | Note a |
| F-701.1. | Child/daycare facilities | Yes | Note e |
| F-801.2. | Airports, heliports & helistops | Yes | 85.00 |

| F-901.2. | Flammable liquids, bowling lanes | Yes | 85.00 |
|---|---|---|---|
| F-1001.2. | Crop ripening & coloring processes | Yes | 85.00 |
| F-1101.2. | Dry cleaning | Yes | 85.00 |
| F-1201.2. | Dust explosion hazard | Yes | 85.00 |
| F-1301.2. | Flammable finishes | Yes | 85.00 |
| F-1401.2. | Fumigation-insecticidal | Yes | 85.00 |
| F-1501.2. | HPM facilities | Yes | 85.00 |
| F-1601.2. | Lumber yard-woodworking plants | Yes | 85.00 |
| F-1701.2. | Matches-bulk storage | Yes | 85.00 |
| F-1801.2. | Oil/gas wells | Yes | 85.00 |
| F-1901.2. | Organic coatings | Yes | 85.00 |
| F-2001.2. | Tents/air-supported structures | Yes | 85.00 |
| F-2102.2. | Wrecking yard, junk yard, waste material handling | Yes | 85.00 |
| F-2201.2. | Welding or cutting | Yes | 85.00 |
| F-2205.2. | Storage of welding cylinders | Yes | 85.00 |
| F-2207.1. | Calcium carbide | Yes | 85.00 |
| F-2208.1. | Acetylene generators | Yes | 85.00 |
| F-2208.7. | Acetylene cylinder storage | Yes | 85.00 |
| F-2301.2. | Hazardous materials | Yes | 85.00 |
| F-2401.2. | Aerosol products | Yes | 85.00 |
| F-2501.2. | Cellulose nitrate plastics | Yes | 85.00 |
| F-2601.2. | Combustible fibers | Yes | 85.00 |
| F-2701.2. | Compressed gases | Yes | 85.00 |
| F-2801.2. | Corrosives | Yes | 85.00 |
| F-2901.2. | Cryogenic liquids | Yes | 85.00 |
| F-3001.2. | Blasting/explosives | Yes | 85.00 |
| F-3101.2. | Fireworks | Yes | 85.00 |
| F-3201.2. | Vehicle repair shop | Yes | 85.00 |
| F-3201.2. | Flammable and combustible liquids storage, handling, use, process | Yes | 85.00 |
| F-3201.2. | Flammable and combustible liquids tanks and equipment | Yes | Note d |
| F-3301.2. | Flammable solids | Yes | 85.00 |
| F-3401.2. | Highly toxic and toxic solids and liquids | Yes | 85.00 |
| F-3501.2. | Irritants, sensitizers and other health hazards | Yes | 85.00 |
| F-3601.2. | Liquefied petroleum gases | Yes | 85.00 |
| F-3701.2. | Organic peroxides | Yes | 85.00 |
| F-3801.2. | Liquid and solid oxidizers | Yes | 85.00 |
| F-3901.2. | Pesticides | Yes | 85.00 |
| F-4001.2. | Pyrophoric materials | Yes | 85.00 |
| F-4101.2. | Radioactive materials | Yes | 85.00 |
| F-4201.2. | Unstable (reactive) materials | Yes | 85.00 |

| F-4301.2. | Water reactive materials | Yes | 85.00 |
|---|---|---|---|
| 8-10.3.8. | Special events | Yes | 85.00 |
| 8-10.4.1. | Open burning | Yes | Note b |
| 8-10.4.2. | Flame producing devices--sweating pipe joints | Yes | 85.00 |
| 8-10.4.3. | Flame producing devices--roofing applications | Yes | 85.00 |
| 8-10.5.11. | Periodic retest fire protection systems and cancellation of scheduled test | Yes | Note c |
| 8-10.13.1.2. | Applying flammable/combustible liquids in floor refinishing operations | Yes | 85.00 |
| 8-10.13.2.1. | Metal refinishing operations | Yes | 85.00 |
| 8-10.31.1.1. | Sale of fireworks | Yes | 500.00 |
| 8-10.31.1.2. | Display of fireworks | Yes | 85.00 |

Note a--Assembly and education facilities with an approved capacity up to fifty (50) persons is forty-two dollars and fifty cents ($42.50); fifty-one (51) to five hundred (500) [is] eighty-five dollars ($85.00); above five hundred (500) is one hundred seventy dollars ($170.00).

Note b--Special events up to fifty (50) persons is forty-two dollars and fifty cents ($42.50); fifty-one (51) to five hundred (500) [is] eighty-five dollars ($85.00); above five hundred (500) is one hundred seventy dollars ($170.00). The above fees may be waived if an inspection fee is included in the county's special event fee that covers all agencies.

Note c--Periodic retest of fire protection systems is based on a eighty-five dollar ($85.00) hourly rate for each inspector. Half hour rates are forty-two dollars and fifty cents ($42.50). As defined in Section 8-10.5.9., a eighty-five dollar ($85.00) fee will be assessed for cancellations less than forty-eight (48) hours prior to scheduled inspections and/or retest of fire protection systems.

Note d--Administrative review of flammable and combustible liquid storage tank permit applications and/or on-site inspections of such equipment is based on a eighty-five dollar ($85.00) per hour rate. Half hour rates are forty-two dollars and fifty cents ($42.50).

Note e--Annual child/daycare inspections with 1--4 children will be forty-two dollars and fifty cents ($42.50), 5--9 children will be eighty-five dollars ($85.00), and 10 or more children will be one hundred seventy dollars ($170.00).

(Ord. No. 98-23, 7-11-98; Ord. No. 02-20, 7-20-02)

# § 8-10-2.1. General definitions.

*Code official* shall have the same meaning and authority as the fire marshal.

*Designee* shall be the Arlington County Emergency Communications Center (ECC) (703) 558-2222.

*Dwelling unit* a single unit providing complete, independent living facilities for one or more persons, including permanent provisions for living, sleeping, eating, cooking, and sanitation.

*Floor refinishing operations* are those in which a finish is to be applied using a flammable or combustible liquid.

*Metal refinishing operations* are those operations performed in or around occupied structures involving the stripping of an old finish and applying a new finish using a flammable or combustible liquid.

*Occupancy* the purpose for which a building or portion thereof is utilized or occupied.

*Operations procedure manual* a manual, as approved by the code official, that describes the various components and procedures for operating all fire protection equipment and/or systems in a structure.

*Person in control* shall mean any firm, corporation, or person, even a person of low rank or authority, who is solely or jointly in control of all or any portion of the premises, facility, structure, vehicle, device, other property, substance, material, gas, liquid, chemical or condition regulated by this Code. A person in control includes an owner, operator, permit holder, tenant, occupant, manager, employee, agent, contractor, attendant or other person.

*Stacked unit* is any type of R-3 structure (one or two-family dwelling units) containing two (2) or more dwelling units where each dwelling unit has an independent means of egress and the dwelling units are arranged one above the other either partially or totally.

*Subsurface structure* shall include, but is not limited to, structures such as subway stations, railroad tunnels including rapid rail transit tunnels, and highway tunnels.

(Ord. No. 98-23, 7-11-98)

## § 8-10.6.1. Exterior access.

Any exterior doors which are blocked by storage or other use inside shall have a sign on the exterior of such door with the words "NO ACCESS". The sign shall be constructed of durable materials, permanently installed and readily visible. Letters and numbers shall contrast with the sign background and have the appropriate width-to-height ratio to permit the sign to be read easily. This subsection shall not be construed to permit the blocking of any exit or egress door.

(Ord. No. 98-23, 7-11-98)

## § 8-10.6.1.1. Exterior door marking and access for all mid level and high-rise buildings.

All new and existing buildings over four (4) stories as defined by the Statewide Fire Prevention Code shall install signage on the outside of their exterior doors stating the stairway location, and all doors shall have door handles and keyed entry locks. They keys to these doors shall be kept on the existing key rings in the rapid entry key box or fire control room.

(Ord. No. 02-20, 7-20-02)

## § 8-10.6.2. Egress door security devices.

Security devices on egress doors other than those approved by the Building Code listed in Chapter 44, shall be approved by the code official. The storage of chains and padlocks on panic hardware shall be prohibited whenever a structure is occupied.

(Ord. No. 98-23, 7-11-98)

## § 8-10.6.3. Exit signs.

The installation of low-level exit signs to supplement regular exit signs shall be placed in all new and existing occupancies to include places of assembly, hotels, department stores, or other buildings subject to transient occupancy, and semi-permanent occupancy such as an apartment house, and as deemed necessary by the code official. Such exit signs may be approved luminescent, self-luminous, or self-illuminated types. They are not intended to replace standard exit signs but are designed as an extra assetto a building occupant seeking egress in a smoke-filled environment at a location that is the last to become obscured.

Where floor proximity exit signs are specifically required, exit signs shall be placed near the floor in addition to those signs required for doors or corridors. These signs shall be sized and illuminated in accordance with the requirements of the Statewide Fire Prevention Code F-610. The bottom of the sign shall be not less than six (6) inches or more than eight (8) inches above the floor. For exit doors, the sign shall be mounted on the door or adjacent to the door with the closest edge of the sign withinfour (4) inches of the doorframe.

(Ord. No. 02-20, 7-20-02)

recover from the responsible party the necessary costs incurred for the provision of public emergency services reasonably required to abate any such public nuisance.

(c)  The term "nuisance" shall include, but not be limited to, dangerous or unhealthy substances which have escaped, spilled, been released, or which have been allowed to accumulate in or on any place, and all unsafe, dangerous, or unsanitary public or private buildings, walls, or structure which constitute a menace to the health and safety of the occupants thereof or the public. The term "responsible party" shall include, but not be limited to, the owner, occupier, or possessor of the premises where the nuisance is located, the owner or agent of the owner of the material which escaped, spilled, or was released, and the owner or agent of the owner who was transporting or otherwise responsible for such material and whose acts or negligence caused such public nuisance.

(Ord. No. 82-42, 12-4-82; Ord. No. 83-18, 6-18-83; Ord. No. 90-26, 8-11-90; Ord. No. 93-25, 12-13-93)

## § 3-15. Small appliance replacement program.

(1)  *Permit* . A mechanical, electrical or plumbing contractor may install, as prescribed by the inspection service division, permanently wired or plumbed appliances on a small appliance replacement permit, provided the capacity of the electrical panel or gas service in the building is not exceeded. Small appliances include, by way of illustration but not limitation, central air conditioner, oil or gas furnace/boiler replacement, attic fan, exhaust fan, disposal, dishwasher, water heater and humidifier, stoves, dryers,range hoods and exhaust fans.

(2)  *Fees* :

   (a)  Permit fee . . . $ 35.00

   (b)  Each additional appliance added on the same permit . . . 8.00

   (c)  Reinspection fee . . . 30.00

(3)  *Licensing* . Class A contractors are exempted from these requirements . Class B electrical, plumbing and mechanical contractors certified by examination of the Virginia Board of Housing and Community Development as a master mechanical, electrical, or plumbing workers shall register and post bond:

        Annual registration fee . . . $ 20.00

        Bond . . . 5,000.00

Contractors licensed by other Virginia jurisdictions with equivalent examinations may be licensed without submitting to the examination. Class A contractors are exempted from these requirements. Class B electrical, plumbing and mechanical contractors with certified Level II mechanical, electrical, or plumbing worker shall only register and post bond.

(Ord. No. 83-18, 6-18-83; Ord. No. 84-13, 5-12-84; Ord. No. 88-8, 4-30-88; Ord. No. 92-1, 2-1-92; Ord. No. 95-8, 4-29-95; Ord. No. 04-10, 4-24-04)

## § 3-16. Arlington County Building Code Board of Appeals.

(a)  Pursuant to Section 36-105, Code of Virginia, the Arlington County Building Code Board of Appeals shall consist of seven (7) members based on their ability to render fair and competent decisions regarding application of the Virginia Uniform Statewide Building Code. At least one (1) member each shall be an experienced builder, one (1) a licensed electrical contractor, one (1) a licensed plumbing or mechanical contractor, and one (1) a licensed architect or engineer. Employees or officials of Arlington Countyshall not serve as panel members.

EXHIBIT

(b)  The Arlington County Building Code Board of Appeals shall conduct its business in accordance with administrative procedures contained in the latest edition of the Virginia Uniform Statewide Building Code.

(Ord. No. 89-25, 9-23-89)

.

# EXHIBIT 10

FILED

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

2005 OCT 27 P 3: 10

STEPHEN C. CROSSAN, et al                     )

                            **Plaintiffs,**        )

v.                                                            )

                                 )

COUNTY OF ARLINGTON, MANAGER, et al. )     Civil Action No. 05-CV-1219

                                 )

                   **Defendants.**        )

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

## OPPOSITION TO PLAINTIFF'S REQUEST FOR TEMPORARY RESTRAINING ORDER AND PERMANENT INJUNCTION

COMES NOW, the County Manager of Arlington County, Virginia, Sharita Hughes and Deputy Fire Marshal, Samuel K. Grierson, by counsel, Louise M. DiMatteo, Assistant County Attorney, in opposition to the Plaintiffs' demand for a temporary restraining order and injunctive relief and state the following:

I.      FACTS

Three affidavits are attached to this Opposition from Deputy Samuel Grierson (*Exhibit A*), Sharita Hughes (*Exhibit B*) and Richard Freeman (*Exhibit C*). These Affidavits outline certain facts at issue in this matter which contradict the Complaint filed herein by the Plaintiffs. In sum, these affidavits relate the following pertaining to events leading up to and including October 20, 2005 which are the subject of the complaints made by the Plaintiffs:

Stephen Crossan is an individual known for many years to the Arlington County Department of Human Services as he was adjudicated "not guilty by reason of insanity" on an arson charge dating back to 1996. Because Mr. Crossan was committed to the Northern Virginia Mental Health Institute for many years, his conditional release into the community was monitored by the Institute through the Program Assertive Community Treatment Team

1

(hereinafter "PACT" team).  Sharita Hughes is a member of the PACT team and Mr. Crossan is one of her clients.  It is as a result of this ongoing relationship that Ms. Hughes was in contact both with Mr. Crossan and Mr. Shipkovitz since 2004.

In providing case management services through human services to Mr. Crossan, Ms. Hughes had many occasions to visit Mr. Crossan (daily and twice daily visits were required as a term of his conditional release from the Institute into the community) in the apartment located at 1200 South Crystal Drive, Unit 314, in Arlington, Virginia.  It was during these visits that Ms. Hughes became concerned about Mr. Crossan's health and welfare as the conditions of the apartment deteriorated due to the excessive accumulation of material in the apartment.  Ms. Hughes became concerned that one of the occupants was hoarding.  Mr. Crossan told Ms. Hughes that Mr. Shipkovitz was hoarding these items not Mr. Crossan.

Because Ms. Hughes was worried about Mr. Crossan she advised him to clean up the apartment or she would have to involve the fire marshal's office as the situation appeared dangerous to her.  She observed as recently as the beginning of October that a narrow path of about 15 inches was all that was available to navigate through the apartment to the bedrooms and bathroom.  There was no visible means of cooking and Mr. Crossan told Ms. Hughes that there was no room in the refrigerator for his food.  Ms. Hughes was concerned that Mr. Crossan was not eating nutritious foods and was losing weight.

When no improvement in the conditions of the apartment were apparent, Ms. Hughes arranged for the fire marshal and building code enforcement to go to the apartment to inspect for violations.  On October 20, 2005, after arranging with Mr. Crossan for a visit, Ms. Hughes, Samuel Grierson and Richard Freeman (from building code enforcement) arrived at Mr. Crossan's apartment.  Mr. Crossan freely permitted them entry for the purpose of investigating

whether there were any fire code or building code violations. Mr. Crossan is the sole owner of the apartment and Mr. Shipkovitz is merely residing there with permission of Mr. Crossan. Mr. Crossan has stated that there is not a lease between himself and Mr. Shipkovitz.

Upon entry, the parties observed that there was rubbish, debris, papers, boxes, bags and all manner of containers and variety of materials piled and strewn from floor to ceiling in every room of the apartment *except the bedroom where Mr. Crossan slept.* As is apparent from the Affidavit of Richard Freeman and the photos attached thereto (*see Exhibit C*) this condition was clearly dangers and beyond the mere "clutter" that Plaintiffs suggest the condition to be. Indeed there can be no question but that the photos clearly demonstrate a dangerous condition to the occupants as well as to anyone who may enter.

The photos also clearly reveal that the kitchen is unusable – but if one were to actually use the stove or oven, would certainly engulf the unit in flames. Additionally, it is clear that the toilet is also entirely non-functional – the only toilet in the apartment. There is clearly no egress as there is but a mere 15 inches or so to squeeze through to enter the premises and move around the apartment. Indeed, with the exception of Mr. Crossan's bedroom, it is hard to fathom how anyone can live in and be productive in such an environment. It causes one to wonder how Mr. Shipkovitz is running a successful patent law business from such a shambles.

Upon examination of the premises, both Deputy Grierson and Richard Freeman made findings as detailed in their affidavits and attachments thereto, amounting to violations of the Fire Code and Building Code and those violations were posted on the front door of the apartment unit. Those notices prohibit admission into the apartment due to its unsafe condition.

II.     Based upon the facts stated above, Plaintiffs cannot prevail in their efforts to secure a temporary restraining order and permanent injunction. *Blackwelder v. Seilig*, 550 F.2d

189 (4th Cir. 1977) requires that a petitioner for interlocutory relief bears the burden and must make a "strong showing that it is likely to prevail upon the merits" and show "that without such relief it will suffer irreparable injury". *Blackwelder*, 550 F.2d 189, 193 (4th Cir. 1977). Additionally, the Court must ask "would the issuance of the injunction substantially harm other interested parties" and "wherein lies the public interest?" *Id.*

Plaintiffs cannot make a strong showing that they will prevail upon the merits. The Plaintiffs have alleged violations of their civil rights under 42 U.S.C. § 1983 by finding the apartment in which Crossan and Shipkovitz reside violated both the Virginia Uniform Statewide Fire Prevention Code and the Virginia Uniform Statewide Building Code. The Defendants state that they followed the requirements of these Codes and evacuated the apartment for the safety of the occupants therein.

The Virginia Uniform Statewide Fire Prevention Code (hereinafter "Fire Code") allows for the evacuation of any premises "when, in the fire official's opinion there is actual and potential danger to the occupants…because of … inadequacy of any means of egress…." *Fire Code § 110.6, attached hereto as Exhibit D.* In this case, Deputy Fire Marshal Grierson made a determination that the structure was unsafe due to the excessive accumulation of personal affects and general debris and found that there was a danger to the occupants therein. *See Affidavit of Deputy Grier, Exhibit A.* After the notice is provided to the owner of the premises, the owner may appeal the decision of the fire official to the local board of fire prevention code appeals. *Fire Code § 112.5, Exhibit D.* Plaintiff, Stephen Crossan, the only plaintiff who may appeal a citation for violation of the Fire Code, has not appealed this decision.

Likewise, the Virginia Uniform Statewide Building Code (hereinafter "Building Code") allows owners aggrieved by the determination of code inspectors the ability to appeal citations

4

for violations of the Building Code. *Building Code § 106.5. Exhibit E.* Plaintiff, Stephen Crossan, the only plaintiff who may appeal a citation for violation of the Building Code, has not appealed this decision.

Mr. Crossan is the sole owner of the apartment and is responsible for any and all of the violations contained in the unit. Additionally, Mr. Shipkovitz is living in the apartment as a guest of Mr. Crossan; there is no lease. Any complaint that Mr. Shipkovitz may have about being able to retrieve his belongings should be made against Mr. Crossan, the owner of the apartment. Under the Fire Code and the Building Code the owner of the premises has the obligation to maintain it in a safe and habitable condition and upon a violation the owner is responsible to remediate the violations.

Mr. Crossan has been offered the opportunity to clean up the apartment. The fact that this has not been done and the apartment remains closed to entry is entirely within Mr. Crossan's control. The fact that Mr. Shipkovitz alleges harm because he is being deprived of his possessions is a matter which should be taken up with Mr. Crossan, not the County of Arlington.

III.    Under the Federal Rules of Civil Procedure, Rule 4, when a Plaintiff sues individuals, those individuals must be served personally. Neither Sharita Hughes nor Deputy Samuel Grierson has been served in this matter. A copy of the suit was delivered to the Office of the County Manager, but it is not clear whether the County Manager was properly served. Whether Ron Carlee, the County Manager, was properly served or not, it is clear from the pleadings that there are no allegations against Ron Carlee at all. It is unclear why he is named in this suit at all as the Plaintiffs have alleged nothing about him.

It is clear that this matter is not properly before the Court as none of the parties has been properly served under Rule 4. For this reason the matter should not be heard.

IV.    In conclusion, it is clear that the only Plaintiff with any interest in the subject property is Stephen Crossan. Mr. Crossan, the sole owner of the premises, permitted Ms. Hughes, Deputy Grierson and Mr. Freeman access to his apartment for the express purpose of investigating allegations of building and fire code violations. This permission was gained freely from Mr. Crossan. Because permission was granted, no warrant or summons was necessary. Thereafter, the premises, clearly in violation, was evacuated under the Fire Code and remains so for the safety of its occupants until such time as Mr. Crossan determines to take action to clear the violations. Mr. Shipkovitz has no standing to allege a violation except, perhaps, against Mr. Crossan who permitted the inspection to take place and who has the obligation to maintain the premises free from building and fire code violations.

Mr. Crossan has the ability to fix the problem and this can be done quickly if he has the determination to do so. Mr. Crossan has, thus far, failed to act.

The County Manager, Sharita Hughes and Deputy Grierson respectfully request that the request for a temporary restraining order and injunctive relief be denied.

Respectfully submitted,

County Manager of Arlington County, Virginia
Sharita Hughes
Deputy Samuel K. Grierson
By Counsel

Stephen A. MacIsaac
County Attorney


By: _Louise M. DiMatteo_
Louise M. DiMatteo
Assistant County Attorney
VSB # 30273
#1 Courthouse Plaza
Suite 403
2100 Clarendon Boulevard
Arlington, Virginia 22201
(703) 228-3100
Counsel for Arlington County Manager,
    Sharita Hughes
    Deputy Samuel K. Grierson


## Certificate of Service

I hereby certify that a true copy of the foregoing was hand-delivered to Samuel Shipkovitz at 1513 North Ohio, Arlington, Virginia this 27th day of October, 2005.


_Louise M. DiMatteo_
Louise M. DiMatteo

# EXHIBIT 11

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

OFFICE OF THE COUNTY ATTORNEY
ARLINGTON, VIRGINIA
RECEIVED

JUN 2 2006

BY _____
TIME _____

STEPHEN C. CROSSAN, et al,          )
                                    )
            Plaintiffs,             )
                                    )
      v.                            )
                                    )
COUNTY OF ARLINGTON MANAGER, et al. )    Civil Action No 05-1219 (CMH-LO)
                                    )
            Defendants              )

PLAINTIFFS'
TRANSMITTAL OF FIRST DRAFT OF
PROPOSED JURY INSTRUCTIONS

Plaintiff hereby submits two copies of their First Draft of Proposed Jury Instructions.

                              Respectfully submitted,

                              _Samuel Shipkovit_
                              SAMUEL SHIPKOVIT
encl: First Draft of Proposed Jury Instructions    Plaintiff pro se / attorney
                              P.O. Box 2961
                              Arlington, VA 22203

            Certificate of Service
I hereby certify that a copy of the foregoing Plaintiff's Transmittal of First Draft of Proposed Jury Instructions (with same) was mailed first class postage prepaid to: L. DiMatteo, Esq., Asst. County Attorney, ARLINGTON GOVT., 2100 Clarendon Blvd., 4th Flr., Arlington, VA 22201
                              _Shipkovit_

## PROPOSED JURY INSTRUCTIONS

The jury are instructed that if they believe from the evidence that the defendant _____ had exceeded his (her) authority they shall so find.

The jury are instructed that if they found that Defendant _____ exceeded his (her) authority and by his (her) acts caused damage, financial loss, or personal injury _(including loss of earnings)_ To Shipkovitz by his (her) act, then they are to (1) find that Deft. _____ exceeded authority (2) determine the amount of monetary award to be awarded to the Plaintiff

This may include consideration of physical suffering, including as to dental injuries, including to loss of portions of permanent teeth and cost of repair, including crowns, bridges or other corrective requirements caused by Defendant _____

The jury are instructed that if they believe the placard was wrongfully posted on Oct. 20, 2005, then they shall so find.

The jury are instructed that if they believe _from the evidence_ the Notice of Unsafe Structure (the second notice) was wrongfully issued on Oct 25, 2005, then they shall so find

The jury are instructed that if they believe from the evidence that Emergency Violation Notice (the first notice) was wrongfully issued on Oct. 20, 2005, then they shall so find.

The jury are instructed that if they believe from the evidence that the Grierson Fire Notice was wrongfully issued, then they shall so find,

The jury are instructed that if they believe from the evidence that Defendant _____ entered Shipkovitz's bedroom without warrant or permission, then they shall so find.

The jury are further instructed that if Defendant _____ knowingly ignored Shipkovitz's NO TRESPASSING signs and entered his bedroom, they shall so find

The jury are instructed that if they believe from the evidence that Defendant _____ wrongfully changed the lock ON OCT. 20, 2005, then they shall so find.

The jury are instructed that if they believe from the evidence that Defendant _____ continued its ~~wrongfull~~ lockout AFTER THE NEXT DAY Oct. 21, 2005 wrongfully, then they shall so find.

The jury are instructed that if They believe from The evidence That Defendant _____ violated Shipkovitz's 14th Amendment Due Process right by refusing to respond to Shipkovitz's Appeals to both the local Fire Appeal Board and the local Cod Board filed Oct 31, 200 then They shall so find.

The jury are instructed that if They believe that Hughes rang The unit's doorbell and was in front of the other Defendants when they entered, the jury shall so find.

The jury are instructed that if they believe from the evidence That Crossan gave permission to Hughes only to enter, the jury shall so find.

The jury are instructed that if They believe from the evidence that Shipkovitz's 4th Amendment rights were violated by the search of his belongings and his bedroom, Then the jury shall so find.

The jury are instructed that if They believe from the evidence that Crossan could not or did not have the mental capacity to consent to Deft. _____ t search the unit, they shall so find.

The jury are instructed that if They believe from the evidence that Defendant _____ had no permission to enter The unit on Oct. 20, 2005, Then they shall so find

The Court instructs the jury that if they find for the Plaintiff, they should award fair damages.

The court instructs that it is not necessary that material facts be proven by direct evidence; they may be proven by circumstantial evidence, that is the jury may draw all reasonable and legitimate inferences and Deductions from the evidence adduced before them.

The Court instructs the jury that if they believe from the evidence that Plaintiff Shipkovitz was harmed by Defendant _____ by not permitting Shipkovitz to continue to remove his belongings they shall so find

The Court instructs the jury that if they believe from the evidence that Defendant _____'s refusal to continue to permit Shipkovitz in to continue to remove his belongings and such refusal was wilful or malicious, they shall so find accordingly.

The jury is the Sole Judges of the weight of the evidence and of the credibility of the witnesses, and the jury has the right to discard or accept the testimony or any part thereof of any witness that the jury regards proper to discard or accept, when considered in connection with the whole evidence in this case, but the jury has no right arbitrarily to disregard the credible testimony of a witness

The jury are instructed that if they believe from the evidence that Defendant _____ was acting in accordance with a "policy, practice or custom", then they shall so find.

The jury are instructed that if they believe from the evidence that there was an arlington "policy, practice or custom" to do the acts complained of Then They shall so find.

The jury are instructed that if They believe from the evidence that Defendant Hughes was required to have a "Social worker's license", then they shall ~~so find~~. so find,

The jury are instructed that if they believe from the evidence that Defendant _____ violated Shipkovitz's 14th Amendment Due Process rights, then they shall so find, and shall make a fair award for Plaintiff Shipkovitz.

The jury are instructed that if they believe from The evidence that Deputy Fire Marshall Grierson had police powers, including to arrest, Then they shall so find.

The jury are further instructed that if they believe /Grierson from the evidence had police powers and failed to provide a "Miranda warning" to Crossan, then they shall so find.

The jury are further instructed that if They believe from the evidence that Grierson had no authority to change the lock, then they shall so find.
on Oct. 20, 2005

The jury are further instructed that if They believe from the evidence that There was no (1) food (2) foodstuffs, (3) garbage, (4) trash, or (5) debris in The unit on Oct. 20, 2005,
(5) excessive newspapers
no objectionable amount of

Then they shall so find as to each.

The jury are instructed that if they believe from the evidence that Shipkovitz's 14th Amendment rights, including his Due Process rights under said Amendment, were violated, then they shall so find.

The jury are instructed that if they believe from the evidence that there was a "Hoarding task force" or a "hoarder task force", then they shall so find.

The jury are further instructed that if they believe from the evidence that Defendant Freeman was "head" of the "hoarding task force", then they shall so find.

The jury are instructed that if they believe from the evidence that ongoing abatement of egress and other issues and accompanying removal by Shipkovitz of his property was wrongfully stopped, then they shall so find.

The jury are instructed that if they believe Plaintiff Sabo was harmed by the refusal to permit him in to retrieve the rest of his property, then they shall so find.

# EXHIBIT 12

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division



|                          |     |
|--------------------------|-----|
| STEPHEN C. CROSSAN, _et al._, | )   |
| Plaintiffs,              | )   |
| v.                       | )   |
| COUNTY OF ARLINGTON MANAGER, _et al._, | )   |
| Defendants.              | )   |

Civil Action No. 05-1219

## MEMORANDUM OPINION

This matter comes before the Court on Defendants' Ron Carlee
(Carlee), Arlington County Manager; Keith Grierson (Grierson);
Dana Wilson (Wilson); Richard Freeman (Freeman); and Sharita
Hughes (Hughes) (collectively County Defendants) Motion for
Summary Judgment pursuant to Fed. R. Civ. P. 56(b), (c).
Plaintiffs' Amended Complaint, filed against County Defendants
and others, alleges violations of 42 U.S.C. § 1983 (2000) (Count
2); intentional business interference (Count 3); and assault,
slander, false imprisonment, and intentional business
interference (Count 4). In addition, Plaintiffs seek a permanent
injunction against County Defendants (Count 1). The Court has
jurisdiction over this matter pursuant to 28 U.S.C. § 1331, 1367.

Plaintiff Samuel Shipkovitz (Shipkovitz) is a former
resident of 1200 Crystal Drive, Arlington, VA 22202 (the Condo).

Plaintiff Anthony Sabo (Sabo) had personal property in the Condo under the care of Shipkovitz at the time in question. Defendants Carlee, Grierson, Wilson, Freeman, and Hughes are employees of Arlington County, Virginia. Carlee is the County Manager, Grierson is a Deputy Fire Marshall, Wilson and Freeman are code enforcement officials, and Hughes is a mental health worker.

Stephen Crossan (Crossan) is the owner of the Condo. In 1996 Crossan was found Not Guilty by Reason of Insanity on an arson charge in Virginia state court and was committed to the Northern Virginia Mental Health Institute (Mental Health Institute). Upon his committal, Crossan entered into an agreement with Shipkovitz whereby Shipkovitz would reside in the Condo during Crossan's stay in the Mental Health Institute. Crossan remained in the Mental Health Institute until his conditional release in 2004. Crossan and Shipkovitz both resided in the Condo from 2004 to October 20, 2005.

Pursuant to his release from the Mental Health Institute, Crossan was required to meet daily with representatives from the Arlington County Department of Human Services, one of which was Hughes, Crossan's case manager. Hughes met with Crossan on a weekly basis from 2004 to October 2005, at which time she became concerned that Shipkovitz's massive accumulation of personal property (i.e., paper, boxes, bags, trash, newspapers, etc.) was making the Condo uninhabitable for Crossan. After several

2

unsuccessful attempts to encourage Shipkovitz to remedy the situation, Hughes contacted Grierson regarding the conditions of the Condo. On October 20, 2005, Hughes arrived at the Condo with Grierson, Wilson, and Freeman (collectively the Inspectors). Grierson explained to Crossan that he and the others were there to inspect the Condo, and requested Crossan's permission to do so. Crossan consented and the Inspectors entered the condo and inspected it for fire code violations.

Grierson determined from his inspection of the Condo that Shipkovitz's massive accumulation of personal property was a fire hazard and that the Condo was uninhabitable. Grierson posted appropriate evacuation and fire hazard notices on the Condo's front door and notified Crossan that he would have to vacate the Condo until the violations could be remedied. Crossan complied, and the Condo's management company changed the locks on the Condo to ensure that no one would enter the Condo until the violations were remedied and the Condo was declared habitable.

On the evening of October 20, 2005, Shipkovitz returned to the Condo to find the locks changed. Shipkovitz timely contacted Grierson, per the notices posted on the front door of the Condo, and requested entry to the Condo to remedy the violations. Grierson, after having obtained permission from Crossan, agreed to let Shipkovitz into the Condo. Grierson met Shipkovitz at the Condo on four to five occasions for a total of seventeen hours so

3

that Shipkovitz could remove sufficient personal property from the Condo to render it habitable. Shipkovitz failed to remedy any of the violations, and Crossan, the owner of the Condo, instructed Grierson on December 14, 2005, to no longer let Shipkovitz enter the Condo.

In February 2006 Crossan contracted to have the excess personal property removed from the Condo, and on March 3, 2006, Grierson removed the evacuation and fire hazard notices. Shipkovitz claims that the County Defendants illegally searched the Condo, trespassed in his personal quarters, and destroyed his business as a patent attorney by denying him access to materials in the Condo, including Sabo's property. Sabo claims that County Defendants illegally seized his property in the Condo. County Defendants claim that the Inspectors lawfully inspected the Condo pursuant to Crossan's voluntary consent.

Courts must grant summary judgment if the moving party demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In reviewing a motion for summary judgment, courts view the facts in a light most favorable to the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Once a motion for summary judgment is properly made and supported, the opposing party then has the burden of showing that a genuine dispute as to any material fact

4

does exist. <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio
Corp.</u>, 475 U.S. 574, 586-87 (1986). The mere existence of some
alleged factual dispute between the parties will not defeat an
otherwise properly supported motion for summary judgment; the
requirement is that there be no genuine issue of material fact.
<u>Anderson</u>, 477 U.S. at 248. "Rule 56(e) requires the non-moving
party to go beyond the pleadings and by [his] own affidavits, or
by the 'depositions, answers to interrogatories, and admissions
on file,' designate 'specific facts showing that there is a
genuine issue for trial.'" <u>Celotex Corp. v. Catrett</u>, 477 U.S.
317, 324 (1986).

Count 1 of Plaintiffs' Amended Complaint seeks a permanent
injunction against County Defendants requiring them to grant
Plaintiffs access to the Condo and obtain judicial consent before
conducting similar residential inspections. In addition,
Plaintiff requests that the Court order the Arlington County
Department of Human Services to instruct its employees to
maintain the confidences of their clients. Crossan, having
remedied the Condo's violations, is currently in possession of
the Condo, therefore, if Plaintiffs desire access to the Condo or
anything therein they must obtain such access from Crossan, the
owner of the Condo. The County Defendants have no ability to
grant Plaintiffs access to Crossan's private residence. Likewise,
there is no basis for the Court to order Arlington County to

5

obtain judicial consent before inspecting residences for fire
hazards when the owner of the residence has consented to the
inspection. Crossan had full authority to allow the Inspectors to
inspect the Condo, <u>United States v. Matlock</u>, 415 U.S. 164, 169-71
(1974), and there is no evidence that they engaged in any
misconduct or violated any law while performing said inspection.

Finally, there is no basis for the Court to order the
Arlington County Department of Human Services to instruct its
employees to maintain their clients confidences. While Shipkovitz
contends that Hughes promised him that she would not disclose
anything she saw in the Condo regarding him or his possessions,
there is no evidence to support such a claim or a relationship
between Hughes and Shipkovitz that would create a right of
privacy. Hughes was obligated to ensure through her weekly
examinations of Crossan that he was succeeding outside of the
Mental Health Institute, and she had every right to report to
Grierson the obvious and excessive fire hazard that Shipkovitz
had created in the Condo through his massive accumulation of
personal property. Therefore, summary judgment should be granted
to County Defendants on Count 1.

Count 2 of Plaintiffs' Amended Complaint alleges that County
Defendants and Defendants Philip Almeida (Almeida), Robert Speck
(Speck), and Chas. E. Smith Management, Inc. (CESMI), violated 42
U.S.C. § 1983 by conducting an unreasonable search of the Condo,

illegally seizing their property therein, and illegally denying them access to the Condo. As an initial matter, Plaintiffs may not pursue a claim against Carlee under § 1983 because "[a] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents." Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691-92 (1978). There is no evidence that Carlee had any knowledge of or participated in the inspection of the Condo on October 20, 2005. Likewise, there is no evidence that the Inspectors were acting pursuant to an official county policy that caused a constitutional tort. Id. The unrebutted evidence is that the Inspectors performed a lawful inspection of the Condo based on Hughes prior conversation(s) with Grierson and Crossan's consent to the inspection. Therefore, Plaintiffs may not pursue a claim against Carlee based upon the inspection of the Condo performed by the Inspectors.

Similarly, Plaintiffs may not pursue a claim against the Inspectors for their inspection of the Condo. First, Crossan, the owner of the Condo, explicitly authorized the inspection of the Condo. Second, the Inspectors are entitled to qualified immunity as "their conduct [did] not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Finally, all claims against Speck were dismissed pursuant to the Court's Order of April 27, 2006, and the Court finds that all claims

7

against Defendants Almeida and CESMI should be dismissed at this time due to Plaintiffs' failure to prosecute those claims. Therefore, summary judgment should be granted to County Defendants on Count 2.

Count 3 of Plaintiffs' Amended Complaint alleges intentional business interference against County Defendants. Specifically, Plaintiffs allege that County Defendants refused to grant them temporary or permanent access to the Condo, thus destroying Shipkovitz's business and Sabo's ability to patent his property in the Condo. County Defendants did grant Plaintiffs access to the Condo to remedy the violations, which Shipkovitz failed to do, until Crossan ordered Grierson to stop granting Plaintiffs access to the Condo. Furthermore, there is no evidence of "intentional interference inducing or causing a breach or termination of ... [a business] relationship or expectancy" by County Defendants. Chaves v. Johnson, 230 Va. 112, 120 (1985). Therefore, summary judgment should be granted to County Defendants on Count 3.

Count 4 of Plaintiffs' Amended Complaint alleges assault, slander, false imprisonment, and intentional business interference against Defendants Almeida, Speck, CESMI, Black Ice Security Services, Inc. (Black Ice), and John Doe 1. All claims against Almeida, Speck, and CESMI should be dismissed for the reasons stated in the Court's discussion of Count 2. All claims

8

against John Doe 1 should be dismissed because Plaintiffs have
failed to prosecute their claims against John Doe 1.

Plaintiffs filed the Amended Complaint on January 20, 2006,
and served process on Black Ice on February 10, 2006. The only
action Plaintiffs have taken against Black Ice since serving
process was to file an Application for Default against Black Ice.
Plaintiffs ask the Court to enter default judgment against Black
Ice in the amount of $170,000. Specifically, Plaintiffs seek
$2,000 in dental costs and $168,000 in lost future earnings.

The two components of Plaintiffs' requested damages against
Black Ice are pure speculation and have no evidentiary support.
Plaintiffs request $2,000 in dental costs that Shipkovitz will
allegedly incur to repair six cracked teeth that he suffered
because Black Ice refused to let him into the Condo on October
20, 2005, to retrieve his custom orthodontic night guard.
Plaintiffs, however, cannot obtain damages for these alleged
dental costs for three reasons. First, Shipkovitz failed to
mitigate these damages by taking appropriate remedial action,
such as obtaining a replacement night guard. Haywood v. Massie,
188 Va. 176, 182 (1948). Second, the unrebutted evidence in this
case is that Plaintiffs did in fact have access to the Condo and
the night guard on at least four occasions from October 20, 2005,
to December 14, 2005. Finally, Black Ice was under no duty, as
Plaintiffs contend, to let Shipkovitz into the Condo when it had

9

been placed under a vacate order by Grierson.

Plaintiffs also request $168,000 in lost future earnings caused by Black Ice's refusal to let Shipkovitz into the Condo on October 20, 2005, to retrieve his résumé, federal work application, and work product materials. Plaintiffs, however, cannot obtain damages for these alleged lost future earnings for two reasons. First, Plaintiffs have failed to introduce any evidence, other than Shipkovitz's affidavit, that Shipkovitz is permanently disabled and unable to continue working as a patent attorney. See Norfolk Ry. & Light Co. v. Spratley, 103 Va. 379, 386-87 (1905) (stating that "[t]here is, ... no evidence other than that of experts by which courts and juries can determine whether a disease or an injury has or can be permanently cured, or what its effect will be upon the health and capability of the injured person in the future"). Second, even if the Court were to believe Plaintiffs' unsupported claim that Shipkovitz is peramently disabled, Plaintiffs have failed to produce any evidence or argument to support a finding that Black Ice caused such disability. Therefore, all claims by Plaintiffs against Black Ice should be dismissed for failure to prosecute.

An appropriate Order shall issue.

*Claude M. Hilton*
UNITED STATES DISTRICT JUDGE

Alexandria, Virginia
June 22 , 2006

10



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

**Alexandria Division**



|  |  |
|---|---|
| STEPHEN C. CROSSAN, <u>et al.</u>, | ) |
| Plaintiffs, | ) |
|  | ) |
| v. | ) |
|  | ) Civil Action No. 05-1219 |
| COUNTY OF ARLINGTON MANAGER, <u>et al.</u>, | ) |
|  | ) |
| Defendants. | ) |

<u>**ORDER**</u>

This matter comes before the Court on Plaintiffs' Motion for Reconsideration. It appearing to the Court that its Order and accompanying Memorandum Opinion of June 22, 2006, were correctly decided for the reasons stated therein, it is hereby

ORDERED that Plaintiffs' Motion for Reconsideration is DENIED.

_Claude M. Hilton_
UNITED STATES DISTRICT JUDGE

Alexandria, Virginia
July 7 , 2006

# EXHIBIT 13



**samspatusa@aol.com**
06/02/2006 05:16 PM

To: schulteb@washpost.com, samspatusa@aol.com
cc: hstjf1@aol.com, brianshipp@aol.com
Subject: PICTURE OF LIVING ROOM



00000006.JPG



EXHIBIT 14



**Better information. Better health.**

Article Link: http://www.webmd.com/balance/features/when-people-hoard

## health & balance

# When People Hoard
**Has clutter created chaos in your life? Are you unwilling to throw anything away? What you call collecting may actually be hoarding.**

By Richard Trubo                                                    Reviewed by Brunilda Nazario, MD
WebMD Feature

Is your apartment cluttered with stacks of newspapers up to your chin and towers of unread magazines that have reached almost nosebleed heights? Just to get from the living room to the bedroom, do you have to tiptoe over Christmas wrapping paper from the 1980s, junk mail from your college days, and a broken TV that hasn't worked since the final episode of *M*A*S*H?*

You might call yourself a "collector" or maybe even a "pack rat." But for the psychologists who study people like you, they'd probably label you a "hoarder."

When your junkaholic behaviors involve acquiring and keeping objects that appear to have limited if any value, and they begin to take over your living space, you meet the definition of a hoarder. Such people can't make a decision about the worth of anything, from food tins to tattered receipts, and over a period of years, they may accumulate mountains of "stuff" that can eventually leave them isolated and almost incapacitated in their own homes. Their possessions may cover their floors, couches, chairs, tables, and beds. They may have to wade through knee-deep piles of debris just to get to the bathroom.

At its worst, hoarding can become a health and safety hazard, with the clutter posing a fire risk, and making it almost impossible for repairmen to enter their homes to fix a leaky faucet or a refrigerator on the blink. Yet hoarders continue to add to their "collections" with no willingness to discard any of it.

"These are people who can no longer use entire rooms in their homes because of all of their possessions," says Gail Steketee, PhD, professor at the Boston University School of Social Work. "They may lose their medications in the piles and have to repurchase them. They may file their taxes late, if at all, because they can't find the paperwork they need."

**Trash or Treasure?**

When it comes to hoarding, one man's junk is another man's treasure. "Most of us are attached to things we inherited from our parents or grandparents, or we're attached to photographs or special items that we've bought," says Steketee. "But people with hoarding problems often become emotionally attached to items that strike the rest of us as junk, or to pieces of paper that aren't particularly interesting."

Hoarders may become anxious and angry at the mere suggestion of getting rid of items that they've held onto for years. They often say that if they throw something away, they may need it someday when it will be impossible to retrieve.

So they collect scraps of paper with shopping lists from years ago. They may hold on to old clothing, extra furniture, used envelopes, clothing price tags, soda cans, string, leaves, even cigarette ashes, burned-out light bulbs, used tea bags, and toilet paper cores. One woman saved wishbones from chickens because "one day they will be used for making wishes." Another collected clothes that weren't her size because she "might run into someone who needs them someday."

**Trash or Treasure? continued...**

When confronted with their behavior, hoarders often claim that it isn't a problem at all. At the same time, they are often embarrassed to have visitors to their home.

Most experts report that hoarding doesn't seem to play favorites with rich or poor, young or old, although the middle-aged and the elderly have had more years to squirrel away the stuff that might drive others crazy. There are no good statistics on the number of hoarders, although some estimates have put the number at less than 1% of the population. These people are often single, but among those who are married, divorces often occur when a spouse simply can't live in such chaos.

**Is It OCD? Or ADD?**

Many psychologists believe that hoarding is a subtype of obsessive-compulsive disorder (OCD), while others argue that it may be a variant of attention deficit disorder (ADD), which leaves people having difficulty with decision making, procrastination, and staying on task long enough to organize their surroundings. "Try to give hoarders an assignment to throw something out, and they won't do it," says Stephen C. Josephson, PhD, clinical psychologist in New York City, and clinical associate professor of psychology in psychiatry at Cornell Medical School. "I see the clutter more often in people with ADD than OCD."

In most cases, hoarders rarely look at the possessions they've saved, according to Fred Penzel, PhD, a Huntington, N.Y., psychologist and author of *Obsessive-Compulsive Disorders*. Nevertheless, they feel some sense of security knowing that these items are there "just in case."

Steketee has treated people who have refused to part with old sales slips "because they represent a day in their lives, even though they have no idea what they bought. Somehow, the fact that it has a date on it, and that it belonged to them, it becomes important."

**Hoarding Animals**

One of the oddest hoarding behaviors involves the accumulation of domestic animals. Individuals have been known to hoard dozens of dogs and cats in their houses. In Los Angeles, for example, a woman was recently arrested on suspicion of animal cruelty after 600 animals were found in her home, many of them dead or very sick.

Gary Patronek, PhD, director of the Tufts Center for Animals and Public Policy at Tufts University School of Veterinary Medicine in North Grafton, Mass., has studied animal hoarders and found that most of them are women, 46% are 60 years of age or older, and more than half live alone. In nearly 70% of the cases, animal urine and feces accumulate in living areas. About 700 to 2,000 cases of animal hoarding occur in the U.S. each year.

**What About Treatment?**

The treatment of hoarding can be challenging since it means changing behaviors that may almost be lifelong. Some hoarders are simply too embarrassed to seek help. Others panic when contemplating discarding their "treasures."

Medications that have been used to treat obsessive-compulsive disorder -- such as Paxil and Zoloft -- have had limited success for people who hoard. Stimulant drugs used in ADD (such as Ritalin) are often more successful, says Josephson, in combination with behavioral therapy.

The goal of therapy is to help people understand why they save items, teach them organizational and decision-making skills, and help them acquire the fortitude to drive past garage sales and thrift stores. Many hoarders explain that they're saving newspapers in order to read them someday. But a therapist may be able to help them gain insights into alternatives by having them answer pointed questions such as, "If you don't save these papers, what sources do you have to get the same information if you need it? Can you go online instead of saving these newspapers, and get more accurate and up-to-date information that's available on the web?"

"But hoarding is very difficult to treat," says Josephson. "I see it as a chronic condition that you can help people

manage, but they may need ongoing help."

**View Article Sources**

© 2003 WebMD, Inc. All rights reserved.

©2005-2007 WebMD, Inc. All rights reserved.
.WebMD does not provide medical advice, diagnosis or treatment.

My Notes:

# EXHIBIT 15



**Pergamon**

0005-7967(95)00071-2

*Behav. Res. Ther.* Vol. 34, No. 4, pp. 341–350, 1996
Copyright © 1996 Elsevier Science Ltd
Printed in Great Britain. All rights reserved
0005-7967/96 $15.00 + 0.00

# A COGNITIVE–BEHAVIORAL MODEL OF COMPULSIVE HOARDING

## RANDY O. FROST* AND TAMARA L. HARTL

Department of Psychology, Smith College, Northampton, MA 01063, U.S.A.

*(Received 5 September 1995; in revised form 19 October 1995)*

**Summary**—Compulsive hoarding is a little studied phenomenon within the research literature. The information available on compulsive hoarding is diverse and not well integrated. In the present article we propose a tentative cognitive-behavioral model of compulsive hoarding. The purpose of such a model is to provide a framework for the development and testing of hypotheses about compulsive hoarding. In this model hoarding is conceptualized as a multifaceted problem stemming from: (1) information processing deficits; (2) problems in forming emotional attachments; (3) behavioral avoidance; and (4) erroneous beliefs about the nature of possessions. Specific hypotheses about each of these are discussed.

## INTRODUCTION

Hoarding has been defined as the "acquisition of and failure to discard possessions that appear to be useless or of limited value" (Fost & Gross, 1993, p. 367). While there is only a limited amount of research on this phenomenon, there is now sufficient information to formulate a tentative model of hoarding from which more refined questions can be generated. What follows is such a model based on our research (Frost & Gross, 1993; Frost, Hartl, Christian & Williams, 1995; Frost, Krause & Steketee, 1996), on our interviews with both nonclinical and clinical hoarders, and on our attempts to alter hoarding behavior (Frost & Hartl, 1995).

The first problem in proposing such a model has to do with the definition of hoarding. While the definition above provides a general outline of the phenomenon of hoarding, it does not provide sufficient guidance on how to distinguish hoarding as a behavioral phenomenon from hoarding as a clinical symptom. In the first of our studies on this topic, we received well over 100 responses to ads placed in a small town newspaper (pop. 30,000) asking for people who considered themselves to be 'packrats' or 'chronic savers'. While almost all of the respondents met the criteria for hoarding, not all of them had what would be considered a clinical hoarding problem. The feature that most clearly distinguished those who suffered impairment from hoarding symptoms from those who did not was the degree of clutter in the living areas of their homes. In our experience this was a better indicator of a clinical hoarding problem than the volume of their possessions. On the basis of our work in this area, we propose that clinical compulsive hoarding should be defined as: (1) the acquisition of, and failure to discard a large number of possessions that appear to be useless or of limited value; (2) living spaces sufficiently cluttered so as to preclude activities for which those spaces were designed; and (3) significant distress or impairment in functioning caused by the hoarding. Several features of this definition are important.

The advantage of including clutter as a defining characteristic is that it is directly tied to the functional deficit associated with the symptom. For instance, one of our hoarding *S*s had not been able to use any room in her house in an unimpeded way. Her dining room was piled halfway to the ceiling with possessions and only a single narrow pathway through the room was open. There were no uncluttered sitting surfaces in her TV room, and her kitchen table had not been used for 5 yr because of the pile of clutter on it. The clutter in each of these rooms had a dramatic effect on her life. In another case the hoarder was evicted from her house by the health department because of the clutter. In our experience, most impairment associated with the disorder results from the influence the clutter has on the person's life. The distress and/or impairment caused by hoarding

---

*Author for correspondence.

can be seen in a variety of ways: excessive anxiety about others moving or touching possessions, conflict with spouse over clutter, illnesses of family members that are directly linked to the clutter (e.g. allergies), inability to complete necessary activities due to clutter (cooking, paying bills, etc.), distress over not providing a 'proper' home environment for children, embarrassment or withdrawal from social relationships due to the clutter, inability to invite others into the home, and inability to work because of the clutter (i.e. inefficiency caused by clutter).

One assumption that is made in this definition is that clinically significant hoarding cannot occur in the absence of clutter. This assumption needs further testing. While it is possible to imagine that someone could spend so much time acquiring, organizing, and protecting their possessions (and not cluttering their home) that they neglect other aspects of their lives, we have seen only one case in which this might have occurred. A local psychiatrist referred a patient to us whom he described as a severe hoarder. The client described himself in the same way. In our home visit, however, we found the clutter ratios in his home to be within normal limits. While he saved many possessions, they were well organized and out of the way. When questioned about the problems created by his hoarding, he complained that his wife left him because of the clutter, and the clutter was preventing him from forming any new relationships. There was no interference at work, nor was he unhappy about his saving habits. It is crucial to note that he attributed the interference to the clutter, not to hoarding *per se*. In our judgment, his 'hoarding problem' was a non-threatening way for him to explain why his wife left him. His marital problems appeared to have more to do with an authoritarian interpersonal style. Although in our judgment this case did not reflect distress or impairment in the absence of clutter, the possibility exists that distress or impairment from hoarding can exist in the absence of clutter. Further research is needed to address this possibility.

This example illustrates a diagnostic problem with respect to compulsive hoarding. This patient described himself in a way that led his psychiatrist to conclude that he was a severe hoarder. Direct observation of his home indicated that he was not. Home visits may be necessary in order to insure accurate diagnosis.

Another assumption has been that hoarding involves primarily the saving of objects with no sentimental value. Descriptions of hoarding symptoms in both DSM-IV (American Psychiatric Association: APA, 1994) and the Yale–Brown Obsessive Compulsive Scale, the most widely used measurement instrument for obsessive compulsive disorder (YBOCS: Goodman, Price, Rasmussen, Mazure, Fleischmann, Heninger & Charney, 1989) imply that hoarding is characterized by the saving of *nonsentimental* objects. This emphasis runs counter to anecdotal (Frost & Hartl, 1995; Warren & Ostrom, 1988) and empirical (Frost *et al.*, 1995) evidence that one of the primary features of compulsive hoarding is an excessive emotional attachment (hypersentimentality) to possessions. Seemingly worthless objects are given sentimental value even though they may not be associated with any memorable experience. For example, one of our *S*s became distraught about the prospect of discarding a piece of an old bank envelope on which was written how the money in the envelope was spent. There was nothing of special importance about the list (groceries, drug store items, etc.) and nothing significant as a reminder of an important time. The note had gained an emotional significance far beyond its true value. The reason behind this may have to do with its safety signal value which will be discussed later in the paper. In the present context, we propose that the definition of hoarding should not be limited to nonsentimental possessions.

Most clinical descriptions of hoarding have associated it with obsessive compulsive disorder (OCD). Various estimates of the frequency of hoarding among obsessive compulsive disorder patients range from 20% (Rasmussen & Eisen, 1992) to 31% (Frost *et al.*, 1996). However, hoarding has been seen in conjunction with other disorders as well. Specifically, there are reports of hoarding in organic mental disorders (Greenberg, Witztum & Levy, 1990), psychotic disorders (Luchins, Goldman, Lieb & Hanrahan, 1992), and eating disorders (Frakenberg, 1984). We have found it among patients with PTSD and depression as well. The prevalence of hoarding in these disorders is largely unknown. Its existence is inferred from a very small number of case descriptions. Also, hoarding is a diagnostic criterion for obsessive compulsive personality disorder (OCPD: APA, 1994). Although a great deal has been written about OCPD, very little is known about this symptom of it. Several studies (Frost & Gross, 1993; Frost, Krause *et al.*, 1996) have failed to find a relationship between a measure of hoarding and a measure of OCPD (MCMI-II). In these studies however, hoarding was correlated with several of the OCPD diagnostic criteria, specifically

perfectionism and indecisiveness. Whether hoarding as part of OCPD differs from hoarding as part of OCD remains to be seen. One potential difference is in whether the hoarding behavior is seen as part of one's character (OCPD) or recognized as excessive (OCD). The usefulness of this distinction among OCD patients has recently been questioned, however (Kozak & Foa, 1994). What is considered in the present paper is hoarding associated with OCD. There may be similarities with hoarding associated with other disorders, but it cannot be assumed that all the features described here pertain to hoarding not related to OCD.

In this analysis hoarding behavior is viewed as a multifaceted problem that stems from information processing deficits, emotional attachment problems, behavioral avoidance, and erroneous beliefs about the nature of possessions. Each of these will be briefly outlined below. These facets of hoarding are not exclusive and, in fact, overlap in significant ways. It should be noted that this model is based on preliminary research and observation and is meant as a guide to future research on hoarding and not as a finished product.

## INFORMATION PROCESSING DEFICITS

We hypothesize 3 types of information processing deficits associated with compulsive hoarding, some of which are related to other types of compulsive behavior. Specifically, these information processing deficits include deficits in decision-making, deficits in categorization/organization, and difficulties with memory functions. They appear to be general in nature but have profound effects on the determination of value of possessions. As will be evident, these are interrelated problems that contribute to hoarding behavior.

### Decision-making deficits in compulsive hoarding

Indecisiveness seems to be a hallmark symptom of compulsive hoarding. Case descriptions have often commented on the problems in decision-making among people who save compulsively (Shafran & Tallis, 1995; Warren & Ostrom, 1988). Warren and Ostrom (1988) suggest that the tendency to avoid making and/or postponing decisions may be a result of a fear of making mistakes. Saving everything, Warren and Ostrom suggest, may be a way of avoiding decision-making. More recently, systematic evidence of a relationship between hoarding and indecisiveness has been reported (Frost & Gross, 1993; Frost & Shows, 1993). In these studies substantial correlations (0.50–0.61) were reported between compulsive hoarding measures and general indecisiveness. In addition, significant associations were found between hoarding and perfectionism, in particular, the Concern Over Mistakes dimension of perfectionism (Frost, Marten, Lahart & Rosenblate, 1990). This finding is consistent with Warren and Ostrom's hypothesis that avoiding decisions about discarding possessions may stem from a fear of mistakes. Frost and Gross (1993) speculate that hoarding is an avoidance behavior tied to indecisiveness and perfectionism. They suggest that saving allows the hoarder to avoid the decision required when discarding a possession, and to avoid the worry that a mistake had been made when something was discarded.

In addition to a general tendency to worry about making mistakes and to be indecisive, there are several features of the process of decision-making which should be examined to determine why hoarders fail to discard possessions. Decisions about discarding an object are based on estimates of the value of that object, its instrumental value or sentimental value. Instrumental value refers to judgments about the future use or need for a possession, while sentimental value refers to the emotional attachment associated with the possession (Furby, 1978). Anecdotal descriptions of hoarding behavior have emphasized the fact that hoarders save things because they foresee a use or need for them. In our first series of studies on hoarding, saving for instrumental reasons was the primary rationale given by compulsive hoarders for the things they saved, but sentimental saving was also prominent (Frost & Gross, 1993). These findings largely coincide with the reasons nonhoarders give for saving possessions (Furby, 1978). In studying the types of objects saved by compulsive hoarders, it becomes clear that the kinds of things saved and the reasons for saving appear to be similar to nonhoarders, but the volume is larger (Frost & Gross, 1993). Hoarders appear to define a larger number of things as sentimental and necessary in the future.

This would suggest that the decision-making deficit results from a higher threshold for deciding what to discard. When most of us decide to discard a possession, we make a judgment that we

will not have a need for it in the future, or if we do, we will be able to acquire a suitable replacement. It may be that compulsive hoarders mistakenly judge the likelihood of future need as higher than do nonhoarders. In other words, if asked "What is the probability you will have a future need for this item?" the hoarder will give a higher probability than the nonhoarder. Thus, the decision to save may be made simply because of an erroneous judgment about the probability of future use.

Alternatively, both the hoarder and the nonhoarder may judge the probability of future need for a possession the same, but the hoarder concludes that the possession should be saved while the nonhoarder concludes that the possession should be discarded. The question then becomes why is the threshold for saving different for the hoarder? The answer may lie in the meaning or perceived consequences (i.e. the risk) of not having a possession when it is needed. For the hoarder, the consequences may appear more damaging and thus they are not willing to take the risk. Alternatively, it may reflect differences in self-efficacy. For example, a nonhoarder may decide that the probability of future need for an object is high, but that they have the resources to re-acquire the object. A hoarder, on the other hand, may make the same judgment about future need, but conclude that the object may not be re-attainable. Consequently, the hoarder would make the decision to save and the nonhoarder will make the decision to discard.

One other relevant belief we observed in one case was the belief by the hoarder that the value of possessions changes over time. That is, although it may not be considered valuable at the present time, it may be so in a week or a month. Therefore, it is best not to throw anything away just in case it may be more valuable later. This may be simply part of the uncertainty inherent in the process by which hoarders make judgments about value.

Beliefs about the consequences of discarding a needed possession may play a crucial role in decision-making regarding saving. Common lore about compulsive hoarding suggests that it stems from childhood experiences with poverty and deprivation (Adams, 1973), and that hoarders decide to save things because of a fear of deprivation. Shafran and Tallis (1995) note the onset of hoarding in 2 patients was precipitated by an experience of deprivation. They go on to suggest that hoarding may be a sort of compensatory behavior. However, our findings have failed to support the relationship between hoarding and early deprivation experiences (Frost & Gross, 1993). Hoarders were no more likely to report financial deprivation during childhood than nonhoarders. A large sample study of clinical hoarders is needed to examine this issue more closely.

In our view, other believed consequences may be more relevant. Our recent work (Frost *et al.* 1995) indicates that hoarders may experience an exaggerated sense of responsibility for harm, much the same as that seen for other OCD symptoms (Rachman, 1993; Salkovskis, 1985). The nature of this harm is of two sorts: harm associated with not having a needed possession, and harm (damage) coming to the possession. In either case, a lower threshold for saving may be due to concerns about the risks and consequences of throwing away something that may be needed later. Although this fits within the context of responsibility and risk-aversion theories of OCD, the exact nature of the negative consequences for the hoarder is less clear than it is for the compulsive checker or cleaner. Our interviews with hoarders have yielded very little specific information about the feared consequences of throwing something away. One feature that is reported frequently is that each possession is seen as unique (see discussion below) and, consequently, as irreplaceable. When asked why she was having trouble throwing away a 5-yr old newspaper, one of our *S*s stated, "That information will be lost. I'll never be able to retrieve it". Thus, the harm may be in the form of a loss leading to avoidance of decisions to discard possessions in order to prevent the unpleasant emotional state associated with loss.

In addition to judgments of use and consequences of discarding possessions, other cognitive processing going on at the time of the decision to save may be important. Compulsive hoarders appear to have a peculiar perspective with regard to possessions. When deciding whether or not to discard a possession, they spend most of their time thinking about being without the possession (the cost of discarding) and little time thinking about the cost of saving it, or the benefit of not having it. This notion is similar to an observation made by Smith (1990) about animal hoarding. Smith (1990) speculated that the sight of a nut (by a squirrel) puts the squirrel 'in touch with' the feeling of being hungry and without the nut. For the hoarder, the sight of the possession puts them 'in touch with' the feeling of being without the possession and needing it. This feeling dominates their consideration of whether the possession should be discarded. Keeping the possession may be

illogical, but it allows them to avoid being 'in touch' with the feeling of deprivation or the experience of loss mentioned earlier. In this context, the decision-making is heavily influenced by the sight of the possession. Having possessions in sight is something some hoarders strive for (Frost & Hartl, 1995). On numerous occasions in our work with hoarders, the sight of an object seemed to greatly increase its value.

*Deficits in categorization/organization*

In addition to decision-making deficits, another cognitive process related to hoarding is categorization. One of the cognitive/information processing deficits that is thought to be associated with OCD is an impairment in the structuring and categorization of information (Reed, 1985). Related research has indicated that obsessionals have more complex concepts than nonobsessionals (Frost, Lahart, Dugas & Sher, 1988; Persons & Foa, 1984; Reed, 1969a, b). That is, their concepts are more detailed and require more information for making decisions. Consequently, they define category boundaries too narrowly (under-inclusion), resulting in smaller sizes of categories and larger numbers of categories (Reed, 1969a, b). For instance, Persons and Foa (1984) found obsessive compulsives created a greater number of categories when asked to sort words into piles that belonged together. Underinclusion has several important implications for compulsive hoarding. First, if, as mentioned earlier, each possession is seen as totally unique (in its own category), no other possession can substitute for it. Such a view greatly increases the value of each possession, and makes discarding more difficult.

Another consequence of under-inclusiveness is that all attributes of a possession must be considered before discarding it. Because each possession is unique and complex, it is not possible to decide that a class of objects (e.g. old newspapers) is unimportant and can be thrown out without close examination. One of our clients had to look through each section of each newspaper before discarding it, even though the only portion she wanted was the cooking section.

In addition to its influence on saving, under-inclusiveness contributes to the accumulation of clutter and disarray in the lives of compulsive hoarders. Because each possession is unique, it can not be categorized with similar objects, and thus there is no way to organize possessions. For many hoarders, books are a major source of clutter. In each case we have seen, the organization (or lack thereof) has been the same. The clutterer begins to read a book and, after reading for a while is interrupted or must do something else. The book is not returned to the bookshelf because it is not like the other books (it is being actively read) and is placed on the floor. The person may not come back to that book right away, but instead looks something up in another book. This book is now also unique and cannot be returned to the bookshelf, nor placed with the other book on the floor. Instead, this book is placed on the couch. Next, a cookbook is scanned and placed on the counter. This pattern is repeated until there are books everywhere. Their position in the room has meaning and an idiosyncratic sort of organization exists, but the ultimate result is chaos and clutter. In fact, the lack of a coherent organizational scheme may be a major variable in determining the level of impairment for the compulsive hoarder.

The resulting clutter does not, as it would appear, reflect a lack of organizing categories, but too many of them. Each object in a pile of clutter is its own category. Because there is a finite amount of space available, objects get piled on top of one another until there are large mounds of unrelated objects. There is, among the chaos, a sort of temporal organization. During our treatment protocol (Frost & Hartl, 1995) we have frequently observed hoarders picking up a possession and, not knowing what to do with it, say "I'll just set it here for now." This was done with so many objects that before long, these new piles were so numerous, and so close together, that they became another large disorganized pile. This happened with such frequency that we labelled it 'churning'. Hoarders' attempts to organize and discard their possessions on their own appear to be characterized by this process. Possessions are simply picked up, examined, and moved to a new pile. It appeared to us that churning involved a search to find something the individual knew how to categorize—a clear-cut exemplar—something that could be categorized easily. The clear exemplar can be put away, but everything else, since it is not clear where any of it should go, stays in the pile. In such attempts the possessions have been examined and moved, and a few items put away, but little progress is made since most of the possessions go back into the pile.

Furthermore, based on our observations, it appears that each examination of a possession increases its value to the hoarder. That is, more frequently seen objects increase in importance and value.

An additional explanation for the categorization problem may be the application by hoarders of excessively complex concepts making it difficult to organize objects and put them away. If an article out of the newspaper has both travel and employment information, the hoarder feels unable to file it in either category. If it is filed under travel, it will be 'lost' as information related to employment. Cross-referencing seems too cumbersome a process, and thus the article is not filed but remains in the pile since it is not clear where it should go.

Also inhibiting organization is the mixing of important with unimportant possessions. The typical hoarder's pile contains everything from gum wrappers to paychecks. Our observations suggest that when a hoarder picks up a possession with the intent of deciding whether to discard it, the value of that object increases. As noted earlier, whatever is in sight assumes extra value. Consequently, objects cannot be differentiated or categorized according to their value since all seem at the moment to be 'very important' possessions. The importance of visual cues in this process can be seen in the following example. Our treatment protocol required that each possession examined must be placed into one of a small number of categories, boxed, and moved out of the living area. Typically we begin with 3 categories; display, discard, and 'to go through later'. One hoarder in trying to organize her possessions created a fourth category, an 'immediate to-go-through' box. In it were placed possessions from a pile on her living room couch that she deemed essential to go through right away (i.e. before our next session). At the next session she had not gone through the box and could not remember what was in it. Furthermore, she created yet another category that she called 'immediate-immediate to-go-through'. The things in this box, she said, were clearly more important than the things in the 'immediate to-go-through' box. Despite the fact that the objects were comparable, the more recently excavated (seen) items became more important. On numerous occasions in our work with hoarders, items that had not been seen in years were immediately given a high value.

One cost of mixing important and unimportant possessions in hoarding piles is the difficulty this creates when trying to clean out these piles. Over the course of 20+ sessions with one compulsive hoarder, she has on at least 5 occasions found envelopes filled with money (up to $100) stuck amid piles of old newspapers. These events make discarding large quantities of possessions difficult. The hoarder is convinced, and probably correctly so, that in discarding a large pile of things without examining them, he/she may discard something of real value.

The perspective or frame of reference also seems to interfere with the appropriate determination of the value of possessions. When considering a possession's worth, hoarders appear to determine the value of the possession in isolation, with very little weight given to how this possession fits into the context of their lives. For example, a hoarder may have 5000 recipes, most of which will never be used. Yet this fact is not considered when trying to decide whether to save a new recipe. Only the potential value of this recipe and the presumed cost of not saving it are considered.

On the basis of our observations, hoarders appear to have very little knowledge regarding what people normally save and don't save. During our attempts at treatment, clients frequently asked whether they should save things such as grocery receipts, old catalogues, etc., that most people would easily throw away. This uncertainty may be a result of not having learned from experience what can be safely thrown away.

*Difficulties with memory*

A third type of problem related to information processing has to do with memory. Two aspects of memory are salient here: a lack of confidence in memory and the overestimation of the importance of remembering or recording information. One of our clients kept old newspapers because she was convinced that she would not be able to remember the information they contained. Furthermore, she considered it essential that she remember the information. Keeping newspapers was a way of retaining information without having to remember it. Most of the papers were never read. Still their presence gave her the 'sense' that she had access to the information they contained, thereby constituting a substitute for her poor memory. The importance of this information seemed to be associated with a belief that one should remember everything that has been read. This phenomenon also affected attempts to organize possessions. The concern of one hoarder was, "If

I put it with this stuff (into a filing system), I won't remember it". This represents another example of a reliance on visual cueing. When during the course of treatment this hoarder created a filing system that by her own account worked much better than having things in piles, she still complained that she had the sense that she had lost many possessions because they were no longer in sight. One hoarder had markers (colored cards) which she placed in the hoard to indicate the presence of important possessions. Another had a sense of when objects were placed in the pile, a sort of temporal organization. In these examples the clients believe they cannot remember things without keeping a possession or fully documenting information associated with the possession. One obstacle to organization among hoarders is the belief that if the possession isn't in sight, it will not be remembered.

Hoarders also seem convinced of the importance of remembering things about the possession. It may be that they perceive the negative consequences of not remembering such details to be more likely and more severe than do nonhoarders. This may be part of the perfectionism that is associated with hoarding (Frost & Gross, 1993). Making a mistake (i.e. forgetting some detail related to a possession) is seen as a failure and causes anxiety. One client stated, "My husband (from whom she was separated) could remember everything, my memory is so bad I have to keep things to remind me". It is unclear at this point whether there are deficits in memory associated with hoarding, perhaps in the same way there are deficits in memory associated with compulsive checking (Sher, Frost & Otto, 1983), or whether this phenomenon is related only to confidence in memory. Concerns about memory may show up as checking rituals among hoarders. One of the biggest obstacles in our recent experimental case study (Frost & Hartl, 1995) was that old newspapers had to be checked thoroughly to make sure nothing of importance was being lost. In some cases, compulsive hoarding may be an alternate presentation of a checking ritual. Additional research on this aspect of hoarding may be helpful in understanding the phenomena.

The memory deficit could be related to the over inclusion of objects in the important category. Most people are more concerned with remembering important items, and are less worried about those things deemed less important. If hoarders have an exceptionally large number of items they consider important, the task of remembering them all becomes more difficult.

## EMOTIONAL ATTACHMENT PROBLEMS

Although definitions of hoarding as a symptom of OCD (Goodman *et al.*, 1989) and as a symptom of OCPD (APA, 1994) indicate that possessions are saved for non-sentimental reasons, there is growing evidence that contradicts this view. A number of case studies and anecdotal reports have described highly emotional attachments to possessions (Frankenburg, 1984; Frost & Hartl, 1995; Greenberg, 1987; Warren & Ostrom, 1988). Hoarders view many of their possessions as extensions of themselves. The possessions are part of their owner and are imbued with human-like qualities. When other people touch, move or use the possessions the hoarder feels violated, as if they've lost control of their environment (Frost *et al.*, 1995). In a more empirical vein, Frost and Gross (1993) found that hoarders reported more saving for sentimental reasons and a greater level of emotional attachment to their possessions than did nonhoarders. In a recent investigation, we found additional support for this assertion (Frost *et al.*, 1995). High levels of hoarding in both college students and a community sample were associated with 'hypersentimentality' about possessions. This research suggested two types of emotional attachment to possessions that are associated with hoarding. The first was pure sentimentality. Possessions were seen as a part of the self and getting rid of them was like losing a close friend. They served as meaningful reminders of important past events. The second type of emotional attachment to possessions was related to their value as 'safety signals' (Rachman, 1983; Sartory, Master & Rachman, 1989). Frost and Hartl (1995) describe the reaction of one hoarder during a particularly stressful day, "I just want to go home and gather my treasures (things) around me". In this sense the possessions provide a source of comfort and security and may signal a safe environment. Thus, each possession comes to acquire an association with comfort and safety. The thought of getting rid of the possession violates this feeling of safety. Many hoarders seem to react similarly when acquiring new possessions. Buying or acquiring objects, even if they are obviously frivolous and unnecessary, seems to provide some degree of comfort for many hoarders. In this way, compulsive buying may be related to hoarding.

Although no data exist on such a relationship, we have seen numerous examples of compulsive buying among hoarders, particularly buying items that are never used.

## BEHAVIORAL AVOIDANCE

One prominent feature of hoarding behavior that is closely tied to indecisiveness, perfectionism, and emotional attachment to possessions is behavioral avoidance. Saving possessions allows the hoarder to avoid or postpone making a decision, perhaps because of a fear of making mistakes. Making any kind of decision appears to be quite difficult for hoarders (Frost & Gross, 1993; Frost & Shows, 1993). Hoarders have high levels of concern over making mistakes (Frost & Gross, 1993). It may be that making the wrong decision, especially regarding the discarding of possessions, is seen as a salient mistake and one to be avoided at all costs. In treating compulsive hoarding, we observed numerous examples of the avoidance of decision-making, usually in the form of saying "I'll put this here for now and deal with it later". As noted earlier, this was a major factor in the 'churning' of piles of possessions.

Hoarders may also avoid the unpleasant chore of weighing the myriad of variables relevant to the value of a possession. Since the meaning of each possession is more complex and its consideration is more difficult than it is for nonhoarders, decisions about organizing possessions are more difficult and more unpleasant for hoarders. Saving allows the hoarder to avoid this task. Also avoided are the difficulties associated with deciding where to put objects for which no organizational scheme exists. The problems associated with where to put possessions can be avoided by putting everything into a pile to be sorted later.

Finally, saving allows the avoidance of the harmful consequences of making the wrong decision and throwing out a needed possession. As Frost and Gross (1993) point out, it is not entirely clear what these consequences are. However, observation of attempts to discard possessions offers some possibilities. In the process of evaluating an integrated treatment for hoarding we found that consequences associated with discarding possessions usually focused on themes of loss (Frost & Hartl, 1995). More specifically, the focus was on the loss of important attachments, information, and opportunities.

In addition to the avoidance of decision-making is the avoidance of the emotional upset associated with the discarding of cherished possessions. As noted earlier, emotional arousal may stem from two sources: emotional attachment to possessions and the reliance on possessions as safety signals. Reactions to attempts to discard possessions appear to be extreme. Greenberg (1987) reported extreme anger among hoarders toward family members who attempted to intervene with their possessions. We have observed numerous examples of extremely intense reactions by hoarders who discard cherished possessions. In one example, a hoarder decided to discard a book that, although treasured, she had not look at in years and had never read. Immediately after putting the book into the 'sell' box, she began crying. When asked to give a SUDS rating she said, "I just feel like I want to die". Saving such a possession allows the hoarder to avoid such intense negative emotion. Interestingly, although this reaction was extremely intense, it was very short-lived. Within 2 min of discarding the book she was asked to give another SUDS rating. Her rating was 0, and she expressed disbelief about how intense her feeling of loss was for a possession she now recognized as of little worth to her. This example suggests that research is needed on emotional processing during treatment for compulsive hoarding. Perhaps what is most onerous is not the discarding of a possession, but the decision to discard it. Once a decision is made to discard something, the emotional reaction may be gone.

With hoarding behaviors that go on for an extended period of time an additional avoidance problem develops. Such a large volume of possessions accumulates that it becomes an enormous job to get rid of them. This results in further procrastination in an attempt to avoid the enormity of effort required to deal with the mountain of possessions. The motivational problems created by this issue were some of the most troublesome aspects of our recent case study (Frost & Hartl, 1995). Therapy for compulsive hoarding requires two related but somewhat different tasks. The first is to get rid of a significant number of possessions so as to make the home livable, while the second is to help the client develop the skills to maintain a relatively constant number of possessions and a sufficient amount of livable space.

## BELIEFS ABOUT THE NATURE OF POSSESSIONS

Several beliefs about the role and meaning of possessions seem to distinguish hoarders and nonhoarders. These beliefs are also seen with other OCDS symptoms as well. We have observed 3 types of such beliefs in our work with compulsive hoarders: beliefs about the necessity of maintaining control over possessions, beliefs about responsibility for possessions, and beliefs about the necessity of perfection.

In our recent study (Frost *et al.*, 1995), hoarding among both college and community samples was associated with an exaggerated desire for control over possessions. Specifically, hoarders were less willing to share their possessions or to have others touch or move them. Emotional reactions are common in response to unauthorized touching of a hoarder's possessions (Greenberg, 1987). This may in some way be related to the emotional attachment to possessions in that touching a possession may be viewed as comparable to having control over their person. Second, these beliefs may be associated with the safety signal value of possessions. If others are allowed to touch or move possessions, they may no longer signal safety, but uncertainty, since the status of the possession may be changed. Third, these beliefs may be related to a sense of responsibility for the possession.

Hoarders seem to have a very elaborate sense of responsibility associated with possessions. This belief is similar to that described elsewhere for OCD patients (Salkovskis, 1985). However, our research has suggested that there are two ways in which hoarding is associated with inflated responsibility (Frost *et al.*, 1995). The first is a sense of responsibility for being prepared to meet a future need. Each possession is seen as having functional utility under certain circumstances. Although these circumstances may not pertain at present, they may in the future. Thus, hoarders carry more 'just in case' items with them (Frost & Gross, 1993), they feel as though they must buy useful items they see, especially if they are on sale, and they are reluctant to discard items that may be used in the future.

The second sense of responsibility is to prevent 'harm' coming to the possession itself. The emotional attachments formed with possessions are similar in feeling to attachments formed with people. Possessions seem to have human-like status for hoarders and therefore must be protected from harm. It is as though by 'protecting' a possession they are protecting themselves from harm (Frost *et al.*, 1995). In line with this, our observations suggest that it is much easier for a hoarder to sell, recycle, or give away a possession than it is to throw it in the trash. It may be that this is related to hoarders concern about other people touching their possessions. Concerns about others touching possessions may have to do with a fear of damage or loss of the possession. Also, protecting possessions may be related to the value possessions hold as safety signals.

Finally, some features of compulsive hoarding appear to reflect underlying beliefs about what is possible and what one should be expected to do. For example, one hoarder saved all her old newspapers. When asked about throwing them away she had two concerns. The first was that she had not read everything in them, and the second was that even what she had read she couldn't remember in sufficient detail to suit her. She also could not throw away any junk mail without close examination. For her, throwing away junk mail meant ignoring potential opportunities. These examples appear to reflect two basic beliefs. Keeping old newspapers because they had not been thoroughly read may reflect the belief that perfection in this sphere is possible (thoroughly reading and remembering every newspaper). She felt that if she did not do this task (reading the paper) thoroughly, she had somehow failed. Keeping the papers was a way of simply postponing the recognition of that failure. Keeping articles from newspapers because she cannot remember the details also reflects a belief that she should remember everything. Again, not doing so reflects a failure on her part. Not allowing opportunities to go unscrutinized may also reflect this belief in the necessity of perfection.

The foregoing analysis is based on our research and experiences to date with this phenomenon. It is meant to provide a framework for the development, refinement and testing of hypotheses relevant to the study of compulsive hoarding. It is not meant to be an exhaustive listing of relevant variables. It may be useful for the generation of hypotheses regarding this complex and sometimes debilitating problem. Many aspects of this model are consistent with current theorizing about OCD. It remains to be seen the exact nature of the differences between compulsive hoarding and

other OCD phenomena. Greenberg (1987) suggests that hoarding is distinct from more classical obsessive compulsive symptoms, but is still part of OCD. Shafran and Tallis (1995) argue that the cognitive and behavioral features of compulsive hoarding are the same as those of other OCD symptoms. Further study of compulsive hoarding should provide insight into what features are common to all OCD vs specific to classic OCD symptoms like cleaning and checking.

*Acknowledgements*—The authors would like to thank Gail Steketee for her comments on a draft of this article.

## REFERENCES

Adams, P. L. (1973). *Obsessive Children*, New York: Brunner/Mazel.
American Psychiatric Association (1994). *Diagnostic and Statistical Manual of Mental Disorders* (4th edn). Washington, DC: Author.
Frankenburg, F. (1984). Hoarding in anorexia nervosa. *British Journal of Medical Psychology*, *57*, 57–60.
Frost, R. O. & Gross, R. C. (1993). The hoarding of possessions. *Behaviour Research and Therapy*, *31*, 367–381.
Frost, R. O. & Hartl, T. (1995). Treatment of compulsive hoarding: a multiple baseline single case design. Unpublished manuscript.
Frost, R. O. & Shows, D. L. (1993). The nature and measurement of compulsive indecisiveness. *Behaviour Research and Therapy*, *31*, 683–692.
Frost, R. O., Krause, M. & Steketee, G. (1996). Hoarding and obsessive compulsive symptoms. *Behavior Modification*, *20*, 116–132.
Frost, R. O., Hartl, T. L., Christian, R. & Williams, N. (1995). The value of possessions in compulsive hoarding. *Behaviour Research and Therapy*, *33*, 897–902.
Frost, R. O., Lahart, C. M., Dugas, K. M. & Sher, K. (1988) Information processing among non-clinical compulsives. *Behaviour Research and Therapy*, *26*, 275–277.
Frost, R. O., Marten, P., Lahart, C. & Rosenblate, R. (1990). The dimensions of perfectionism. *Cognitive Therapy and Research*, *14*, 449–468.
Furby, L. (1978). Possessions: toward a theory of their meaning and function throughout the life cycle. In Bates, P. B. *Life Span Development and Behavior*, (Vol. 1). New York: Academic Press.
Goodman, W. K., Price, L. H., Rasmussen, S. A., Mazure, C., Fleischmann, C. L., Heninger, G. R. & Charney, D. S. (1989). The Yale–Brown Obsessive Compulsive Scale: I. Development, use, and reliability. *Archives of General Psychiatry*, *46*, 1006–1011.
Greenberg, D. (1987). Compulsive hoarding. *American Journal of Psychotherapy*, *XLI*, 409–416.
Greenberg, D., Witztum, E. & Levy, A. (1990). Hoarding as a psychiatric symptom. *Journal of Clinical Psychiatry*, *51*, 417–421.
Kozak, M. J. & Foa, E. B. (1994). Obsessions, overvalued ideas and delusions in obsessive–compulsive disorder. *Behaviour Reseach and Therapy*, *32*, 343–353.
Luchins, D. J., Goldman, M. B., Lieb, M. & Hanrahan P. (1992). Repetitive behaviors in chronically institutionalized schizophrenic patients. *Schizophrenia Research*, *8*, 119–123.
Persons, J. & Foa, E. (1984). Processing of fearful and neutral information by obsessive–compulsives. *Behaviour Research and Therapy*, *22*, 259–265.
Rachman, S. (1983). The modification of agoraphobic avoidance behaviour: some fresh possibilities. *Behaviour Research and Therapy*, *21*, 567–574.
Rachman, S. (1993). Obsessions, responsibility and guilt. *Behaviour Research and Therapy*, *31*, 149–154.
Rasmussen, S. & Eisen, J. (1992). The epidemiology and clinical features of obsessive compulsive disorder. *The Psychiatric Clinics of North America*, *15*, 743–758.
Reed, G. F. (1969a). "Under-inclusion"—A characteristic of obsessional personality disorder: I. *British Journal of Psychiatry*, *115*, 781–785.
Reed, G. F. (1969b). "Under-inclusion"—A characteristic of obsessional personality disorder: II. *British Journal of Psychiatry*, *115*, 787–790.
Reed, G. F. (1985). *Obsessional Experience and Compulsive Berhavior: A Cognitive–Structural Approach*. Orlando, FL: Academic Press.
Salkovskis, P. (1985). Obsessional–compulsive problems: a cognitive–behavioural analysis. *Behavioural Research and Therapy*, *23*, 571–584.
Sartory, G., Master, D. & Rachman, S. (1989). Safety-signal therapy in agoraphobics: a preliminary test. *Behaviour Research and Therapy*, *27*, 205–210.
Shafran, R. & Tallis, F. (1995). Obsessive-compulsive hoarding: three cases suggesting the primacy of learning and cognition. Unpublished manuscript.
Sher, K. J., Frost, R. O. & Otto, R. (1983) Cognitive deficits in compulsive checkers: an exploratory study. *Behaviour Research and Therapy*, *21*, 357–363.
Smith, J. P. (1990). *Mammalian Behavior: The Theory and the Science*. Tuckahoe, NY: Bench Mark Books.
Warren, L. W. & Ostrom, J. C. (1988). Pack rats: world class savers. *Psychology Today*, *22*, 58–62.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

SAMUEL SHIPKOVITZ,                                )
                                                                        )
                                                                        )      Civil Action No. 07-1053 (RCL)
                                          Plaintiff,           )
                                                                        )
                              vs.                                   )
                                                                        )
THE WASHINGTON POST COMPANY, et al.     )
                                                                        )
                                      Defendants.          )

---

**[PROPOSED] ORDER**

Upon consideration of Defendants' Motion for Summary Judgment and

supporting papers, Plaintiff's opposition thereto, and Defendants' reply, and for good cause

shown, it is hereby ORDERED this ____ day of _____, that Defendants' motion

is GRANTED.

_____
Royce Lamberth, United States District Judge

Copies to:

Samuel Shipkovitz
5829 Nicholson Street
Pittsburgh, PA 15217

Ara Tramblian, Esq.
Deputy County Attorney
2100 Clarendon Blvd., #403
Arlington, VA 22201

Kevin Baine, Esq.
Jonathan Kravis, Esq.
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005