`IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SAMUEL SHIPKOVITZ,                          )
                                            )
                    Plaintiff,              )
                                            )
       vs.                                  )    Civil Action No. 07 -1053(RCL)
                                            )
THE WASHINGTON POST COMPANY, et al.)
                                            )
                    Defendants.             )
_____)

## PLAINTIFF'S OPPOSITION TO WP DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

07-1053-OPtoWPMSJ

NOW COMES PLAINTIFF, who responds to the WP Defendants' [ The Washington Post Company, WP Company, L.L.C., and Bridget Schulte] Motion for Summary Judgment as follows:

The following is the best Plaintiff could do in the time allowed, and needs further time to conduct further research and to edit this paper for more focused clarity and other reasons. Plaintiff has serious medical and other problems which greatly slow down his ability to function, as previously discussed. Further, Plaintiff has been speaking with several attorneys experienced in the matters involved, and would appreciate further time to retain one, and provide a more expert response.

Plaintiff refers to Plaintiff's Declaration and his Statement of Material Facts In Genuine Dispute attached hereto.

### Background Summary

Plaintiff has reviewed the WP Defendants' Motion For Summary Judgment and it

seems that certain important facts have been left out. First, Plaintiff called the WP Metro

Desk, not Ms Schulte,, whom he did not then know. *Several months later* she called.

Plaintiff stated what had happened and made it clear that any article having his cooperation

need concern only his situation, and that he insisted on review and comment on anything to

1

be published.  She admits that she started to comply, but later after the first article was

published stated to Plaintiff  that her boss insisted on ignoring our agreement and

published anyway without contacting Plaintiff for his comments (believe his name was

Jonathan??). Not until the June, 2006 publication did Plaintiff find out that she had

expanded it to include other victims ( but none of the other 18 Arlington victims, *infra*) ,

other Fire Depts., and a broadening of the definition

of  "hoarding" beyond even the Arlington Hoarding Task Force ( Pl. Op. to WP MSJ SS

Declaration Ex. 1, and others' definition of "hoarding" beyond their definition of storage of

organic matter, vegetative trash, open food, dead beings, pets, pet matter, wreaths,worthless

items, etc., which Plaintiff did not have.

WP continues to claim as their defense that they did "fair reporting" of  the

apartment condition, which  is just not true.  Their statements, not of the official

proceedings of U.S. District Court, Eastern District of Virginia ("EDV") (Civ. No. 05-

1219-A)  false and defamatory,  has brought and continues to bring ridicule and humiliation

to Plaintiff falsely claiming that "he slept *on* his stuff…" is just plain fabricated.  WP's

response is that since there were Plaintiff's boxes and belongings *around* the deflated air

mattress, and  sleeping camping pad, i.e. his bed, (Plaintiff has severe sciatica and is

required to sleep on a super firm bedding surface he slept on which were on the carpet. and

with no boxes or other of his belongings below[1]  So what is around one's bed has nothing

to do with one's BED.  Saying someone sleeps on his boxes/stuff obviously implies mental

---

[1]  Whether renowned attorney  FitzGerald sleeps with his files *near* his bed has nothing to do with the
"BED"—same with Plaintiff.  Whether one of Plaintiff's aunts sleeps with her childhood turtle toys
*near* her bed has nothing to do with her "BED".

2

illness and cause for ridicule—which is the situation caused by WP's false defamatory statements complained of.

Plaintiff alleges that the articles falsely state as fact those phrases quoted in Complaint Paragraphs 17 (June, 2006 publication) and 20 (July, 2006 publication).. Plaintiff did not sleep on his boxes/stuff , such is indicative of mental illness and these fabrications subjected Plaitiff to ridicule, and thus WP is guilty of defamation.

Defendant WP generalizes and misleads the court by claiming that the general "condition of the condominium" is what the cause is about. It is not. In fact, it is clear, *infra*, that their view is that from discussing a single case, making false defamatory material statements of fact, destroying that person, including his ability to make a living, by generalizing to other unrelated situations (Plaintiff is believed the only one who had been locked out of his unit with an illegal lock change to prevent cure, but perhaps also the other 18 Arlington admits to, who are not discussed) , expanding the definition of "hoarding" beyond the Arlington Task Force definition, and then associating Plaintiff with mental illness can immunize the defendant by then claiming "matter of public concern". This can not stand.   The article was supposed to be only about his case and Plaintiff was maliciously and falsely led by Schulte  to believe that the article would be sympathetic toward him.

Simply put he was misled, lied to and betrayed by Schulte. .  The "gist" of the article is clearly that Plaintiff is "mentally ill" and unfit to practice his professions. "Mental illness" is even mentioned in the first article. The "gist" of the article is not a treatise of the definition of "hoarding", and does not even mention the Arlington written definition (Spt.,

3

2005 Task Force paper)nor the definition introduced by WP for purposes of their instant Motion. Defendants rely on the unlawfully taken photographs. They do not stand for what they claim. See SS Decl., attached and referenced photos. Mr. Kravis has agreed to keep those under seal, as they should be.

As to the claim that the apartment had trash and debris, this also is false. The photographs show many containers, merchant bags, office equipment, office supplies, tools, books, electronics, and basically a collection of new *inorganic* items. There was no open food, trash- discards of food or paper, vegetation, organic matter, wreaths, or other living or formerly living items, nor worthless items. Therefore, the statements that there was trash and debris is just plain false. These false statements are not minimal, but serious false statements that have subjected Plaintiff to severe ridicule, unemployment, unemployability, and even social avoidance by those who only know him slightly and those who do not really know him but believe the articles.

Crossan began getting day passes in late 2004 and asked Plaintiff, his tenant and friend [since 1990] if he could stay in the second bedroom. As they had been friends since 1990, Plaintiff agreed. As stated elsewhere, Crossan only let in his "medicine-taking-observer/social worker" Hughes. She, on October 20, 2005, without his permission brought the others from Arlington County in behind her when he opened the door for her (See the three declarations under oath/penalty of perjury signed by Crossan so stating). The warrantless inspectors rushed in behind her, unlawfully changed the locks and transferred Crossan involuntarily to a mental health facility.

4

As to the legitimacy of the EDV proceedings, as stated before, Plaintiff spoke with various attorneys during the first week of the EDV case, including the attorney most known for his ACLU work, Victor Glasberg, who emphatically stated that Plaintiff had no chance at all to have any fair treatment in EDVcourt, as "Hilton…worst possible judge for civil rights cases", "anti-black anti-Jewish, anti-Moslem, anti-minorities"). So the Order of EDV on June 22, 2006 baselessly and falsely claims that no warrant was needed and falsely claims permission; and ignores the Declarations made under penalty of perjury (evidence) of Crossan that he only permitted Hughes to enter and the others came storming in behind her. Crossan's three declarations speak for themselves.

B. The EDV court stated on June, 2006 (9 months later) that since Crossan was back in the unit that there was no reason to grant an injunction, as it had become moot. Plaintiff's motion was for both of them—not just Plaintiff tenant or Crossan. Hilton even had the audacity as to the cause as to an outside security company, which prevented Plaintiff from hiring a locksmith to enter, to ignore its own rules for processing a default motion and affidavit and denied Plaintiff's proper default papers (further indication of prejudicial treatment).

C. Plaintiff did not know Schulte prior to her calling him. Plaintiff called the WP Metro Desk. For months no one called back. *Several months later* she called him. Plaintiff specifically stated that he would cooperate provided that he was given a prepublication review and opportunity to provide comments. She agreed. That promise was ignored. He was led to believe by Schulte that Plaintiff would be treated sympathetically (warrantless search and seizure, locks illegally changed, no opportunity to cure, and later Crossan's brother's colleague Yeager and Yeager's buddy Naudus steal over $80,000 of his property).

D. At no time was Plaintiff informed by Schulte that she would expand the matter to other cases , other municipalities, and/or expand the definition of "hoarding" beyond the definition of "hoarding" stated in the September, 2005 Arlington County Task Force white paper, which on its criteria page (p.7) concerned only the collection of used food, vegetation, organic material, pets, pat matter, pet excrement, wreaths and living /dead matter.

It had been agreed that Schulte would present her planned article to Plaintiff for his review and comment prior to publication. She did not live up to her agreement (breach of contract??).. The unexpected-date article came as a huge horrible surprise and shock with the serious false defamatory statements enumerated in Complaint paragraphs 17 and 20..

Plaintiff did email the photograph published, but it was to be for proof of the "JonesDay backroom"condition and was not agreed to be published. Ignored was the also-transmitted photograph of Hughes on said October 20, 2005 in a HAZMAT outfit with respirator unlawfully searching his bedroom—so this "raid" was a planned vicious attack. Schuilte ignored this most important photo in her effort to slant the article to "mental illness', rather than the outrageous criminal behavior of the Arlington officials.

The title to the article was also false malicious and vicious : "FIGHTING TO REMAIN ENGULFED IN JUNK". Plaintiff received no call from Schulte as to the draft article. There was no junk.

The second article of July 18, 2006 did not quote the court decision paper in any reasonable or factual manner. No where in said decision does the EDV Court make any comment that any count was "without merit", yet alone the false and defamatory quote from Curtius/DiMatteo that each and **"every count was found to be without merit"**. This false defamatory statement of fact destroys any attorney's professional reputation, including Plaintiff's. While WP attempts to sloff off this serious false quote that DiMatteo suckered WP//Schulte into believing and which negligence, at least, could have been avoided if Schulte had merely looked at the Order

6

itself,. This is circumstantial evidence of negligence and fault. Claiming that it is not

serious unless a Rule 11 sanction is also in such Order has no basis. Whether a

sanction is imposed has nothing to do with the seriousness of the false statement of fact

("every count was found to be without merit") [every surgery was found to be poorly

done and ineffectual ?] that destroys a professional's/attorney's reputation and is libel

*per se.*

I.
Plaintiff will and can prove:

1. that Defendant WP made the false and defamatory statements enumerated in
   Paragraphs 17 and 20. See SS Declaration attached hereto.

2. That WP published them without privilege as to any third party. That any claim of
   "fair reporting" or "fair comment" is just meritless, as the items complained of are
   clearly false and unrelated to their claim of immunity as to generalizing the articles
   to "hoarding" or claims that the subject apartment's condition was accurately
   described. Further and importantly relevant the privilege applies only to
   descriptions of official proceedings. These matters [false statements enumerated in
   Complaint Paragraphs 17, 20] were not discussed in the EDV proceedings.
   Therefore, there is no privilege applicable to these unrelated personal (attack) false
   statements. That is, there was no trash, debris, food, vegetation, pet matter, or
   worthless items and after-the-fact attempts to redefine the definition of "hoarding"
   beyond the Arlington definition, the only definition involved in his EDV case, is
   just further evidence of malice/bad intent.

3. That Defendant WP's fault in publishing them amounted to at least negligence
   (Schulte taking the word of Curtius/DiMatteo without taking the minimal step of
   reading the Order to verify).

4. either the statements complained of were actionable as a matter of law irrespective
   of special harm [libel *per se*] or that its publication caused Plaintiff special harm.

5. Libel *Per Se* (as to profession) fits the first category. Plaintiff is unemployed, is
   unable to obtain any new business, and has lost most of his previous business.

   The statements challenged in the Complaint were materially false . Claiming

that the [false claim of] inaccuracies are minor as their defense is beyond  opinion. The

use of boxes/stuff as part of his bed , a completely false statement which clearly

implies mental illness ( and the basis for liability and damages per the *Lorain Journal*

case) has nothing to do with what ___*surrounds*___ the bed, which WP claims  as their

defense[2].  Plaintiff emphatically disagrees.  Such is a jury question and not subject to

decision on summary judgment.  They are the basis for damages.  Plaintiff never slept

on his stuff.  WP's attempt to divert attention by now  claiming that instead the boxes

and stuff were AROUND the bed area is not a minor inaccuracy.  The article does not

describe the area *around* the bed.  Its serious effect casting mental illness aspersions on

Plaintiff are not diluted by referring to the unpublished photographs in their Motion To

Summary Judgment, which do not support them.

One of Plaintiff's uncles was a WWII Army GI and career IRS attorney who had

a better law library than the WDPA office which he had in a separate  apartment which

he owned.  Piles of books and drafts related to ongoing projects were often observed.

No one ever bothered him or the unit.  Does that convert him from a devoted hard-

working IRS employee into a crazy "hoarder" under their nonstandard definition[3].  So

since there was no food, pet, vegetation. Living/dead, organic matter was involved,

---

[2]

[3] Plaintiff was a mentoree of Richard Thronburg during Plaintiff's college years (Pgh. 14th Ward YR).
Thornburg then was little known person with a mildly retarded infant son.  His home was replete with
nonneatness- much associated with this son.  Several years ago Plaintiff inadvertently came upon him at the
Bailey's Crossroads (Va.) Staples where he was accompanying this son—now in his late 30s.  He
reminisced about his Pittsburgh days, about his other mentorees, some of whom he brought into his Pa.
governor's cabinet.  So is this class act gentleman to be destroyed for not being neat for a purpose 30+
years later.  Plaintiff, as a Patent Attorney, has met multitudes of brilliant engineers and scientists and very
few were neat, and most of whom had multiples of books in piles, equipment scattered about, etc.
    So to expand the definition of "hoarding" beyond that related to living/organic matter is simply to
mislabel and destroy hard working honorable professionals..  One of the Supreme Court cases (Forest City)
lists Harry Alan Sherman as the Plaintiff's attorney.  He was known to Plaintiff as daughter Roz's father.
Their home and yard were replete with exotic cars and car parts  ("hoarding again?").

falsely calling someone a "hoarder" based on having a significant amount of office equipment, books, etc. is just defamatory to hard working professionals.

## B. THE DEFAMATORY STATEMENTS ARE MATERIAL AND FALSE

Defendant WP attempts to divert the attention of the Court by claiming that the false statements are "slight inaccuracies" They are not. Such consideration is a jury question since they involve the consideration of what is factual. Consideration of what is material or minor is also an issue of fact for a jury.

Going through Complaint Paragraph 17 statement one by one:

A    "he works sporadically and has had long periods of unemployment"

False – Plaintiff was both self-employed as both an electronics engineer and Patent Attorney, as well as a contract patent attorney, and on the day of the raid, October 20, 2005, was working as such and had been for considerable time. Defendant ignores this serious false statement published by them made from whole cloth. Plaintiff never told Schulte any such thing as to "employed sporadically', etal. as they now claim. They even admit that Plaintiff had even provided to Schulte prior to publication the name of the law firm which their papers disclose—so they knew they were making this false statement up.

See SS Declaration Para.  _14-A_..

B. "He admits that his place was a mess"

False. Never happened. Non-neatness is unrelated to "mess", which again implies food items left out, etal., which is just made up.

See SS Declaration Para. 14-B _.

C.  "Yes, he slept *on top of* his stuff on the floor".

False- totally made up. They now admit that this is false, but claim that it is a minor inaccuracy (Defts's fn 1 claim does not make it so. It clearly implies that such a person must be mentally ill IF TRUE—and it is NOT. See item 17G "mental illness, brain dysfunction, and obsessive-compulsive disorders".

9

See SS Decl. Para. 14-C__.

D…."…there were boxes in the bathtub"

FALSE- defamatory by implication. The boxes belonged to Crossan-- not Plaintiff-- but the article falsely implies that they were Plaintiff's. (See Deft. fn2). Deft. WP's opinion of the perceived "gist" of the article is fanciful. The "gist " of the article is clearly that Plaintiff and others accused of "hoarding" (their expanded definition) is mentally ill. As the case law , infra, Lorain Journal, holds, defamation by inference or implication is still actionable defamation.

See SS Decl. Para. _14-J_.

E. "…The rest, from floor to ceiling was crammed with 'rubbish, debris, paper,...bags..."

FALSE—Totally made up as to these items. The unlawfully-taken photos do not show any trash or rubbish in the unit and no area outside of the office area went from floor to ceiling, and it had stacked modular plastic file drawers, desks, Ex. 4 DOESNOT show any opened cans or bottles in the sink. The exhibits show office supplies, office equipment, merchant bags having new (nonorganic) items.

See SS Decl. Para. 14-E__.

F. "…the kitchen was unusable."

FALSE—the kitchen was used by both. The electric stove was disconnected due to Crossan's NGRI arson charge.

See SS Decl. Para. 14-F___.

G. "…its association with mental illness, brain dysfunction, and obsessive-compulsive disorders."

FALSE-- Plaintiff has never yet been diagnosed or adjudged any of these, nor seen any related medical provider.

See SS Decl. Para. 14-G___.

H. "After 6 weeks, Crossan's family hired a lawyer, refused to allow Shipkovitz back into the condominium and hired a moving company to haul his things to a storage facility in Fairfax County, where they still sit".

10

FALSE
1. Only Steve's brother, not his sister or any other relative-- was involved. He hired Yeager.
2. Yeager hired his friend, "Art Naudus"[real name not known] who has a cleaning and "home improvement" business, Stanley T. Naudus Corp.

Stating that one's entire ***family*** was united in doing this is both false and serious.

Only Steve's brother John was involved.   In fact, Crossan's sister in Wisconsin, specifically stated that she had nothing to do with it and that she had favored letting Plaintiff move out on his own, which he wanted to do.  Steve's (Annandale, Va.) nephew, his only other living relative was also not involved.  Again, this is a serious falsehood meant to ridicule Plaintiff, when in fact only his dishonest brother, John, knowing that Steve had lost 50% function in both his kidneys and had a greatly shortened life, did this to ensure that only he could inherit Steve's  property and that Steve's 15-year friend, Plaintiff, would not then be involved or around.  John visited Steve only once in 8 years.  Again, this is not a minor inaccuracy and a jury need decide.

See SS Decl.  Para.  __14-H_.

I. "Shipkovitz's... court filings were...handwritten on 100 percent recycled paper."

Mostly FALSE- implies Plaintiff is a nut unfit to represent anyone as a lawyer.
(1) Only one paper was handwritten as it had a nonextendible deadline.

(2) None of his filings were on "100 percent recycled paper". Plaintiff always used the cheapest bleached [nonrecycled] paper.

See SS Decl. Para.  12__.

This false statement of using "100 percent recycled paper" implies that Plaintiff is a "green extremist-- i.e., a " green nut".

See SS Decl. Para.  12__.

11

15. In Complaint Paragraph 20:

"...trash"

FALSE- there was no trash in the unit. As the photos show, there were many merchant bags containing new items, and much office equipment and supplies. "Back room of JonesDay" similarly having office equipment and supplies is not trash ( no discarded paper, used food, food bags and the like, etc.)

See SS Decl. Para. 15-A__.

WP's defense that the articles accurately describe the condition of the apartment is just

plain FALSE. If anything, the photos prove Plaintiff's point. *Nonneatness shown in the*

*photos is unrelated to "hoarding" (collection of organic matter).*

## LAW

### DEFAMATION  BY  IMPLICATION

The WP claim that they can defame anyone by broadening Plaintiff's or any

person's personal matter into a "matter of public importance" or matter of "public concern"

and claim immunity from liability. Such is not the law. See *Michaels v. International*

*Entertainment Group, Inc.*, 5 F. Supp. 2d 823 (C.D. Cal. 1998); D.C. Code 23-542 (1996),

*Florida Star v. B.J.F.*, 491 U.S. 524 (1989), Cf. *Bartnick v. Vopper*, 532 U.S. 514 (2001)).

Where both sides present evidence as to "meaning conveyed" as here, it becomes a

jury question, not dispositive on summary judgment. See *Masson v. New York Magazine*,

Inc., 501 U.S. 496, 115 L. Ed. 2d 447, 111 S. Ct. 2419 (1991).  Where there is an a dispute

as to "different effect on the mind of the reader" by both parties, it becomes a jury question,

*Masson*, Id, and summary judgment is impermissible.

12

Where there is a claim that quotations purport to be a "verbatim repetition of the speaker's statement", and it is not,  such as that "every count was found to be without merit","only a trial on the merits will resolve the factual dispute, *Time, Inc. v. Pape*, 401 U.S. 279 (   ); *Bose Corp. v. Consumers Union*, 466 U.S. 489 (   ).

Where there is a difference in meaning between the quotation and the transcript and a jury could find that difference exposed Plaintiff to "contempt, ridicule or obloquoy", a jury might find it defamatory and thus is not appropriate for summary judgment. This applies to the false Curtius publication published by WP, claiming to quote the EDV judge Order of June 22, 1996, when she/DiMatteo fabricated the quotation. Also see *Masson*, *infra*.

As also stated in *Masson*"... a single sentence may be the basis for an action in libel even though buried in a much larger text."

**A statement is not a "minor inaccuracy "...if it would have a different effect on the mind of the reader from that of the truth".** ***Masson, supra***. **Such applies here to each of the complained-of false statements. by WP.**

Even statements of opinion can be actionable if they imply a provably false fact, or rely upon stated facts that are provably false. *Moldea v. New York Times Co.*,  22 F. 3d 310 (D.C. Cir. 1994). Even calling Plaintiff a "hoarder" meets this test.

When a challenged  statement is capable of a defamatory meaning and Plaintiff can prove it to be false, a claim is actionable.

13

False defamatory statements about an attorney are *per se* actionable. *Grossman v. Guemans*, 631 F. Supp. 972 (D.D.C. 1986), *Joseph v. Xerox Corp.*, 594 F. Supp. 330 (D.D.C. 1984), *Wallace v. Skadden Arps*, 715 A. 2d 673 (D.C. 1998) ("ascribing conduct and characteristics that would tend to injure them in their...profession or community standing" *per se* actionable; "If a defamatory statement injures a person in his or her trade or profession, then the statement is *per se* actionable, *Carwile v. Richmond Newspapers*, 196 Va 1, 82 S.E. 2d 588 (1954), *Swengley v. ITT*, 993 F. 2d 1063 (4th Cir. 1993). Also see *Howard Univ. v. Best*, 484 A.2d 958 (D.C. 1984) [fitness for the proper conduct of their lawful business). The complained-of false defamatory statements about Plaintiff stated to be about an attorney make WP liable.

The question of actionability of alleged libelous language is for the jury where it is not libelous *per se*, but in the light of extrinsic facts, is susceptible of a construction which will give it a defamatory meaning. See *Washington Herald Co. v. Berry*, 41 App. D.C. 322 (1914).

Where a published article is susceptible of several meanings, one of which is libelous, whether or not the article is libelous is for the jury to decide. *Chaloney v. Washington Post Co.*, 36 App. D.C. 231 (1911). Again the false Curtius quote published by WP is not a quote ; it is fabricated; and while WP baselessly claims it interpretable as non-libelous, it is not an issue that can be settled by summary judgment.

A court may only rule as a matter of law that a statement is not defamatory when the publication is not reasonably capable of ***any*** defamatory meaning and cannot be

14

reasonably understood in any defamatory sense in making this determination. *Washburn v. Lavoie*, 357 F. Supp. 2d 210 , affd. 437 F. 3d 84 (2004).

Certainly falsely claiming that Plaintiff slept on his boxes makes Plaintiff appear "odious, infamous or ridiculous" and are actionable, *Guilford Transportation Industries, Inc., et al. v. Wilner*, 760 A.2d 580 (D.C. 2000).

Only when a court can say that the publication is not reasonably capable of any defamatory meaning and cannot be reasonably understood in any defamatory sense that it can rule as a matter of law that it was not libelous. *Guilford*, Id, citing *Levy v. Amer. Mut. Ins. Co.*, 190 A. 2d 475 (D.C. 1964).

If the court determines that a statement is capable of having a defamatory meaning, then whether the statement in in fact defamatory and false is a question of fact to be resolved by the jury. *Guilford*, Id., citing Restatement (2d) Torts, § 614(1).

False statements that make the Plaintiff appear "odious, infamous or ridiculous" are actionable. *McBride v. Merrill Dow, et al.*, 540 F. Supp. 1252 (D.D.C. 1982), revd. in part on other grounds, 717 F.2d 1460 (D.C. Cir. 1983).

Also see *Chapin v. Knight-Ridder, Inc.*, 993 F. 2d 1087 ( 4th Cir.   1993) at p. 1105 :

> " ...In order to render words defamatory and actionable, it is
> not necessary that the defamatory charge be in direct terms,
> but it may be made indirectly, and it matters not how artful
> or disguised the modes in which the meaning is concealed, if
> it is in fact defamatory.  Accordingly, a defamatory charge
> may be made by inference, implication or insinuation...In
> determining whether the words and statements complained
> of are reasonably capable of the meaning ascribed to them
> by innuendo, every fair inference that may be drawn from
> the pleadings must be resolved in the plaintiff's favor.

15

> However, the meaning of the alleged defamatory language
> can not, by innuendo, be extended beyond its ordinary and
> common acceptance."

As stated above,, DEFAMATION BY IMPLICATION IS

ACTIONABLE.  See *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 110 S.

Ct. 2695, 111 L. Ed. 2d 1 (1990), *Schnupp v. Smith*, 457 S.E. 2d 46, 249 Va.

353 (1995), *Hatfill v. New York Times Co.*, , 416 F. 3d 320 (4th Cir.. 2005),

citing *Conley v. Gibson*, 355 U.S. 41 (1957) [INFERENCES FAIRLY

ATTRIBUTABLE TO THE PUBLISHED WORDS].

Even innocent inaccuracies are actionable, *State v. Heckel*, 143 Wash 2d

824, 24 P. 3d 404 (2001).

Plaintiff, as an indisputable private nonpublic figure,  need only

meet the burden of *Gertz v. Welch*, 418 U.S. 323, 94 S. Ct. 2997, 41 L. Ed.

789 (1974), i.e. demonstrate some fault on Defendant's part and proof of

actual injury (not necessary if libel per se).  See *Herbert v. Lando*, 441 U.S.

153, 99 S. Ct. 1635, 60 L. ed. 2d 115 (1979) (normal discovery of

Defendant appropriate, including as to matters of intent or motive) (f.n. 10,

12, 15, F.R. Civ. P. 26(b)(1)).  Here this court for unknown reasons denied

Plaintiff's already issued discovery relevant to the facts and as to the issue

of fault.

The title of the first article, "FIGHTING TO REMAIN ENGULFED

IN JUNK" makes clear that the author intended to transmit the inference

that Plaintiff was "mentally ill" [words used in the article], meeting the

16

requirements of *White v. Frat. Order of Police*, 909 F. 2d 512, 520 (D.C. Cir. 1990) (ASSERTING A FALSE FACTUAL CONNOTATION ACTIONABLE.   See *Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990)).

Even as to "fair comment", where there is room for doubt, the jury must be permitted to pass upon the question. See *Chapin v. Knight-Ridder,* Inc., 993 F. 2d. 1087 (4th Cir. 1993), supra at 1107, citing *James v. Haymes*, 160 Va. 253, 168 S.E. 333 (1933).

While discovery in the EDV *Crossan* case disclosed that Arlington had done the same outrageous warrantless searches and seizures to at least 18 others in the year before the "raid" upon Plaintiff's apartment, WP failed to follow up this important fact in the record, which they claim she reviewed, so that any claim of "public importance" would have any logical meaning, was not performed, i.e. they never even attempted to identify those other similarly situated victims which they could have followed up on to actually  make it a matter of public concern, rather than a falsehood based hatchet job on this Plaintiff.

Evidence of motive and factual issues is sufficient to preclude summary judgment. See *Suzuki Motor Corp. v. Consumers Union*,      F.2d (No. 00-56043  9th Cir 2002).  Plaintiff has executed his Declaration on the relevant facts and issues  and his Statement of Material Facts In Genuine Dispute, attached hereto.  As there is both issues of fact and intent and fault in the instant case, this court not permitting issued  discovery as to facts and

motive seeming an error, and the many factual disputes as to facts and implications, no summary judgment is appropriate in this case at this stage. At WP MSJ p. 7

WP Ex. 4A, 4B do not show the kitchen "unusable" as WP without basis claims. The stove had been disconnected long before, in 1996, due to Crossan's arson issues. Certain counters had boxes and containers of files, kitchen and other tools and electronics. The microwave was the used heating source and the sink was actually comprised of two bowls, only one of which had been in use for years, the other used for storage due to a disposal malfunction. Both Plaintiff and Crossan mostly ate out. See SS Decl. at 14-F.

WP MSJ Ex. 4C-4V, 4AA-4LL do not show that the condo was "crammed with rubbish, debris", [ there was no open food or discarded paper] which is completely separate from office supplies, merchant bags having new items or containers, mostly stacked modular plastic drawers ( containing non-food, mostly office oriented. tools, sewing, construction/plumbing/electrical, electrical/electronic items) as WP falsely claims.

See SS Decl. at 14- E.

WP MSJ Ex 4A does not show open food cans and open beverage bottles as claimed.

18

Taken together, the photos show a high density storage of mostly brand new inanimate business/construction/ tools/ household type of items-- not organic/vegetation/open food/pets/pet matter/worthless items. Most of Plaintiff's items were new.

WP MSJ fn 1 is vehemently disagreed with by Plaintiff. What one sleeps _on_ is completely unrelated to what is _**around**_ one's bed or sleeping area as discussed above. "Sleeping on his stuff" clearly implies mental illness-- but PLAINTIFF DID NOT SLEEP ON HIS STUFF/BOXES. See SS Decl. at Para. 14-C.

WP MSJ fn 2 is similarly a flawed defense. The article clearly implies that Plaintiff and only Plaintiff had boxes in the unit, including the bathtub. SS Decl. 14-D. But it was Crossan who had the apartment similarly filled with his stuff, including his FORD MUSTANG collectibles, including a front bumper, steering wheel, chrome hood pony, logo chrome parts, etc.. And it was Crossan who used the bathroom and tub as his storage area, besides part of the  the living room, which had  his, not Plaintiff's,  Mustang parts  (although both agreed  that FORD made the most reliable engines).

The "gist" of the articles is not that "hoarding"  exists, but that Plaintiff is "mentally ill".  The published falsehood that Plaintiff was unemployed and only worked sporadically, which was not then true, despite his top credentials, supports the implication that Plaintiff was "mentally ill" , which WP intended. Such was the overt goal of DiMatteo who went

19

around saying such to attorneys such as Deborah E. Kramer, a friend of Plaintiff's. See Complaint and SS Decl. Para. 13__.

The Defendant and Plaintiff differ as to the definition of "hoarding". WP's submission of claimed expert witness treatise-type articles is objected to and need be striken, *infra*. A non-M.D. web site and a paper by two non-M.D. psychologists are not treatises, *infra*. No scientific basis support or qualified expert witness affidavits for the articles has been provided and thus are excludable pursuant to the *Merrill Dow* U.S. Supreme Court decision, *infra*. Arlington County's Hoarding Task Force September, 2005 paper at criteria, p. 7, definition was the only one involved in the EDV case, and as such, it is outrageous that WP can unilaterally claim the right to expand the definition beyond the September, 2005 Arlington Task Force September, 2005 "white paper" definition. Arlington also had various newsletter articles for the elderly discussing hoarding and again only organic matter collection, valueless useless items, not collection of inanimate items, primarily office equipment and supplies, tools, etc. was discussed.

This dispute as to the definition of "hoarding", which the published articles charge Plaintiff with being, requires denial of summary judgment and requires a jury trial to determine which definition of "hoarding" applies. For the WP Defendants to claim that after discussing Plaintiff in the article, then discussing "mental illness, brain dysfunction, and obsessive-

compulsive disorders" that there is not the logical process and direct

implication that Plaintiff is "mentally ill" is ridiculous. As the case law ,

*Milkovich v. Lorain Journal Co.,* etal, stand for, is that defamation by

implication is actionable. Also see *Chapin, supra.*

WP MSJ p. 12:

The article clearly states (falsely) that Plaintiff has been

unemployed, sporadically employed and unemployable for years before the

raid, Oct. 20, 2005. This is a false defamatory statement. which made the

Plaintiff, having superior credentials, appear ridiculous or unstable-- When

he was locked out of the unit on October 20, 2005 and after a while

thereafter, he did indeed become "out of business". His files , business

equipment, etal. had all been illegally seized. Plaintiff never told Schulte

that he was ONLY doing short term contract work. Such statement was

fabricated.  It is believed that Schulte spoke with one of Plaintiff's client,

Sabo.  While long term work is preferable to short term work, money is

money.

As to the Crossan "family" quote, as discussed above,  the clear

implication of "family" is that many people were in union against Plaintiff--

this is just plain false. Steve Crossan has a brother John, a sister in

Wisconsin, and a nephew, son of a deceased brother, living in Annandale,

Va. Both parents were deceased. Only brother John was in any way

involved. In fact, the sister disavowed any involvement in the matters, and

21

the nephew was not close to the rest of the family, and was not known

involved in any way.  John, an extremely vicious greedy jerk, who, except

for once on his way somewhere else,  never visited Steve during the many

years of his commitment, and only became involved when he learned that

Steve had been overdosed by the State and had lost 50% function in each of

both of his kidneys and had a much reduced life expectancy.  Brother John

wanted to ensure his total and sole status as heir to Steve's assets, and

removing Plaintiff [Steve's only friend] from Steve's life  became his

objective, by having Yeager and Naudus breaking off Plaintiff's second lock

on the door of the apartment, breaking into the unit and stealing anything of

value.  This evil intent was expressed by John Crossan to attorney Henry

FitzGerald in a phone conversation in February, 2006.

WP MSJ  fn 7

    Nowhere in the EDV Order does it state any count, yet alone every

count, was "WITHOUT MERIT".  Accusing an attorney of filing papers

that are "without merit" is defamatory *per se*, and in this case totally false.

WP cites cases in which these words **were in the court papers**,.  But such

is not the case here.


    Conservative professionals do not overtly involve "green"

preservation with their professional work.  Plaintiff never, to his his

22

knowledge, used "100% recycled paper" which would imply that Plaintiff is a "green nut".

### FAULT  - Rule 56(f) Issue

Plaintiff is a private person.  Pursuant to *Gertz v. Robt. Welch* , 418 U.S. 323, 340, Plaintiff need only prove falsity of the statements, that they have a defamatory effect, that they have a defamatory meaning as at least one view in order to prevent summary judgment, and that Defendants have made the statements as a result of fault, including at least mere negligence. The Defendants filed a Motion To Deny Discovery, which this Court, without waiting the time allowed by the Rules for Plaintiff to respond, granted [WP's Motion].  Such is not understood.  Plaintiff has, hopefully, made a researched argument that the false statements are not slight inaccuracies, and that, in any event such is a question of fact for the jury, as the cited caselaw requires, *supra*.  An opinion may imply a false assertion of fact and is actionable. *Milkovich*, *supra*.

### REPUBLICATION

.

At common law, each republication was a separate tort [Restatement (2d) of Torts §578].  Republication of these falsehoods were made by the London Sun Telegraph, the Sydney (AU) Herald, MSNBC, ABCNEWS, and others, since the first Washington Post article was published. WP is liable for these republications.

23

## Libel *Per Se*

Certain misstatements complained-of are beyond "inaccurate"; they grossly are totally false with serious implications against Plaintiff. "Sleeping ***on top of*** his stuff" is one of their false statements of fact, clearly implying mental illness. Ascribing to Plaintiff conduct and characteristics that would tend to injure him in his "trade, profession or community standing" is libel *per se. Howard Univ. v. Best*, 48 A.2d 958 (D.C. 1984) or adversely affect [his] fitness for the proper conduct of [his] lawful business". *Wallace v. Skadden Arps*, 715 A.2d 873 (D.C. 1998), cited in *Guilford Transportation Industries, Inc. v. Wilner*, 760 A.2d 580 (D.C. 2000).

The "gist" of the article is clearly that Plaintiff is an unemployable mental case despite his credentials. The article falsely claims that trash, debris and organic matter were among his belongings in the unit. But the facts are that there was no trash, debris and the like, merely a collection of office equipment, office supplies, books, tools, and the appearance of the "back room of JonesDay", which has not yet been raided to Plaintiff's knowledge. The article makes Plaintiff appear odious, infamous or ridiculous. (standard of *Johnson v. Johnson Pub. Co.*, 271 A.2d 696 (D.C. 1970)). If a statement is capable of bearing a defamatory meaning. then whether that statement is in fact "defamatory" and false is a question of fact to be resolved by the jury. , *supra*, citing Rest. (2d.) of Torts § 614 (1).

24

"Words must be construed in the plain and popular sense in which the rest of the world would naturally understand them". *Schnapp v. Smith*, 249 Va. 353 (Va. 1995). The standard is "what would a "reasonable reader of the column likely conclude". *Hatfill v. New York Times*, 416 F.3d 320 (4th Cir. 2005). Also see the primary case in support of Plaintiff's case and Opposition, *Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990). The court is to consider the allegedly defamatory statement(s and their fair inferences and innuendos derived from it". *Schnupp, supra*, and *Hatfuill, supra*.

The concept of interpretation of words in context is validated in *Masson v. New Yorker Magazine*, 501 U.S. 496, 111 S. Ct. 2419, 115 L. Ed. 2d 447 (1991), and in *Moldea v. New York Times*, 22 F. 3d 310 (D.C. Cir. 1994).

Whether there was a material negligent misstatement or knowledge of falsity or reckless disregard as to the truth or falsity is a jury question. *Masson*, supra. Plaintiff is entitled to his issued discovery.

The D.C. Circuit in *Ollman v. Evans*, 750 F.2d 970 (D.C. Cir. 1989) decided that its test, applicable here, as to whether a statement is in fact or opinion, is a 4-factor test resulting in a conclusion of "totality of circumstances". The 4 factors are: (1) the "specific language used; (2) "whether the statement is verifiable"; (3) "the general context of the statement"; and (4) "the broader context in which the statement appeared".

25

Applying same to the instant false statements of fact (listed in Complaint

Paragraphs 17 and 20), verified and in Plaintiff's Declaration, attached

hereto, of all such includes the title of the first article which puts great

weight in Plaintiff's favor. Entitling the first article "FIGHTING TO

REMAIN ENGULFED IN JUNK" is a clear demeaning attack on the

Plaintiff and certainly weighs factor No. 4 in his favor. As to factor 1, the

individual detailed false statements of "fact' are unambiguous and clear,

such as the false statement that "Plaintiff slept on **top** of his stuff". This

statement, like the others complained of are totally fabricated and beyond

"inaccuracies". They are gross and intentionally aimed at depicting Plaintiff

as a "nut", a "Green nut" (the false 100% recycled paper" false statement),

and, if there was any doubt as to their intent, they even mention "mental

illness". They are fabricated, defamatory, material, and directly imply or

state that Plaintiff is mentally ill and ridiculous. and the article makes the

quote that such persons, including Plaintiff by clear context, has "mental

illness, brain dysfunction, and obsessive-compulsive disorders". The

unlawfully-taken photos , Plaintiff's Declaration attached hereto evidence

the truth, the verifiable truth. The "gist' or general milieu of the WP

statements is simple: Plaintiff is a "nut", even a "green nut".

The U.S. Supreme Court validated the *Ollman* principles in

*Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 110 S. Ct. 2695 (1990).

Plaintiff   to directly prove fault, as compared to circumstantial facts, by

26

WP, issued his First Set of Interrogatories to the WP Defendants.  Denying

Plaintiff his discovery,  seems to indicate some form of bias, and a forseeing

of denigrating the gross false defamatory statements by WP to some

incorrect midget view of the facts.  The matters, including quotes

complained of in Plaintiff's Complaint, are not "slight inaccuracies", but

gross fabrications, defaming Plaintiff, making him appear ridiculous,

odious, etal., as described above.  Caselaw requires that such be decided by

a jury.

### THE  WP DEFENSE OF "FAIR COMMENT"

> "It is worthy to note that at common law, even
> the privilege of "fair comment" did not extend to a
> "false statement f fact", whether it was expressly
> stated or implied from an expression of opinion.
> Rest (Second) of Torts §566, Comment a (1977).   ".

*Milkovich* at p. 19.

> "...When such a statement involves a private figure
> on a matter of public concern, a Plaintiff must show
> that the false connotations were made with some
> level of fault as required by *Gertz*."

*Milkovich* at p. 20, 21.

Plaintiff is therefore entitled to his discovery at this stage.

> "Fair comment" applies to expressions of opinion
> and not to a false statement of fact, whether
> expressly stated or implied from an expression of
> opinion.   Rest. (Second) of Torts  § 566.

*Milkovich* at p. 14.

See Plaintiff's Declaration

Plaintiff Declaration avers the truth of the facts complained of

## FAULT – INTENT – NEGLIGENCE BY WP DEFENDANTS

"Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment may be entered against a party who fails to present sufficient evidence 'to establish the existence of an element essential to that party's cause, and on which that party will bear the burden of proof at trial'. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed 2d 265(1986)." Plaintiff issued discovery to the WP Defendants, and in his Motion For Extension of Time included a Rule 56(f) Declaration that the discovery is needed to have direct evidence of fault and certain facts. The Court inexplicably issued an Order denying Plaintiff his necessary discovery and said Declaration is repeated here. Therefore, in any event, summary judgment is inappropriate at this stage.

### Rule 56(f) Declaration

I, Samuel Shipkovitz, Plaintiff in this case, issued interrogatories to there WP Defendants that bear on both factual issues and fault involved in the preparation and publication of the two complained of articles. This discovery is necessary to prove at least one element of my case, and to responsibly or reasonably or even adequately respond to the WP Motion For Summary Judgment.

I hereby declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed this 19th day day of January, 2008

*Samuel Shipkovitz*
Samuel Shipkovitz

Nevertheless, "in determining whether a party moving for summary judgment has made a showing that there are no triable issues of fact, a court must view all inferences to

28

be drawn from the underlying facts 'in the light most favorable to the party opposing the motion'" *United States v. Diebold*, 369 U.S. 654-5, 82 S. Ct. 993, 8 L Ed.2d 176(1962), This standard of review also applies to discussions of summary judgment in libel actions, i.e. the Plaintiff's facts are presumed true, i.e. that the publications' complained of statements are false for purposes of such review. *Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1293; *Herbert v. Lando*, 781 F.2d 298, 308(2d Cir.    ) and 441 U.S. 153, 90 S. Ct. 163, 60 L. Ed. 2d 115 (1979); *Liberty Lobby v. Rees*, 852 F.2d 595 (D.C. Cir. 1988). On a motion to dismiss a libel suit alleging an actionable statement, the court must credit the Plaintiff's allegations of the factual falsity of said statement. *Conley v. Gibson*, 355 U.S. 41, 78 S. Ct. 99, 2 L. Ed. 2d 80(1957).

A defamatory implication must be present in the plain and natural meaning of the words used. *Carwile v. Richmond Newspapers, Inc.*, 196 Va. 1, 82 S.E.2d 588(1954). The quotes complained of here meet this test. Discussing Plaintiff and associating him falsely with "sleeping on top of his stuff", and "boxes in the bathtub" fully knowing that they were not his, is one example of WP MAKING DEFAMATORY IMPLICATIONS  (direct proof also needed (besides circumstantial)) by Plaintiff's discovery issued; see his R.56(f)) declaration; ignored, and with said discovery denied. WP's instant Motion need be tabled in the interests of justice.

A statement, <u>even of opinion</u>, may be actionable if it asserts a provably false fact or false factual connotation. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1,  110 S. Ct. 2695, 111 L.Ed2d 1 (1990), *Sculimbrene v. Reno*, 150 F. Supp. 2d 8 (D.D.C. 2001).

"The court should not dismiss "for failure to state a a claim a complaint which alleges defamation if the publication is reasonably susceptible of *a* defamatory meaning". [emphasis added] *Clawson v. St. Louis Post-Dispatch*, L.L.C., 906 A. 2d 305 (D.C. 2006).

The question of the actionability of alleged libelous language is for the jury. *Washington Herald Co. v. Berry*, 41 App. D.C. 322 (App. D.C. 1914). Whether an attributed quotation has the degree of falsity required is not entitled to be considered for summary judgment as there is an issue of fact for the jury. *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, supra (1992). Whether a Defendant acted with the requisite knowledge of falsity presents a jury question, Id. Plaintiff has been stopped in his issued discovery. In addition to libel *per se* (no requirement of proving damages), Plaintiff also has suffered damages as he has been unable to obtain any long term or reasonable employment or engagements.

Under District of Columbia law, for a statement to be defamatory, the statement must injure Plaintiff in his trade, profession or community standing, or lower him in the community's estimation. *Bennett v. U.S. Chess Federation*, 468 F. Supp. 2d 79 (D.D.C. 2006), *Caudle v. Thomason*, 942 F. Supp. 635 (D.D.C. 1996), *Afro-American Pub. Co. v. Jaffe*, 366 F. 2d 649, 125 U.S. App. D.C. 70 (C.A.D.C. 1966), *McBride v. Merrell Dow*, 540 F. Supp. 1252, affd. in part 717 F.2d 1460, 230 U.S. App. D.C. 403 (D.D.C. 1982), *Joseph v. Xerox*, 594 F. Supp. 330 (D.D.C. 1984), *Guilford Transp. Indus., Inc. v. Wilner*, 760 A. 2d 580 (D.C. 2000). This has certainly occurred. See SS Decl. Para. _1_.

The language must make the Plaintiff appear odious, infamous, or ridiculous. *Bennett*, supra, *Caudle*, supra, and most of the above.

30

Certainly falsely claiming that Plaintiff is largely "unemployed", "sporadic", "slept on his stuff", "had boxes in the bathtub", combined with the mention of "mental illness" injures Plaintiff in his professions (attorney, patent attorney, Ph.D. Electrical Engineering consultant) , and community standing, and certainly makes him appear, at best, ridiculous. Also see *Jankovic v. Intl. Crisis Group*, 429 F. Supp. 2d 165 (D.D.C. 2006), *Lyles v. Micenko*, 404 F. Supp. 2d 182 (D.D.C. 2005), *Mastro v. Pepco*, 398 F. Supp. 2d 67, affd. in part 447 F.3d 843, 371 U.S. App. D.C. 68 (D.D.C. 2005), *Clawson v. St. Louis Post-Dispatch, L.L.C.*, 906 A. 2d 308 (D.C. 2006), *Klayman v. Segal*, 783 A. 3d 607 (D.C. 2001), *Beeton v. District of Columbia*, 779 A. 2d 918 (D.C. 2001), *Benic v. Reuters, Inc.*, 357 F. Supp. 2d 216 (D.D.C. 2004).

If a publication constitutes libel per se, a Plaintiff need not prove the defamatory nature of the publication. *Bannum, Inc. v. Citizens for A Safe Ward Five, Inc.*, 383 F. Supp. 2d 32 (D.D.C. 2005).

The court in considering defenses to an action for libel must first determine whether the publication is capable of bearing *a* [meaning any] defamatory meaning. *Hoffman v. Washington Post Co.*, 433 F. Supp. 600, affd. 578 F. 2d 442, 188 U.S. App. D.C. 200 (D.D.C. 1977).

If there is a material difference in the meanings attributed by the parties, summary judgment is inappropriate as this difference is an issue of fact for a jury. *Masson*, supra.

### WP's CLAIM OF MERE MINOR  INACCURACIES IS  BASELESS

WP relies on   "...minor inaccuracies will not give rise to a defamation claim when the ultimate defamatory implications are themselves not actionable". *Tavoulareas v. Piro*,  817 F.,2d 762, 788 (D.C. Cir. 1987).

31

Plaintiff views the complained of quotes in Complaint Paragraphs 17 and 20 as completely false, substantial fabrications on matters that can only lead to the conclusion that Plaintiff was "mentally ill" , such words being actually used later in the article, and a "green nut", falsely claiming that Plaintiff used "100% recycled paper";  such are not minor inaccuracies. The falsehoods all cumulatively lead to these false conclusions.

Making a complete falsehood about what Plaintiff slept on is basically admitted as a falsehood by them, but is defended by them by referring to items surrounding the bed area. The two matters are entirely separate. Falsely stating that "Plaintiff slept on his stuff"[boxes]  clearly implies mental illness.  What surrounds one's bed area implies nonneatness, WP cannot assert, yet alone prove, any relationship between the two.

Therefore, Plaintiff meets the *Tavoularaeas* test as "slept on his stuff" has actionable defamatory implications, i.e. mental illness, which they mention explicitly later in the article.  Such should eliminate any doubt as to their malicious intent when they bring the general charge of "mental illness, brain dysfunction, and obsessive-compulsive disorder".  Accusing a professional or another falsely of possessing a  serious disease is actionable at common and D.C. law.

The test for materiality as to defamatory statements is articulated in *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496(1991), *Gomba v. McLaughlin*, 180 Colo. 232, 504 P.2d 337-8 (1972), in which the test is whether the false statements "cause a different effect on the audience than would have been produced had the truth of the matter been spoken".  Also see *AIDS Counseling & Testing Center v. Group W Television, Inc.*, etal., 903 F.2d

32

1000(4ᵗʰ Cir. 1990). Clearly the audience would not have considered this Plaintiff mentally ill if the truth, i.e. that he did NOT " sleep ON his stuff", been spoken. Therefore, the WP Defendants caused the different effect and the falsehood is major, --not a "minor inaccuracy" as they claim. The article had no picture of the bed area/ The article does not mention what is around the bed area, and they refer only in their instant Motion to nonpublished [illegally-taken] photos of what is around the bed area, which, as explained above, is irrelevant. Such effect was reinforced by their mention of "mental illness" later in the same article. The common law clearly holds that falsely stating that someone has a negative serious disease is actionable *per se*, especially as to a professional.

Therefore, the "gist" of the article is grossly false, and not as WP asserts, without basis, that it was substantially true. See *Liberty Lobby v. Rees*, 852 F.2d 595, 601 (D.C. Cir. 1988).

As stated in Rest. (Second) of Torts § 559: "to be actionable, the statement must be not only false, but also defamatory; that is it must tend to harm the reputation of another as to lower him in the estimation of the community, or to deter third persons from associating or dealing with him".

Clearly the false quotes, especially the false "slept on top of his stuff", had "boxes in the bathtub", "works sporadically ...long periods of unemployment" , "mental illness, brain dysfunction...", all false, all cumulatively add to the destruction of his reputation, and by the fact of true unemployment after the articles , prove that they deterred third persons from associating or dealing with him. They succeeded. They are liable as the

33

false defamatory statements made the Plaintiff appear 'odious, infamous or ridiculous'--

especially ridiculous. *See McBride v. Merrell Dow*, 540 F. Supp. 1252 (D.C. 1982).

### "FAIR REPORT" PRIVILEGE STANDARD NOT MET BY WP

Many jurisdictions, even at common law, have adopted some form of a "fair report"

privilege which "protects press reports of ***official proceedings*** as long as the report was

accurate.". Rest. (Second) of Torts §611, *Greenbelt Cooperative Publishing Assn. v.*

*Bresler*, 398 U.S. 6, 90 S. Ct. 1537, 26 L. Ed. 2d 6 (1970); *Time, Inc. v. Pape*, 401 U.S.

279, 91 S. Ct. 633, 28 L. Ed. 45 (1971).

The complained of defamatory statements are only minimally about the EDV

proceedings, but are primarily about Plaintiff personally with various false defamatory

statements as to his bedding, the contents of the bathtub, his employment [libel per se] ,

which were not topics of discussion in the EDV proceedings. Therefore, WP has no basis

to claim the "fair report" privilege as the topics of complaint were not part of the ***official***

***proceedings***.

Further, Plaintiff is a private person -- not a public figure or official. The matters

complained of were not quotes from an official proceeding, just made-up defamatory

fabrications about Plaintiff *personally*, by an, at best, stupid lazy reporter, making up lies,

and then sensationalizing them with the "FIGHTING TO REMAIN ENGULFED IN

JUNK" title of the first article, AN INDICATION OF ACTUAL MALICE; The "gist" of

the article as to plaintiff was that he was a "nut" and a "green nut" ["100% recycled paper

falsehood). see *Wisconsin v. Constantineau*, 400 U.S. 433, 91 S. Ct. 507, 27 L. Ed. 2d 515

(1971) [similarly calling someone a "communist" damages one's reputation and ability to function] and entitled to a trial.

Here there is a factual dispute as to the complained-of false quotes in the articles,  and, when WP admits error they divert/dilute such by claiming that since they claim other false allegations ( such as falsely claiming "trash") that they are privileged.  The  true "gist"  of the article is not the "general conditions of the unit", rather an overt hatchet job on the Plaintiff.

Conclusion:  No summary judgment is appropriate at this stage.

## ARLINGTON  HOARDING  DEFINITION  CAN  NOT  BE EXPANDED BY  WP
## PLAINTIFF DEMANDS THAT  THESE  WP EXHIBITS  BE  STRIKEN

Plaintiff objects vehemently to WP's newly introduced definition of "hoarding", and demands that these WP Motion Exhibits (last two of the WP Exhibits attached to their Motion For Summary Judgment) be striken.  Neither of these articles nor any referral to them was made in the published articles.  Only the Arlington "white paper" definition was ever involved in the EDV case.  Nor do the Exhibits have any expert witness affidavits referring to either.  Therefore, Plaintiff reasonably demands that they not be considered, and need be striken.

Neither of WP's articles allegedly on "hoarding" are admissible under the *Daubert v. Merrill Dow*, 509 U.S. 579 (1993) standard.  They are neither scholarly, nor peer reviewed, nor "generally accepted", nor even have a scientific basis.  Neither has any qualified expert affidavit qualifying either article. The first is a mere page from a general website called WEBMD.

The first article from WEBMD discusses collecting broken TVs, scraps of paper, old clothing, used envelopes, used tea bags, soda cans, string, leaves, ashes, burned-out light bulbs, toilet paper cores, chicken wishbones, wrong size clothes, or domestic animals, such as dogs or cats.

Plaintiff had/has none of these.

The second article from Frost & Hartl, two non-MDs from Smith College, not even a medical school.  It discusses: (1) items of "useless or of limited value", (2) the preclusion of activities for which spaces were designed , and (3) "impairment in functioning" caused by an alleged accumulation.

None of these apply to Plaintiff, who accumulated new office equipment and supplies, electronics, tools, and items that are useful and valuable.  In fact over $80,000 of his property in the unit was stolen by Yeager/Naudus/DiMatteo.  The roms of the unit were functioning for their purposes and in facvt both Plaintiff and Crossan, when there, were so using without issue..

There was no "impairment in functioning" as Plaintiff was quite happy, as best he ever was,  and working productively without problem until the October 20, 2005 "raid".  All normal activities were being conducted there.  Noone was collecting "used envelopes".  These authors also, at p. 343 admit that "nonhoarders" also save the same type of objects so there is no objective test.

Plaintiff did not accumulate any whole newspapers, yet alone 5 years worth as the authors claim as one indicator.  There was no "pile of clutter".  There were piles of separate work projects with relevant books, correspondence, drafts, and items related.  Many of his

colleagues' offices look similar. There was no pile(s) of unrelated items. There was no "piles on top of piles" as these authors indicate is another sign. Plaintiff did retain the Business and Technology sections of several publications, but discarded same regularly— cutting out the most interesting articles. Superrealtor Helene B. , related to a friend from Pittsburgh, violates all of their indicators and yet is reputed the D.C. Barbara Corcoran.

The Frost, etal. article is a mere collection of anecdotes and opinions, and much of it literary sophistry of absolutely no scientific value. They refer to their previous nonsense articles as their authority.

Therefore, neither article has any scientific basis or authority and required to be admissible pursuant to *Daubert v. Merrill Dow*, 509 U.S. 579 (1993). Neither article provides any "general acceptability" as reliable in the relevant scientific field. Scientific meaning having a grounding in the methods and procedures of science. The underlying reasoning or methodology must be scientifically valid. Method of testability must also be undertaken. In medical matters "epidemiological evidence" is required. Such articles are required to have been "peer review"ed, or otherwise undergo "full scrutiny from the scientific community" is also required. None of these *Daubert* requirements are met by either article, and both need be striken, and certainly not considered by the court.

Conclusion: No summary judgment is merited.

encl.: Arlington Hoarding Task Force Sept., 2005 white paper

Respectfully submitted,

Samuel Shipkovitz

Plaintiff peo se

Mailing:        P.O. Box 2961
Addresses       Arlington, VA 22202

37

5829 Nicholson Street
Pittsburgh, PA 15217

Certificate of Service

I hereby certify that a copy of the foregoing Opposition to WP' Motion For
Summary Judgment, Plaintiff's Declaration w Exhibits ( ), Plaintiff's
Statement of Material Facts In Genuine Dispute, proposed  Order,
was mailed this 30th day of January,  2008 to:Ara Tremblian, Esq., Deputy
County Atty, 2100 Clarendon Blvd., #403, Arlington, VA 22201, Jonathan
Kravis, Esq., Williams & Connolly, 725 12th Street, N.W., Washington, D.C.
20005.                                   _____

38

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SAMUEL SHIPKOVITZ,                          )
                                            )
                    Plaintiff,              )
                                            )
        vs.                                 )   Civil Action No. 07 1053(RCL)
                                            )
THE WASHINGTON POST COMPANY, et al.)
                                            )
                    Defendants.             )
_____)

## DECLARATION OF SAMUEL SHIPKOVITZ

I, Samuel Shipkovitz, having personal knowledge hereby declare as follows:

I.

1. I am the Plaintiff in the above-cited case. I received a B.S., MS., and Ph.D. in Electrical Engineering, and after several technical and executive positions, thereafter at the invitation of a former professor, taught same during the day and went to its Law School at night, receiving a J.D. in 1979, and thereafter worked for a major electronics company, the federal government, several law firms, and myself.

2. In 1996, after Stephen Crossan, a former Patent Examiner who had become a friend in about 1990, was charged with arson as to his condominium, was adjudged NGRI and was committed to the State Mental Health Dept. (Central State), he asked me to not move to NW DC as I planned, but to move into his condo at the same rent as I had been paying paying as rent all condo fees, real estate taxes and repairs and expenses associated with the unit, , where his belongings were then moved to the second bedroom. From December 26, 1996 until some time in late 2004, I paid the agreed rent and my occupancy was uneventful. Steve started getting day passes in 2004 and asked if he could occupy the second bedroom when on pass. As his friend since 1990 I agreed. As I had used the apartment as also an office, I also purchased various office equipment and supplies and kept them in the unit, including a commercial copier and several computers. I also had stored there the high-quality tools owned by me as a result of a construction and development company which I stopped operating in 1999. Files from various legal and other matters were also stored there.

39

3. On Oct. 20, 2005, when I returned from my work as a contract patent attorney for a major patent/antitrust law firm, I found the locks to the door had been changed and a Arlington County placard had been posted on the door. I called Steve who informed me that when he let in his medicine-taking observer Hughes, she let in several others when he opened the door to let HER in  Steve told me that they inspected the unit without his permission and Hughes then without any court or other proceeding took him involuntarily to a different mental institution from the one he was committed to (NVMHI) by the State.

4. As I mostly ate out, as did Steve, there was no known open food, and there was no : vegetation, pet(s) or pet matter, wreaths, or organic matter. Due to his arson charge, the electric stove had been disconnected long before, and both used the microwave for heating. There were 2 kitchen sinks, but only one was used.

5. In early 2006 I called the Metro Desk of the Washington Post and spoke to a man (name unrecalled) and also left messages. SEVERAL MONTHS LATER Ms. Schulte called me. As I did not know her before she called me, Schute's Paragraph 3 of her Declaration is false.

6. Ms. Schulte's phone calls, which she mislabels as interviews took place in 2006. I only met her once when she wanted to see where my property had been taken.

7. I did not tell her that I was having a hard time obtaining work with temp agencies, but in obtaining any permanent position.  I did not tell her that I had not worked since Oct. 24 (2005), but had only worked for certain patent clients on their new projects since my files had been locked in the unit, including Crossan case co-Plaintiff Sabo.  I never told her that I "had a number of jobs *off and on* over the years" (BS Decl. Para. 7).  I had last had a permanent position in 2004 when the Principal moved to Florida, and then focussed on the contract attorney world.

8. I did not make the statement claimed by Schulte in her Para. 9, it or something close was believed made by Henry St. John FitzGerald, Esq., former Deputy U.S. Attorney E.D.Va. in the 1960s, my friend and mentor, whom Schulte spoke with.

9. During the trip to the storage unit (video in first internet version of the first article), I had cracked many (attempted) jokes, and the "hoarding again" comment was clearly meant to be humor and not to be taken literally or seriously.  At the time she laughed so it was clear that she understood that I was making a joke.

10. I never received any phone calls from Schuklte in the weeks before and up to the publication of the first article-- despite her agreement as a condition of my cooperation that she would provide a draft for my review and comment prior to any publication.  She could have informed me or provided me a copy by email, which address she had, but did not.

11. I emailed her the unlawfully-taken (no warrant or permission) photo of the living room ( which appeared in the article) which was supposed to be mere confirmation of my "back room of JonesDay" opinion, and not meant for publication. I also sent her a County photo of Arlington medication-monitor [for Crossan] Hughes, wearing a HAZMAT outfit and respirator unlawfully searching my bedroom. This photo of Hughes' outrageous conduct and criminal activity, was not published. WP Motion for Summary Judgment ("MSJ") photo Ex. -GG.

12. None of my filings were on "100% recycled paper". They were all on (as best known) 20lb. bleached (i.e. non-recycled) #80 whiteness [cheapest] paper. One handwritten (and only one) filing was filed as such to meet a nonextendible deadline. Note, it was titled "FIRSTDRAFT".

13. Va./DC attorney Deborah E. Kramer stated to me in Spring, 2006 that DiMatteo had run into Defendant DiMatteo and that DiMatteo had called me "crazy" in that conversation.

14. As to Complaint Paragraph 17:

A. I never said I "worked sporadically and had long periods of unemployment".

B. I never said "the place was a mess".

C. I never "slept on top of [my] stuff on the floor", nor did I sleep on non-bedding.

D. The boxes in the bathtub all belonged to Crossan. Both used the shower (separately-both straight) only. WPMSJ photo EX. O (Crossan's computer boxes+).

E. No where in the unit was there "from floor to ceiling crammed with rubbish, debris, paper,...bags".
Only the office area of the living room had stacked modular drawers which were equivalent to a built-in unit (in which office supplies and files were kept). Nowhere in the unit was there rubbish or debris. WPMSJ Ex. 4-E, J, K, Q, R, S (in article).

F. The kitchen was usable and being used by both. I was not "unusable" as falsely stated in the article. Due to Crossan's arson issues, the electric stove had been disconnected years before, and the microwave used for all food heating. There were two (2) sinks in the kitchen and one was used for kitchen purposes, and the other had a broken part and was not used, other than for storage. WP MSJ photo Ex. 4-A (The left shows the rear half of a large table.

G. I have never been adjudged or diagnosed with "mental illness" or "brain dysfunction" or "obsessive-compulsive disorder".

H. Crossan's _**family**_ did not hire a lawyer. Only Steve's greedy brother John, after learning that Steve had lost 50% of the function of each of both of his kidneys and had a much shortened life expectancy, and John, desiring to make sure that Plaintiff, Steve's only friend, was put out of Steve's life, did John hire lawyer Yeager   Yeager brought in his friend "Art" of the Stanley T. Naudus Corp., a cleaning and home improvement company, which is not a moving company, and  over $80,000 of my belongings was stolen by them. DiMatteo was also involved.   Steve's sister (Wisconsin) disavowed any involvement in any of this.

I. My court filings were sometimes single-spaced. Only one was handwritten due to a nonextendible deadline, and it was clearly  titled "FIRST DRAFT" , and I never used 100% recycled paper, but purchased /used the cheapest (bleached) [20lb.#80 brightness) paper.

J. The boxes in the bathtub, mostly from his computer,  all belonged to Crossan, not me.


As to Complaint Paragraph 20:

A. The EDV Judge's Order speaks for itself.  Nowhere in said Order is any count of that Complaint described as "without merit".

B. There was no "trash" [remains of food or food packaging or loose paper or discards]

C. Only Steve's brother was involved, as described above. Deputy Fire Marshall Grierson told both myself and Mr. Sabo that Ms. DiMatteo ordered him not to let me in.  He never mentioned any of the Crossans as to this to either of us


## II. SHIPKOVITZ DECLARATION AS TO STATEMENT OF MATERIAL FACTS IN GENUINE DISPUTE

There is a genuine issue as to material facts as to the following:   (Plaintiff's states the following is the truth to the best of his knowledge, information and belief).

   A. Beginning in December, 1996, I lived as a tenant with a written lease in my friend (since 1990)  Stephen Crossan's condominium after he/Crossan was committed to the State Mental Health system (Central State Mental Hospital at first).   ___.

   B. Mr. Crossan was arrested in 1996 for felony arson, found not guilty by reason of insanity, and committed to a Virginia state mental health facility. Id.  Starting in late 2004, Mr Crossan starting getting day passes from NVMHI State Mental Hospital

42

and with Plaintiff's permission stayed in the second bedroom of said condominium during said passes/ Id., and as required by the State was required to be observed taking his required medications each day. The State assigned said task to the Arlington County Program Assertive Community Treatment Team ("PACT") and visited Crossan on each day he was out on pass to observe him taking his required medications. Aff. of Sharita Hughes and her deposition; Mem. Op., Crossan , etal. V. Arlington County Manager, et al., No. 05-1219 at 2, et seq., (EDV) (Ex. 12?);

C.  PACT representative Hughes visited Crossan in early October.  She claims she called the Fire Dept.  I have no knowledge as to this.  On October 20, 2005, Deputy Fire Marshall S. K. Grierson and building Code Inspector Richard Freeman, barged in without any warrant when Crossan let in Hughes and they were behind her. No warrant was ever issued and Crossan did not grant permission for the others to enter.  Declarations of Crossan made/executed  under penalty of perjury in EDV case.  See Pl. Ex. 2 attached hereto, which Crossan executed and gave me.
I had in fact a NO TRESPASSING sign on each of the two doors leading to my bedroom..

D.  Photographs were taken without warrant nor permission during said warrantless and permissionless search. These photos taken by Freeman (Aff. Of Freeman) depict the condition of selected portions of the condominium on October 20, 2005. Grierson did not taker any pictures. One of the photos was the one published. The photo of Hughes wearing a HAZMAT outfit and a mask and respirator unlawfully searching my bedroom without permission nor warrant was also taken and emailed to Schulte in 2006. The so-called Affidavit of Crossan was prepared by Yeager after he and Naudus stole my belongings, and imposed on Crossan, who had become so mentally ill that I had to withdraw from representing him,  after Yeager, Crossan's brother's colleague, Yeager broke into the unit and with an "Art Naudus" stole over $80,000 of my property. This "affidavit" is in direct contradiction to Crossan's three previous Declarations made under penalty of perjury in the EDV case, Pl. Ex. 2.
The "affidavit" prepared by Yeager  is false in many respects  relevant to relevant matters, including the ridiculous statement that I was not the tenant.

5.  As a result of this unlawful search violative of the Fourth Amendment, a violation notice that did not have a cure notice with a cure date(stated next day and they had changed the locks), and a placard stating          were posted on the door of the condominium.  The locks had been changed despite no statute or regulation permitting changing someone's locks.  Crossan was involuntarily recommitted without any hearing to a different mental facility.  Admission to the unit was prohibited according to the placard.  Compl. Para. 8;

6. On October 24, 2005, I on behalf of myself, landlord/friend Crossan, and a client of mine,  Sabo, Pl. Ex. 3,who had his laptop and other files and property in the unit ,filed

43

suit in the United States District Court, Eastern District of Virginia at Alexandria against Arlington County officials and others. *Crossan, etal. v. County of Arlington Manager, etal.*, No. 05cv-1219-A (E.D. Va.). In his Amended Complaint, Ex. 9), I stated under verification, that the inspection/search and locking him and Ctossan out of the condominium violated the Fourth, Fifth and Fourteenth Amendments of the Constitution, violated the Virginia Statewide Uniform Building Code, the State Fire Code, various state statutes, and also constituted intentional business interference. Am. Compl.,   Crossan,(Ex.9)  ¶¶60-67. I also included a cause against the security guard service which physically prevented me from having his locksmith enter to pick the lock and allow entry. As stated in the Complaint , I earned my way through Carnegie-Mellon by working as a property manager and had handled multitudes of building code violations and therefore knew that any notice of violation must allow entry and have a cure date to cure. The Arlington posted papers had neither. I requested damages and an injunction allowing me and Crossan back into the condominium, including to cure and have a cure date, and requiring the Arlington County defendants to obtain court permission or warrant before conducting any further actions, and ordering the Arlington County Department of Human Services to maintain clients' confidences and other agreements made. Id. ¶¶54, 55, 64, 67, 73.

7. While my/Crossan/Sabo's lawsuit was pending, I contacted the Washington Post Metro desk, where I spoke with one male and when he did not call back, I left messages for him (Pl. Complaint this case Para. , Pla. Declaration (this case) at Para.   ). ***Several months later*** Schulte called me and we discussed her investigating my case and possibly writing about my case.
Schulte only met me once. All other communications were by phone. It was a condition of my cooperation that nothing would be published without my review and opportunity to comment. She agreed to this.
Unbeknownst to me prior to the publication of the first article Schulte, without ever telling me, spoke with numerous other sources, and had acknowledged receipt of the Arlington Hoarding Task Force "white paper" of September, 2005 and the Answer To Interrogatory from Arlington County ( Pl. Ex. 3 attached hereto) where they admit that they had done the same to 18 others in the year before their act against the me.[warrantless inspection and lockouts or changing of locks]. Mr. Freeman in one brazen conversation warned that they had done this also to a "doctor on Pershing" (meaning M.D.) who they claim had too much stuff in his office.

8.  During a phone conversation with Ms. Schulte prior to publication of the first article, I told Ms. Schulte that I was employed at the time of the "raid' at a major antitrust/patent law firm, but on the date of this much later conversation that as to me obtaining a permanent position that 'people who are older are not looked kindly upon because of the [law firm promotion/partnership track] pyramid". In Spring, 2006, I  stated that I was having a heck of a time getting a permanent or long term job, and was awaiting one of the many temp projects I

had applied for. I also stated that my "age was like the kiss of death for getting a permanent job."

9. During a April-May, 2006 phone conversation with Ms. Schulte, I told her that I had to pay in advance for a deposition I was conducting against Arlington County because I was not a "regularly practicing [trial] attorney". This was solved when my friend Terry Legum, a Fairfax/DC attorney, vouched for me. I never said that I had not worked since October 24, 2005. I did ask Ms. Schulte not to include my age or the name of the law firm I was working at on October 20, 2005, as they were not involved and I had very good relations with them, including a recruiting partner who happened to be involved in the case I was working on (with eight other contract attorneys). I also insisted as a condition of my cooperation that they do not publish or take any photograph of me, and that they submit any draft of any article to me for my review and comment before publication. Ms. Schulte agreed to these conditions.

10. During another phone conversation with Ms. Schulte, I explained to her that I had had a number of permanent jobs over the years (not "off and on"), and that when I was locked out of the condominium that day I was near the completion of a medium term contract attorney project.

11. During another phone conversation with Ms. Schulte, I described the condition of the condominium on October 20, 2005 as "I have five printers...I have piles of books, and piles of business and technical sections of newspapers... This is America. There's no such legal authority as the neatness police." Schulte Aff. At__,

12. During another phone conversation with Ms. Schulte, I suggested to her that my friend and mentor, Henry St. John FitzGerald, be interviewed. Schulte spoke with him and the first article quotes him as saying (i.e., not me) "OK, Sam's a slop [meaning not neat]. We all [all of Sam's friends] know that. But he doesn't deserve this" {referring to the Arlington County raid and unlawful lockout and changing of the locks]. Again, *I* did not make the claimed statement. The article discusses this FitzGerald interview.

13. During another phone conversation with Ms. Schulte, I said "did my apartment look like the back office of Jones Day? Yeah, so what?" Schulte Aff at Para. 10,

14. On one occasion in early June, 2006, I went in Ms. Schulte's car to a storage unit(s) where the dregs of my belongings had been taken after Crossan's brother's colleague Yeager, and Yeager's friend "Art Naudus" broke off the second lock on the door of the unit that I had installed, and they took my property out of Arlington and took it to someplace in Fairfax controlled by

45

Naudus, processed my possessions and stole most everything of value. During that trip we stopped at a Super Dollar store in Seven Corners so that I could purchase a telephone cord. At the store, I purchased three telephone cords[ one for voice, one for internet and one for FAX], an electric shaver, reading glasses [he needs2.5+], hand tools to do the work, and a jar of pickles. Referencing these purchases, I clearly jokingly described myself as "hoarding again?". She laughed, fully recognizing that I was cracking a joke, and the comment was not meant to be taken literally.

15. On October 27, 2005, Arlington County filed an Opposition to Plaintiff's Request For Temporary Restraining Order and Permanent Injunction in connection with the EDV lawsuit. In that filing, the County stated that its employees entered the condominium on October 20, 2005, and (falsely) stated that there "was rubbish, debris, paper, boxes [true], bags [only merchant bags were there], and all manner of containers and variety of materials piled and strewn from floor to ceiling in every room of the apartment except the bedroom where Mr. Crossan slept". There was no variety of materials piled and strewn. The only place that there was tall possessions was in Plaintiff's office area in the living room where he had stacked modular drawers filled with office supplies and files. See photos referenced above. Additionally, Crossan had many of his possessions, such as his Classic Ford Mustang collection of various parts, including a front bumper, in the living room. About one-third of the items were Crossan's. There was no rubbish, debris, or living/organic matter. Nothing was "strewn". The boxes were filled with books and office supplies/equipment/electronics. Only the office area of the living room had tall stacks of drawers/boxes.. See floor plan, Pl. Ex. 3.

16. In its October 27, 2005 opposition, the County wrote that the "photos" of the condominium taken on October 20, 2005 and attached to WP's Motion, states "also clearly reveal that the kitchen is unusable". This was false. While the electric stove had been disconnected due to Crossan's arson charge, the microwave oven was used for food heating. The kitchen had two sinks, and while one, which had broken parts associated and was shut off and was used for storing items, and the other used as a normal sink. The statement that "if one were actually use the stove or oven it would certainly engulf the unit in flames" was fabricated as the electric stove had been disconnected years before and thus could not provide any degree of heat, yet alone result in flames. This was just another example of DiMatteo's lies. The kitchen in fact was used by both. Both usually ate out.

17. On June 2, 2006, I was facing a nonextendible deadline and filed in the Crossan case a handwritten "Transmittal of **First Draft** of Proposed Jury Instructions". This was the only handwritten paper.

18. Before the story was published Ms. Schulte did not attempt to contact me as had been agreed. She had my email address and thus has no excuse as she could have emailed her Draft of the article to me for the agreed-to review and comment. Nor did I have any hint that the story was going to be about anything but me.

19. On June 18, 2006, The Washington Post published Ms. Schulte's article "FIGHTING TO REMAIN ENGULFED IN JUNK..." .

20. Accompanying the June 18 article was a photogarph of the apartment taken by Arlington on October 20, 2005. Ms. Schulte received this photo and also at the same time a photo of Hughes in a HAZMAT outfit and a respirator criminally searching my bedroom which had "NO TRESPASSING" signs on both of the doors to my bedroom.

21

22 On July 27, 2006, The Washington Post published a second article by Ms. Schulte entitled "Hoarder's eviction Was Legal, Judge Says". The article did not quote directly from the parties pleadings, and in particular did not quote from the Judge's Order. Instead Ms. Schulte accepted as true the Arlington County Press Release by Curtius prepared by DiMatteo. **No where in said Order does it mention "without merit" as to any count**—The article claimed to accept as true Curtius' false statement that the Order stated that "Every count was found to be without merit."

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, to the best of my knowledge, information and belief..

Executed this 19th day of January, 2008.

/Samuel Shipkovitz

47

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SAMUEL SHIPKOVITZ, | ] | |
| | ] | |
| Plaintiff, | ] | |
| v. | ] | Civil Action No. 07-1053 (RCL) |
| | } | |
| THE WASHINGTON POST COMPANY, et al., | ] | |
| | ] | |
| Defendants. | ] | |

## STATEMENT OF MATERIAL FACTS IN GENUINE DISPUTE

There is a genuine issue as to material facts as to the following:  (Plaintiff's states the following is the truth to the best of his knowledge, information and belief).

1. Beginning in December, 1996, Plaintiff lived as a tenant with a written lease in his friend Stephen Crossan's condominium after Crossan was committed to the State Mental Health system (Central State Mental Hospital at first).  Compl. ¶7, SS Decl. Para. II-A___.

2. Mr. Crossan was arrested in 1996 for felony arson, found not guilty by reason of insanity, and committed to a Virginia state mental health facility. Id.  Starting in late 2004 Mr Crossan starting getting day passes from NVMHI State Mental Hospital and with Plaintiff's permission stayed in the second bedroom of said condominium during said passes/ Id., and as required by the State was required to be observed taking his required medications each day.  The State assigned said task to the Arlington County Program Assertive Community Treatment Team ("PACT") and visited Crossan on each day he was out on pass to observe him taking his required medications. Aff. of Sharita Hughes and her deposition; Mem. Op., Crossan , etal. V. Arlington County Manager, et al., No. 05-1219 at 2, et seq., (EDV) (Ex. 12?); SS Decl. Para.  II-B___

3. PACT representative Hughes visited Crossan in early October.  She claims she called the Fire Dept.  On October 20, 2005, Deputy Fire Marshall S. K. Grierson and building Code Inspector Richard Freeman, barged in without any warrant when Crossan let in Hughes and they were behind her. No warrant was ever issued and Crossan did not grant permission for the others to enter.  Declarations of Crossan made/executed  under penalty of perjury in EDV case. SS Decl. Para. ___. Crossan.

Plaintiff had in fact a NO TRESPASSING sign on each of the two doors leading to his bedroom.. SS Decl. Para. II-C__.

1

4. Photographs were taken without warrant nor permission during said warrantless and permissionless search. These photos taken by Freeman (Aff. Of Freeman) depict the condition of selected portions of the condominium on October 20, 2005. The Grierson did not taker any pictures. One of the photos was the one published. The photo of Hughes wearing a HAZMAT outfit and a mask and respirator unlawfully searching Plaintiff's bedroom without permission nor warrant was also taken and emailed to Schulte in 2006. The so-called Affidavit of Crossan was prepared by Yeager and imposed on Crossan, who had become so mentally ill that Plaintiff had to withdraw from representing him, after Yeager, Crossan's brother's colleague, Yeager broke into the unit and with an "Art Naudus" stole over $80,000 of Plaintiff's property. This "affidavit" is in direct contradict to Crossan's three previous Declarations made under penalty of perjury in the EDV case.

The "affidavit" prepared by Yeager is false in many respects relevant to relevant matters, including the ridiculous statement that Plaintiff was not the tenant. SS Decl. Para. _II-D_.

5. As a result of this unlawful search violative of the Fourth Amendment, a violation notice that did not have a cure notice with a cure date(stated next day and they had changed the locks), and a placard stating         were posted on the door of the condominium. The locks had been changed despite no statute or regulation permitting changing someone's locks. Crossan was involuntarily recommitted without any hearing to a different mental facility. Admission to the unit was prohibited according to the placard. Compl. Para. 8; Ex. 6 (Grierson Af.); Ex. 7 (Freeman Aff); SS Decl. at _II-5_.

6. On October 24, 2005, Plaintiff on behalf of himself, landlord/friend Crossan, and a client of Plaintiff's Sabo, who had his laptop and other files and property in the unit ,filed suit in the United States District Court, Eastern District of Virginia at Alexandria against Arlington County officials and others. *Crossan, etal. v. County of Arlington Manager, etal.*, No. 05cv-1219-A (E.D. Va). In his Amended Complaint, Ex. 9), Plaintiff stated under verification, that the inspection/search and locking him and Ctossan out of the condominium violated the Fourth, Fidfth and Fourteenth Amendments of the Constitution, violated the Virginia Statewide Uniform Building Code, the State Fire Code, various state statutes, and also constituted intentional business interference. Am. Compl., Crossan,(Ex.9) ¶¶60-67. Plaintiff also included a cause against the security guard service which physically prevented Plaintiff from having his locksmith enter to pick the lock and allow entry. As stated in the Complaint , Plaintiff earned his way through Carnegie-Mellon by working as a property manager and had handled multitudes of building code violations and therefore knew that any notice of violation must allow entry and have a cure date to cure. The Arlington posted papers had neither. Plaintiff requested damages and an injunction allowing him and Crossan back into the condominium, including to cure and have a cure date, and requiring the Arlington County defendants to obtain court permission or warrant before

2

conducting any further actions, and ordering the Arlington County Department of Human Services to maintain clients' confidences and other agreements made. Id. ¶¶54, 55, 64, 67, 73.  SS Decl. at II-6__.

7. While Plaintiff/Crossan/Sabo's lawsuit was pending, he contacted the Washington Post Metro desk, where he spoke with one male and when he did not call back, Plaintiff left messages for him (Pl. Complaint this case Para. , Pla. Declaration (this case) at Para.   ).  Several months later Schulte called Plaintiff and they discussed her investigating his case and possibly writing about his case.  SS Decl. at Para.  . Schulte only met Plaintiff once.  All other communications were by phone.  It was a condition of his cooperation that nothing would be published without Plaintiff's review and opportunity to comment.  She agreed to this.
Unbeknownst to Plaintiff prior to the publication of the first article Schulte, without ever telling Plaintiff spoke with numerous other sources, and had acknowledged receipt of the Arlington Hoarding Task Force "white paper" of September, 2005 and the Answer To Interrogatory from Arlington County where they admit that they had done the same to 18 others in the year before their act against the Plaintiff.[warrantless inspection and changing of locks].  Mr. Freeman in one brazen conversation warned that they had done this also to a "doctor on Pershing" (meaning M.D.) who they claim had too much stuff in his office.  SS Decl. this case at Para. II-7__ .

8. During a phone conversation with Ms. Schulte prior to publication of the first article, Plaintiff told Ms. Schulte that he was employed at the time of the "raid' at a major antitrust/patent law firm, but on the date of this much later conversation that as to him obtaining a permanent position that 'people who are older are not looked kindly upon because of the [law firm promotion/partnership track] pyramid". In Spring, 2006, Plaintiff stated that he was having a heck of a time getting a permanent or long term job, and was awaiting one of the many temp projects he had applied for.  He also stated that his "age was like the kiss of death for getting a permanent job." SS Decl. at Para. __II-8

9. During a April-May, 2006 phone conversation with Ms. Schulte, Plaintiff told her that he had to pay in advance for a deposition he was conducting against Arlington County because he was not a "regularly practicing [trial] attorney". This was solved when Plaintiff's friend Terry Legum, a Fairfax attorney, vouched for Plaintiff.  Plaintiff never said that he had not worked since October 24, 2005.  He did ask Ms. Schulte not to include his age or the name of the law firm he was working at on October 20, 2005, as they were not involved and he had very good relations with them, including a recruiting partner who happened to be involved in the case Plaintiff was working on (with eight other contract attorneys).  Plaintiff also insisted as a condition of his cooperation that they do not publish or take any photograph of him, and that they submit  any draft of

3

any article to him for his review and comment before publication. Ms. Schulte agreed to these conditions. SS Decl. II-9___ .

10. During another phone conversation with Ms. Schulte, Plaintiff explained to her that he had had a number of permanent jobs over the years (not "off and on"), and that when he was locked out of the condominium that day he was near the completion of a medium term contract attorney project. SS Dec. at _II-10_.

11. During another phone conversation with Ms. Schulte, Plaintiff described the condition of the condominium on October 20, 2005 as "I have five printers…I have piles of books, and piles of business and technical sections of newspapers… This is America. There's no such legal authority as the neatness police." Schulte Aff. At__, SS Decl. at    II-11 )__.

12. During another phone conversation with Ms. Schulte, Plaintiff told her that his friend and mentor, Henry St. John FitzGerald should be interviewed. Schulte spoke with him and the first article quotes him as saying (i.e., not Plaintiff) "OK, Sam's a slop [meaning not neat]. We all  [all of Plaintiff's friends] know that. But he doesn't deserve this" {referring to the Arlington County raid and unlawful lockout and changing of the locks].   Again, Plaintiff did not make the claimed statement. SS Decl. at _II-12_.

13. During another phone conversation with Ms. Schulte, Plaintiff said "did my apartment look like the back office of Jones Day? Yeah, so what?" Schulte Aff at Para. 10, SS Dec. at  II-13 .

14. On one occasion in early June, 2006, Mr. Shipkovitz took Ms. Schulte to a storage unit(s) where the dregs of his belongings had been taken after Crossan's brother's colleague Yeager, and Yeager's friend "Art Naudus" broke off the second lock on the door of the unit that Plaintiff had installed, and they took Plaintiff's property out of Arlington and took it to someplace in Fairfax controlled by Naudus,  processed through Plaintiff's possessions and stole most everything of value. During that trip they stopped at a Super Dollar store in Seven Corners so that he could purchase a telephone cord. At the store, Shipkovitz purchased three telephone cords[ one for voice, one for internet and one for FAX], an electric shaver, reading glasses [he needs2.5+], hand tools to do the work, and a jar of pickles. Referencing these purchases, Shipkovitz clearly jokingly described himself as "hoarding again?'. She laughed fully recognizing that Shipkovitz was cracking a joke, and the comment was not meant to be taken literally.  SS Decl. Para. II-14___ .

15. On October 27, 2005, Arlington County filed an Opposition to Plaintiff's Request For Temporary Restraining Order and Permanent Injunction in connection with the EDV lawsuit.  In that filing, the County stated that its

employees entered the condominium on October 20, 2005, and falsely stated that there "was rubbish, debris, paper, boxes [true], bags [only merchant bags were there], and all manner of containers and variety of materials piled and strewn from floor to ceiling in every room of the apartment except the bedroom where Mr. Crossan slept". There was no variety of materials piled and strewn. The only place that there was tall possessions was in Plaintiff's office area in the living room where he had stacked modular drawers filled with office supplies and files. Additionally, Crossan had many of his possessions, such as his Classic Ford Mustang collection of various parts, including a front bumper, in the living room. About one-third of the items were Crossan's. There was no rubbish, debris, or living/organic matter. Nothing was "strewn". The boxes were filled with books and office supplies/equipment/electronics. Only the office area of the living room had tall stacks of drawers.. SS Decl. Para II-15__.

16. In its October 27, 2005 opposition, the County wrote that the "photos" of the condominium taken on October 20, 2005 and attached to WP's Motion, "also clearly reveal that the kitchen is unusable". This was false. While the electric stove had been disconnected due to Crossan's arson charge, the microwave oven was used for food heating. The kitchen had two sinks, and while one, which had broken parts associated and was shut off and was used for storing items, and the other used as a normal sink. The statement that "if one were actually use the stove or oven it would certainly engulf the unit in flames" was fabricated as the electric stove had been disconnected years before and thus could not provide any degree of heat, yet alone result in flames. This was just another example of DiMatteo's lies. The kitchen in fact was used by both. Both usually ate out. SS Decl. Para. II-16_.

17. On June 2, 2006, Plaintiff facing a nonextendible deadline filed in the Crossan case a handwritten "Transmittal of First Draft of Proposed Jury Instructions". This was the only handwritten paper. SS Decl. Para. _II-17__.

18. Before the story was published Ms. Schulte did not attempt to contact Plaintiff as had been agreed. She had Plaintiff's email address and thus has no excuse as she could have emailed her Draft of the article to Plaintiff for the agreed-to review and comment. Nor did Plaintiff have any hint that the story was going to be about anything but him. SS Decl. Para. II-18__.

19. On June 18, 2006, The Washington Post published Ms. Schulte's article "FIGHTING TO REMAIN ENGULFED IN JUNK..." .

20. Accompanying the June 18 article was a photograph of Plaintiff's apartment taken by Arlington on October 20, 2005. Ms. Schulte received this photo and also at the same time a photo of Hughes in a HAZMAT outfit and a respirator

criminally searching his bedroom which had "NO TRESPASSING" signs on both of the doors to his bedroom.
SS Decl. at Para. II-20

21

22 On July 27, 2006, The Washington Post published a second article by Ms. Schulte entitled "Hoarder's eviction Was Legal, Judge Says". The article did not quote directly from the parties pleadings, and in particular did not quote directly from the Judge's Order. Instead Ms. Schulte accepted as true the Press Release by Curtius prepared by DiMatteo. No where in said Order does it mention "without merit" as to any count— The article claimed to accept as truer Curtius false statement that the Order stated that "Every count was found to be without merit."
SS Dec. Para. II-22.

Respectfully submitted,

Samuel Shipkovitz
Plaintiff *pro se*

Mailing:         P.O. Box 2961
Addresses    Arlington, VA 22202
         &   5829 Nicholson Street
              Pittsburgh, PA 15217
              tempcel 703-582-1580

January 22, 2008

6

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SAMUEL SHIPKOVITZ, ) | |
| ) | Civil Action No. 07-1053 (RCL) |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| THE WASHINGTON POST COMPANY, et al. ) | |
| ) | |
| Defendants. ) | |

### [PROPOSED] ORDER

Upon consideration of Defendants' Motion for Summary Judgment and

supporting papers, Plaintiff's opposition thereto, and Defendants' reply, and for good cause

shown, it is hereby ORDERED this _____ day of _____, that Defendants' motion

is $\underline{DENIED}$.


_____
Royce Lamberth, United States District Judge

Copies to:

Samuel Shipkovitz
5829 Nicholson Street
Pittsburgh, PA 15217

Ara Tramblian, Esq.
Deputy County Attorney
2100 Clarendon Blvd., #403
Arlington, VA 22201

Kevin Baine, Esq.
Jonathan Kravis, Esq.
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005



# EXHIBIT 1

# ATTACHMENT 1: HOARDING REFERRAL CRITERIA

Staff of all departments are expected to respond to a hoarding referral for an initial assessment.

One or more of the following conditions should be present for the following departments to accept a referral for ongoing intervention:

## DHS/Adult Protective Services

NOTE: Hoarding is a symptom of an underlying mental illness, however some persons who hoard have a high level of functioning in other areas of their lives.

Typically a person referred to APS would have hoarding and some of the following characteristics:

1. Animal hoarding/animal neglect/animal waste/unsanitary conditions due to animals
2. Human waste inside the residence or in the yard
3. Rotting food
4. Frail, disabled or elderly
5. Presence of dementia
6. Presence of psychosis, paranoia, OCD or other serious mental illness
7. Lack of social supports
8. Evidence of inability to function in other areas of life

## Code Enforcement and Fire Prevention

Presence of dangerous, hazardous and unsafe conditions as defined by building, property maintenance and fire codes.

5

DRAFT

# ARLINGTON COUNTY, VIRGINIA
# INTERDEPARTMENTAL HOARDING TASK FORCE

## Case Management Procedure (v. September 9, 2005)

### POLICY STATEMENT

This procedure was originally developed by the Arlington Interdepartmental Hoarding Task Force in April 2003. It is intended to formalize a collaborative and consistent case management approach for use by County staff managing moderate-to-severe hoarding cases.

### BACKGROUND

*Hoarding behavior is defined as "the acquisition of and failure to discard things that are useless or of no value (living spaces cluttered enough to prevent the activity that the space was designed for and sufficient distress or impairment in functioning (may include impending eviction, financial hardship due to excessive buying, risk of removal of children or subfamilies) caused by the hoarding."* (Frost and Hartl)

The primary goals of hoarding case management are risk reduction to the client and the community and assuring compliance with the appropriate building and property codes.

The Task Force includes representatives from County departments responsible for responding to referrals from residents wanting to identify potential hoarders in their community as well as other involved agencies including Animal Welfare League, Commonwealth Attorney's Office, County Attorney's Office and the Magistrate's Office. Representatives from these groups will convene annually or more often as necessary to discuss significant policy and procedure issues and to be advised of changes.

A smaller subset Working Group, comprised of representatives from DHS/APS, CPHD/Code Enforcement and the ACFD/Fire Marshal's Office will meet monthly to review hoarding developments and enhance procedures at a working level and to coordinate the delivery of hoarding training.

The following procedure applies to those throughout the County with primary responsibility for responding to hoarding complaints. Prior to using this procedure, County staff should be properly trained on hoarding issues and understand the importance of working in consultation with the appropriate departmental managers, supervisors and direct service staff. Supervisors are expected to review this procedure with new employees who will be involved in interdepartmental hoarding efforts.

### STEP 1:

Referrals (See Attachment 1 - Referral Criteria) - Community referrals are received and

Ex. Q

---

processed based on each department's criteria and timeframes. Entry points for referrals are most commonly received by the following departments/programs: DHS/APS, CPHD/Code Enforcement and the ACFD/Fire Marshal's Office. Animal Welfare League or DHS/Emergency Mental Health may also receive referrals. When this occurs, referrals should be redirected to one of the three primary entry points, although staff should respond to an emergency or remain involved in a collaborative manner.

### STEP 2:

Telephone Screening (See Attachment 2 - Assessment Tool) - Telephone screenings will be conducted with the referral source within 3 working days by a representative of the department in receipt of the initial referral. The screener will obtain as much information as possible to determine the following: 1) the level of risk to the client and the community, 2) what problems exist in addition to hoarding (for example, are the utilities operating, does the resident appear ill or confused), 3) which departmental representatives should be included in the initial home visit, and 4) the initial severity for hoarding behavior (See Attachment 3 – Severity Ratings). Information gathered on the hoarding screening tool is considered confidential and only shared with staff on a 'need to know' basis. Information gathered for the screening can include:

- Name and phone number of person making referral (remains confidential to program receiving referral)
- Date of referral
- Name of client
- Address of client
- Phone number
- DOB of client
- Family and other supports (names, addresses and phone numbers)
- Other County programs or private agencies involved
- Physical or Mental Health problems of client
- Are basic needs being met, such as food and shelter?
- Client's attitude towards hoarding: Is there human or animal waste, rodents or insects
- Description of the environment; are there problems with blocked exits, are there rotting food, are utilities operational, combustibles, etc.?
- Are there other people residing in the house?
- Are there animals in the house (dead or alive)?
- Is the person willing to allow access?
- Are there other problems in addition to hoarding?
- Is there knowledge of recent known emergencies at this location?
- Is there knowledge of weapons in the home?

### STEP 3:

Initial Assessment/Investigation - The initial assessment will be conducted by a team (known as the Task Force Response Team) of departmental representatives from DHS/Adult Protective Services and, either, CPHD/Code Enforcement or ACFD/Fire Marshal's Office. This assessment will be conducted within five working days from the

client may have to be removed from the unsafe environment through the enforcement of a mental health detention process. It is rare that persons who hoard meet involuntary detention criteria. Code Enforcement and ACFD/Fire Marshal's Office may immediately declare the property unfit for human habitation (assuming that they have been able to enter and assess) and, thereby, force an involuntary client out of an unsafe environment. If this happens and the client is willing to accept assistance or lacks mental capacity, DHS/APS will make every effort to intervene. (Competent clients may refuse Adult Protective Services.)

Barriers to Intervention – If the Working Group determines that intervention barriers exist that cannot be resolved by the Response Team, such as:

- clients' lacking insight or exhibiting denial, lack of motivation to change, mental illness or dementia;
- clients' refusing services; and/or
- staff's inability to secure a "right of entry" through the Fire Inspection warrant procedure; then,

a representative from its membership will be designated to take the issue to a higher level (e.g., department heads, courts) or to the Task Force depending upon the time sensitivity of the issue, for resolution.

---

telephone screening. There may be unique occasions, based on the findings of the phone screening coupled with lack of availability of staff, when the home visit may be conducted by one team member. In these situations, the team member will notify their supervisor prior to the visit. Directly following the visit, team members will be apprised of site findings to ensure coordination of efforts.

The team will gather appropriate data, using one of a variety of comprehensive assessment tools during the initial home visit.

The assessment tool should include: 1) assessing client capacity (may be done jointly with mental health), 2) assessing risk to the client, 3) rating the hoarding conditions in the environment, 4) assessing social supports, 5) assessing clients' insight/willingness to accept services and reactivity to clean-up assistance, 6) assessing clients' financial status and clients' ability/willingness to pay for services, 7) assessing clients' physical appearance to determine need for medical and/or nurse assessments, and 8) assessing clients' other needs, such as food and shelter, 9) assessing the life safety risk to the adjacent neighboring properties as a result of the subjects hoarding.

Note: If the team is unable to gain entry into the residence because the resident is refusing, the Fire Marshal representative will begin procedures for obtaining a Fire Inspection (see Attachment 4).

STEP 4:
Coordinated Planning - Within 2 business days of the initial assessment, the Task Force Response Team will discuss the case and if it is determined to be either a moderate or severe hoarding case, will decide which County staff need to be involved in the evolving case and will develop an Interdepartmental Intervention Plan that addresses all client safety concerns. Each team member will document all intervention efforts in their respective agency/program records to ensure that there is a record of the Response Team's work.

STEP 5:
Ongoing Intervention Response – During regularly scheduled Working Group meetings, members will debrief recent scenarios. There will be a strict policy that during meetings where "confidential" scenarios are discussed, only Arlington County employees, involved County contractor(s) and applicable State employees are allowed to attend. Members of the Working Group must sign a confidentiality statement as not to discuss privacy information of subjects of hoarding outside of the Working Group. This must be completed upon assignment to the Working Group and renewed annually. The Working Group reviews effectiveness and quality of the coordinated approach and makes recommendations for follow-up by the Response Team.

NOTES:

DHS/APS assists voluntary clients with securing temporary shelter to remove them from unsafe living conditions. If the client refuses to accept assistance and is mentally ill, the

## ATTACHMENT 1: HOARDING REFERRAL CRITERIA

Staff of all departments are expected to respond to a hoarding referral for an initial assessment.

One or more of the following conditions should be present for the following departments to accept a referral for ongoing intervention:

**DHS/Adult Protective Services**
NOTE: Hoarding is a symptom of an underlying mental illness, however some persons who hoard have a high level of functioning in other areas of their lives.

Typically a person referred to APS would have hoarding and some of the following characteristics:
1. Animal hoarding/animal neglect/animal waste/unsanitary conditions due to animals
2. Human waste inside the residence or in the yard
3. Rotting food
4. Frail, disabled or elderly
5. Presence of dementia
6. Presence of psychosis, paranoia, OCD or other serious mental illness
7. Lack of social supports
8. Evidence of inability to function in other areas of life

**Code Enforcement and Fire Prevention**
Presence of dangerous, hazardous and unsafe conditions as defined by building, property maintenance and fire codes.

---

## ATTACHMENT 2: SCREENING TOOL (Optional) where is this report

Telephone Screening:
Date referral received: _____    Date County initiated follow-up: _____

Worker Receiving call: _____    Department _____

Client name: _____    Phone: _____

Address: _____

Social Security Number _____    D.O.B. _____

Referral Source (may be omitted to preserve confidentiality) :
Phone: (___) ___ - _____

Household members: _____

Pets/animals? _____  Own/Rent: _____

Family or other supports: (include names and phone numbers) _____

Other County Programs or private agencies  involved: _____

Physical or Mental Health Problems of client: _____

Are basic needs being met (i.e. food/shelter)? _____

Client's attitude towards hoarding _____    Will client allow access: _____

Description of Hoarding Problem: (presence of human or animal waste, rodents or insects, rotting food, are
utilities operational, are there problems with blocked exits, is there an extraordinary amount of combustibles,
are adjacent properties at risk, etc.)
_____
_____
_____

Other Problems/Needs: _____

Initial Hoarding Severity Rating:    Severe ☐    Moderate ☐    Mild ☐

Others to involve in initial Assessment: _____

**Initial Assessment (At Property):**

Date:

Task Force Response Team Members and Phone numbers:

Final Hoarding Rating: Severe ☐    Moderate ☐    Mild ☐

**Environmental Assessment:**

Fire Hazards:   accumulations:
- human waste ☐ yes ☐ no
- animal waste ☐ yes ☐ no
- extraordinary amounts of combustible materials ☐ yes ☐ no
- smoke detectors ☐ yes ☐ no
- fire extinguishers ☐ yes ☐ no
- means of egress ☐ yes ☐ no
- **emergency escape** ☐ yes ☐ no
- other

Safety Hazards:
- rodents infestation ☐ yes ☐ no
- insect infestation ☐ yes ☐ no
- Animals (dead, ill or large numbers) ☐ yes ☐ no
- rotting food ☐ yes ☐ no
- running water ☐ yes ☐ no
- water heating facilities ☐ yes ☐ no
- heating equipment ☐ yes ☐ no
- interior surface condition
  - walls ☐ yes ☐ no
  - ceilings ☐ yes ☐ no
  - floors _____
  - windows _____
  - doors _____
  - other _____

**Client Assessment:**

Mental health issues: (Dementia, psychosis, OCD, other)

Frail/elderly or disabled:

Risks to client's health and safety:

Family and other social supports:

Client's insight/willingness to accept help:

Financial status/ability or willingness to pay for services:

Client's physical appearance

Client's other needs (food, shelter, medical)

**Recommendations:**

Fire: _____

Code: _____

DHS: _____

Date Presented to Working Group:

Follow-up plan with timeframes:

## ATTACHMENT 3: HOARDING SEVERITY RATINGS

*[handwritten: not rdg for 3/4 ? guzy clue sport]*

**Severe** – A severe rating is given when the following conditions exist: animal hoarding with widespread animal waste, including the presence of diseased or deceased animals; human waste within and around the residence; the presence of combustibles on and around the stove or furnace; hoarding so extreme that there are no even pathways for the resident(s) to walk from area to area (e.g., stairway blocked, entrances to rooms blocked, exits blocked, in general a "sea of debris"); sewer gas entering the home; rodents in the home, risk to neighbors/community due to extreme fire load; and lack of required utilities and facilities.

**Moderate** – A moderate rating is given when the following conditions exist: utilities are generally operative and the client and the client can move about even if through narrow pathways, code and fire violations exist, most living surfaces are covered with items and are unusable for their intended purposes, and home requires professional heavy house cleaners and large dumpsters to clean up.

**Mild** – A mild rating is given when the following conditions exist: environment meets the standard definition of hoarding behavior, but conditions are sufficiently mild so that ordinary household assistance could clean the environment within a few days. Often, mild cases are ones where family members have intervened on a regular basis or the resident(s) has moved so frequently that the hoarding has not accumulated. In these cases, County intervention may be minimal or not required.

## ATTACHMENT 4: WARRANT PROCEDURE AND FIRE INSPECTION WARRANT

In order to meet the requirements of the Fourth Amendment, the government must either have consent to search private property, or have obtained a warrant because there is probable cause to believe that an offense has been committed.[1] It is highly recommended that "right of entry" be based on consent, where possible. This will preserve a better relationship with the subject involved. In addition, the magistrate is more likely to be willing to issue a warrant if other avenues have been exhausted. Where consent cannot be obtained, a warrant can be issued: (1) where facts and circumstances, (2) are within an official's knowledge, (3) of which he has reasonably trustworthy information, and (4) which are sufficient unto themselves to warrant a person of reasonable caution to believe that an offense has been or is being committed.

In addition to stating facts and circumstances that meet the standards of (1) through (4) above, an application for a warrant must identify the purported violation, the purpose of the search and the specific property to be searched.

The local fire official can obtain a fire inspection warrant for inspections under section §27-98.1 (inspections of buildings, structures, properties and premises) and §27-98.2 (issuance of warrant). Fire inspection warrants for inspections pursuant to the Code, buildings, structures, property, or premises subject to inspections pursuant to the Code, shall be to determine compliance with regulations or standards set forth in the Code, shall be based upon a demonstration of probable cause and supported by affidavit.

No inspection warrant shall be issued pursuant to §27-98.1. and §27-98.2, except upon probable cause, supported by affidavit, particularly describing the place, thing or property to be inspected, examined or tested and the purpose for which the inspection, examination, testing or collection of samples for testing is to be made.

Probable cause shall be deemed to exist if such inspection, examination, testing or collection of samples for testing are necessary to ensure compliance with the Statewide Fire Prevention Code or adopted county Fire Code amendments for the protection of life and property from the hazards of fire or explosion.

The supporting affidavit shall contain either a statement that consent to inspect, examine, test or collect samples for testing has been sought and refused or facts or circumstances reasonably justifying the failure to seek such consent in order to enforce effectively the fire safety laws, regulations or standards of the Commonwealth which authorize such inspection, examination, testing or collection of samples for testing.

---

[1] A warrant can be issued based on reasonable legislative or administrative standards, without evidence of violations, where a program of enforcement inspections is conducted. However, that procedure will not apply for individual hoarding cases.

Attached hereto is a Fire Inspection affidavit that will be completed and provided to the Magistrate from the Fire Marshal representative to obtain a warrant. Members who have made contact with the subject other than the Fire Marshal should provide the Fire Marshal written information that is within their personal knowledge as to the facts and circumstances of the case to assist in showing probable cause that a violation of law exists. In addition, members of the Working Group providing this information should also include their resume establishing their knowledge, education, and experience.

The Fire Marshal representative that is writing the affidavit should include their information of the facts and a copy of their curriculum vitae when presenting their case to the magistrate. The affidavit should the members of the Working Group as participants in the Fire Inspection.

When serving the Fire Inspection warrant contact should be made prior to providing ACPD with knowledge that a warrant is being served. A minimum of two armed Fire Marshals or Police Officers must be on the scene while serving the warrant. Body armor must be in place. The Fire Marshal shall notify the Emergency Communications Center prior to serving the warrant and again when the scene is secured.

When serving the warrant, Fire Marshals shall follow policy regarding "knock and announce" procedures. One last effort should continue to gain consent for entry if the subject is on the premises.

After entry is secured, the determination should be made if locks will be changed and if the subject will be removed. Assurances should be made for the shelter requirements of the subject. A notice of violation (see attached) must accompany the documentary of the Fire Inspection warrant. If entry is made, the subject is not on the premises, and the decision is made to change the locks to deny entry for life safety concerns, the required posting must be performed on the entryway.

---

# SAMPLE – NOTICE OF VIOLATION

## Notice of Violation of Fire Prevention Code

An authorized representative of the Arlington County Fire Prevention Division has observed the following violation(s) of the 2000 International Fire Code, Virginia Statewide Fire Prevention Code or the Arlington County Fire Prevention Code on, Wednesday, January 19, 2005, at your premises.

You are hereby ordered to cause the listed corrective action(s) to be taken immediately. If you do not understand any part of this notice or feel you cannot comply within the allotted time, immediately contact this office at (703) 228-4644. No extension of time shall be granted on or after the date the correction is due. Any violation found to exist, or which has been permitted to reappear, will be deemed as failure to comply with this notice of violation. Each day that prohibited conditions are maintained, shall constitute a separate offense

## List of Violations

Section 315.2- Storage in buildings. Storage of combustible materials in buildings shall be orderly. Storage shall be separate from heaters or heating devices by distance or shielding so that ignition cannot occur.

Section 315.2.2- Means of egress. Combustible materials shall not be stored in exits or exit enclosures.

Section 1011.2- Reliability. Required exit accesses, exits or exit discharges shall be continuously maintained free from obstructions or impediments to full instant use in case of fire or other emergency.

Section 110.1- General. The Fire Marshal shall order the following dangerous or hazardous conditions or materials to be removed or remedied in accordance with the Virginia Statewide Fire Prevention Code:

1. Dangerous conditions which are liable to cause or contribute to the spread of fire in or on said premises, building or structure, or to endanger the occupant thereof.
2. Conditions which would interfere with efficiency and use of any fire protection equipment.
3. Obstructions to or on fire escapes, stairs, passageways, doors or windows, which are liable to interfere with egress of occupants or the operation of the fire department in case of fire.

4. Accumulation of rubbish, waste, paper, boxes, shavings, or any other combustible materials, or excessive storage of any combustible materials.

**Section 110.4- Unsafe structures.** All structures that are or shall thereafter become unsafe or deficient in adequate exit facilities or which constitutes a fire hazard, or are otherwise dangerous to human life or the public welfare, or by reason of illegal or improper use, occupancy or maintenance or which have sustained structural damage by reason of fire, explosion, or natural disaster shall be deemed unsafe. Subsequently, the Fire Official may request the legal counsel of the body to institute the appropriate proceedings for an injunction against the continued use and occupancy of the structure until such time as conditions have been remedied.

**Section 110.3- Occupants responsibility.** If a building occupant creates conditions in violation of this code, by virtue of storage, handling and use of substances, materials, devices and appliances, such occupant shall be held responsible for the abatement of said hazardous conditions.

**Failure to remedy said violations on or before January 31, 2005 at 10:00 a.m. shall subject you to the penalties as prescribed by the Virginia State Fire Prevention Code as printed below.**

**109.3 Penalty for violation:** Violations are a Class I misdemeanor in accordance with Section 27-100 of the Code of Virginia. Each day that a violation continues, after a service of notice as provided for in this code, shall be deemed a separate offense.

Samuel Keith Grierson FM 126
Deputy Fire Marshal

13

P

# EXHIBIT 2

## Declaration of Stephen C. Crossan

I, Stephen C Crossan, adult over the age of 18, hereby declare that the following statements are facts of personal knowledge and true:

1. I am a client of the Arlington PACT Team, with Sheuta Hughes as my social worker.
Sam Shipkivitz was my tenant, not a guest.

2. On Oct 20, 2005 about 9:30 AM, Ms Hughes showed up with 3 "inspectors" who accompanied her. I opened the door and Ms Hughes came in with the 3 inspectors. I was not expecting anyone to be with Ms Hughes. Ms Hughes, not I, let them in. Ms Hughes insisted that they be allowed in. Ms Hughes has power to commit me back into the mental health residence provider system. I did not give there voluntary permission to come in. It was obvious that she had had previous discussion with them.

3. All of them talked together. I believe the Deputy Fire Marshall went downstairs and came back with the building engineer and he told Bldg Engr. Jose to change the locks to the door. Within 10 minutes a large orange sign and several other pages were taped to the door. Therefore, I believe that they had been prepared posted papers beforehand.

Sheuta demanded and took me to ACCESS, a group medical/mental crisis home on Chesterfield street near the Rt. 7 Wendy's. On Tuesday Nov. 3d at 11 AM Ms Hughes drove me to a motel and told me I'd have to pay for it until further notice. I had no choice according to her.

I hereby declare the above + true and correct under the penalty of perjury under the laws of the United States of America.
Dated this 6th day of November, 2005

Stephen C Crossan
(EV E)

Stephen C. Crossan
Arlington, VA 22201
December 18, 2005

Mr. Martin Yeager, Esq.

Arlington, VA 22201

Re: 1200 Crystal Drive, #314; Sam Shipkovitz

Dear Mr. Yeager:

This is to confirm that Sam Shipkovitz is my tenant at the unit. As I have not been released from supervision, I am basically his guest when there. He is paying the agreed rent, and I am paying my pro rata share of the electric. Several months ago I was accused by a female resident of the building of harassing her and was taken back for a while to the Arlington Hospital Psychiatric Unit. Thus under the circumstances, Sam is my tenant until my unconditional release as decided by the Virginia Forensic Mental Health Board or the like in Richmond. Sam has been my friend for many years, about 15 years, and we have never had any disagreements, and in fact he has been around to assist me during my problems. I wish to remain friends.

Therefore, and as per the phone messages I left (you were not in your office), I am asking you to please cooperate in permitting Sam to enter the premises to methodically remove the objected-to items, which he has been doing as much as Arlington County will let us in (they changed the locks and have the only new key) and in cooperation with Mr. Giderson. The more time that access (which they control) is permitted, the faster that that the claimed violations can be eliminated

Thank you.

Dec 18, 2005    Stephen C. Crossan
                Stephen C. Crossan

EX. 5

Stephen C. Crossan
Highlander #33
Arlington, VA 22201
January 5, 2006  7PM

Mr. Martin Yeager, Esq.
2000 N. 14th Street
Arlington, VA 22201

Re: 1200 Crystal Drive, #314; Sam Shipkovitz

Dear Mr Yeager:

After conversing with Sam this evening, I have decided not to hire a contractor as suggested, but to continue the organized removal of the objected-to items that Sam and Mr. Grierson were pursuing. Please make every effort to cooperate by instructing the County officials and attorney to also cooperate.

I do not wish to retract my letter of December 18, 2005. This instruction to cooperate in permitting Sam in and for the organized cure of the premises is my voluntary irrevocable decision. As stated before, he and I have been friends for about 15 years and I wish to remain friends. He also has been the tenant since December, 1996. As long as he is making best efforts as for the time that he is being permitted in, there is no reason for conflict. I declare under penalty of perjury under the laws of the United States of America that the above and in the December 18, 2005 letter are true and correct.

Thank you in this matter.

Jan 5, 2006                Sincerely,

                          Stephen C. Crossan
                          Stephen C. Crossan



EX. G

# EXHIBIT 3

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

STEPHEN C. CROSSAN, et al

    Plaintiffs,

v.    Civil Action No. 1:05-CV-1219

COUNTY OF ARLINGTON, MANAGER, et al.,

    Defendants.

## DEFENDANTS' ANSWER TO INTERROGATORY

COMES NOW the County Manager of Arlington County, Virginia and Arlington County, Virginia, by counsel, Louise M. DiMatteo, Assistant County Attorney, and submits the following answer to the interrogatory drafted by the Court on March 31, 2006 on behalf of the Plaintiffs:

1. "The County shall, however, provide to Plaintiffs, in narrative form, statistical information about the number of 'hoarding' or 'clutter' incidents in the County in the last three years, including information as to how many buildings or units were placarded for fire or building code violations and how many individuals were evicted due to such violations."

ANSWER:

The County, via Code Enforcement and the Fire Marshal's office is not able to provide, information as far back as three years and documentation as statistical information regarding this type of cases is not maintained that far back. The information provided is available from the period beginning November 25, 2003.

In reviewing the Code and the records "clutter" is not a trigger word for hoarding-type cases, nor is it a word used in either the Virginia Statewide Building Code or the Fire Prevention Code as a definitional term. "Hoarding" is a word that is used to describe cases that include but

1

Ex. I

---

are not limited to the following types of violations of the Virginia Statewide Building Code: "excessive accumulation of rubbish creating both an unsafe and unsanitary condition at the interior"; "blocked and/or obstructed paths"; "blocked and/or obstructed means of egress"; "inadequate ventilation due to blockage created at windows"; "inaccessibility due to obstructions"; "inadequate clearance at corridors, stairways and passageways".

It is believed that the word clutter has been used by Plaintiffs to downplay the seriousness of the violations and to make it seem that the defendants have improperly made Virginia Statewide Building Code and Fire Prevention Code violations. The word clutter, however, has not been used by the defendants and the County could not search for cases using the term "clutter" because it has no meaning in hoarding cases.

• There are a total of 33 recorded cases described by the fire marshal and code enforcement as "hoarding" cases.

• 18 of the 33 cases resulted in a placard due to fire prevention code or Virginia Statewide Building Code violations or both.

• 18 of the 33 cases resulted in a ban from the premises.

Respectfully submitted,

County Manager of Arlington County, Virginia
Arlington County, Virginia
By Counsel

2



Ex. V



Ex. U