IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SAMUEL SHIPKOVITZ, | ) |
| | ) |
| Plaintiff, | ) Civil Action No. 07-1053 (RCL) |
| | ) |
| vs. | ) |
| | ) |
| THE WASHINGTON POST COMPANY, et al. | ) |
| | ) |
| Defendants. | ) |

**REPLY MEMORANDUM IN SUPPORT OF THE MOTION OF DEFENDANTS
THE WASHINGTON POST COMPANY, WP COMPANY LLC,
AND BRIGID SCHULTE FOR SUMMARY JUDGMENT**

WILLIAMS & CONNOLLY LLP
Kevin T. Baine (Bar No. 238600)
Jonathan Kravis (Bar No. 973780)

725 Twelfth Street, N.W.
Washington, DC  20005
(202) 434-5000

*Attorneys for Defendants The Washington Post Company, WP Company LLC, and Brigid Schulte*

February 11, 2008

## INTRODUCTION

Plaintiff Samuel Shipkovitz has sued The Washington Post and Post reporter Brigid Schulte (collectively "The Post defendants") for defamation and invasion of privacy. Plaintiff's claims are based on statements in two articles written by Ms. Schulte and published in The Post about the official actions taken by Arlington County officials locking plaintiff out of the condominium in which he lived until October 20, 2005, for violations of the Virginia Fire Prevention and Building Codes, as well as plaintiff's subsequent unsuccessful lawsuit against those officials and others. Most of the statements challenged by plaintiff concern the condition of the condominium as of October 20, 2005. The Post defendants have filed a motion for summary judgment, arguing that (1) photographs of the condominium taken by Arlington County officials on the day of the lockout and plaintiff's comments to Ms. Schulte establish that the statements at issue are substantially true; and (2) the articles are protected by the fair report privilege.

Plaintiff's opposition contests hardly any of the material facts relied upon in the summary judgment motion. Instead, plaintiff argues that the undisputed evidence does not establish the substantial truth of the statements at issue. In every case, however, plaintiff's argument is premised either upon an unreasonable or hyper-technical reading of the articles or upon a clear misinterpretation of the undisputed evidence. Plaintiff's position appears to be that he can survive summary judgment simply by insisting that the articles mean what he says they mean or that the evidence shows what he says it shows.

Plaintiff is wrong. "Minor inaccuracies" such as those identified by plaintiff "do not amount to falsity so long as the substance, the gist, the sting, of the libelous charge be justified." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517 (1991) (internal quotations

omitted). In other words, a statement is actionable only if it is "materially false." *Weyrich v. New Republic, Inc.*, 235 F.3d 617, 627 (D.C. Cir. 2001). As plaintiff's opposition clearly demonstrates, his claims against The Post defendants are based on nothing more than "[s]light inaccuracies of expression," which are "immaterial provided that the defamatory charge is true in substance." *Moldea v. N.Y. Times Co.*, 22 F.3d 310, 318 (D.C. Cir. 1994) (quotations omitted). Accordingly, The Post defendants are entitled to summary judgment.

## ARGUMENT

### I.  THE ALLEGEDLY DEFAMATORY STATEMENTS ARE NOT FALSE.

In a defamation action, "[t]he burden of proving falsity rests squarely on the plaintiff." *Lane v. Random House, Inc.*, 985 F. Supp. 141, 151 (D.D.C. 1995). Summary judgment is appropriate where the plaintiff cannot demonstrate a disputed issue of material fact as to falsity. *See, e.g.*, *Jolevare v. Alpha Kappa Alpha Sorority, Inc.*, 521 F. Supp. 2d 1, 13 (D.D.C. 2007); *Paul v. News World Commc'ns*, No. 01CA917, 2003 WL 23899002 (D.C. Super. Ct. Sept. 15, 2003). Therefore, The Post defendants are entitled to summary judgment unless plaintiff can show that a reasonable jury could conclude that the statements at issue are not substantially true. As plaintiff concedes, in applying this standard the challenged statements "must be construed in the plain and popular sense in which the rest of the world would naturally understand them," and must be understood in terms of "what would a 'reasonable reader of the [articles would] likely conclude.'" Pl.'s Opp. to Defs.' Mot. for Summ. J. 25 (Jan. 30, 2008) ("Opp.") (*quoting Schnupp v. Smith*, 249 Va. 353 (Va. 1995), and *Hatfill v. N.Y. Times Co.*, 416 F.3d 320 (4th Cir. 2005)).

2

Plaintiff's complaint identifies twelve allegedly defamatory statements. An examination of each shows that plaintiff has failed to create a disputed issue of material fact with respect to substantial truth.

**1. Plaintiff "works sporadically and has had long periods of unemployment."**

It is undisputed that plaintiff's own Amended Complaint in the Eastern District of Virginia lawsuit against various Arlington County officials and other defendants alleged that plaintiff had been "out of business since October 20, 2005." Am. Compl., *Crossan v. County of Arlington Manager*, No. 05-CV-1219 (E.D. Va.) (Ex. 9)[1] ¶ 66. Unless plaintiff now maintains that he falsely represented his employment history to the *Crossan* court, that allegation alone should be enough to establish the truth of the challenged statement.

Moreover, plaintiff admits that he made several statements to Ms. Schulte in the spring of 2006 regarding his employment history, including:

- "I was having a heck of a time getting a permanent or long term job, and was awaiting one of the many temp projects I had applied for." Shipkovitz Decl. ¶ 8, at 44.

- "[A]s to me obtaining a permanent position," "'people who are older are not looked kindly upon because of the [law firm promotion/partnership track] pyramid.'" *Id.* (alteration in original).

- "[M]y 'age was like the kiss of death for getting a permanent job.'" *Id.* at 45.

- "I had to pay in advance for a deposition I was conducting against Arlington County because I was not a 'regularly practicing [trial] attorney.'" *Id.* ¶ 9, at 45 (alteration in original).

---

[1] Unless otherwise specified, all exhibit citations are to the exhibits filed with The Post defendants' summary judgment motion. The lettered exhibits are all contained in Exhibit 4.

3

Thus, by his own admission, plaintiff had a hard time finding "a permanent or long term job," and was not a "regularly practicing attorney." Any difference between that condition and "work[ing] sporadically" with "long periods of unemployment" is nothing more than a minor inaccuracy.

Plaintiff contends that this statement is false because he was employed "on the day of the raid, October 20, 2005 . . . and had been for considerable time." Opp. 9, 21. But that assertion, even if true, is not inconsistent with the proposition that in June 2006 (when the article was published) plaintiff was "work[ing] sporadically" and had gone through "long periods of unemployment."[2]

**2. "He admits that his place was a mess."** Once again, plaintiff concedes that he made comments to Ms. Schulte that substantiate this statement, including:

- "I have five printers . . . I have piles of books, and piles of business and technical sections of newspapers . . . This is America. There's no such legal authority as the neatness police." Shipkovitz Decl. ¶ 11, at p. 45.
- "[D]id my apartment look like the back office of Jones Day? Yeah, so what?" *Id.* ¶ 13, at p. 45.

There is no material difference between saying that the condominium in which plaintiff lived had "piles of books" and "newspapers" and "look[ed] like the back office of Jones Day" on the one hand and saying that plaintiff's "place was a mess" on the other.

Plaintiff's challenge to the truth of this statement constitutes nothing more than semantic quibbling. Plaintiff argues that "[n]on-neatness is unrelated to 'mess,' which again

---

[2] Plaintiff attempts to elide this distinction by asserting that "[t]he article clearly states (falsely) that Plaintiff has been unemployed, sporadically employed and unemployable *for years before the raid, Oct. 20, 2005*." Opp. 21 (emphasis added). In fact, the article says no such thing—it neither states nor implies anything about plaintiff's employment status prior to October 20, 2005.

4

implies food items left out, et al." Opp. 9. That is simply not true. The common understanding of the word "messy" is "not neat." *See American Heritage Dictionary of the English Language* (4th ed. 2000) (defining "mess" as "a cluttered, untidy, usually dirty condition" and defining "neat" as "orderly and clean; tidy").

    **3. "[H]e slept on top of his stuff on the floor . . . ."** Exhibits EE and II to defendants' summary judgment motion show a mattress, blanket, and pillow buried amidst piles of newspapers, boxes, storage bins, cables, and office supplies. Any difference between sleeping around piles of stuff and atop piles of stuff is a minor inaccuracy that cannot support a defamation claim. *See Masson*, 501 U.S. at 517.

    Plaintiff's suggestion that there is a material difference between sleeping *on* piles of stuff and sleeping *around* piles of stuff because the former but not the latter "clearly implies mental illness," Opp. 8, is completely implausible. Exhibits EE and II show, and plaintiff does not dispute, that he slept on a mattress that was surrounded by piles of newspapers, boxes, storage bins, cables, and office supplies. The notion that this sleeping condition is materially different from sleeping *atop* piles of newspapers, boxes, storage bins, cables, and office supplies is fanciful, and does not create a disputed issue of material fact as to the substantial truth of the challenged statement.

    **4. "[T]here were boxes in the bathtub."** Exhibit BB clearly shows boxes in the bathtub.

    Plaintiff says that the June 18, 2006 article "falsely implies that [the boxes] were" his. Opp. 10. Plaintiff is mistaken—the article does not mention or even suggest who owns the boxes, and indeed expressly notes that some of the items in the condominium belonged to Mr. Crossan. *See* Ex. 1 ("The bumper of an old Mustang, its steering wheel and one of its bucket

5

seats lay in the living room. Those belonged to his roommate, [Shipkovitz] said."). And even if the article did imply that the boxes belonged to plaintiff, that detail is immaterial. It is undisputed that most of the other items in the condominium did belong to plaintiff. And "the gist, the sting" of the article—that plaintiff lived in a condominium rendered uninhabitable by the accumulation of those things—is "justified." *Masson*, 501 U.S. at 517 (quotations omitted).

**5. "The rest [of the condominium], from floor to ceiling, was crammed with 'rubbish, debris, paper, boxes, bags and all manner of containers.'"** This statement, a direct quote from the filings of the Arlington County defendants in the *Crossan* suit, is amply supported by the photographs attached to The Post defendants' summary judgment motion, which plaintiff concedes to be accurate representations of the condition of the condominium where he was living on October 20, 2005. For example, Exhibit A shows trash (a Progresso soup can, a red soda bottle), bags, boxes, and papers covering the kitchen; Exhibits E, L, M O, S and U show piles of boxes throughout the condominium; Exhibits H, P and CC show bags and trash cans filled with paper piled atop one another; Exhibit R shows stacks of boxes surrounding piles of computer equipment, a telephone, electrical cords, and lamps; and Exhibits EE and II show a mattress, blanket and pillow surrounded by what appear to be boxes and plastic bags filled with papers, as well as loose newspapers, a telephone, electrical cords, and several empty soda cans.

Plaintiff's statement that these photographs "do not show any trash or rubbish in the unit," Opp. 10, is simply an unreasonable interpretation of the undisputed evidence. Empty soup cans (Ex. A), empty soda cans (Exs. A, EE, II), unused lamps and electrical cords and telephones and computer equipment (Exs. G, R, EE, II), old newspapers (Exs. H, P, U, EE, II), and old opened boxes of consumer goods (Exs. D, T, BB) constitute "trash" or "rubbish," as those terms are commonly understood. Plaintiff's further contention that "no area outside of the

6

office area went from floor to ceiling" is also untrue—Exhibits E, I, M, R, S, FF, and JJ clearly show boxes and bags stacked nearly to the ceiling at various locations throughout the condominium.

      **6. "The kitchen was unusable."**  Exhibits A and B plainly show an unusable kitchen.  The sink (bottom right corner of Exhibit A) is crammed to overflowing with empty cans and bottles, the countertops and table are piled high with bags and boxes and loose paper, the stove is at least partially obscured by bags and boxes, and access to any part of the kitchen appears difficult if not impossible.

      Plaintiff says that this statement is false because "the kitchen was used by both" plaintiff and Mr. Crossan, Opp. 10 (though elsewhere plaintiff unsurprisingly reveals that they "mostly ate out," *id.* 18), but this argument misses the point.  Even if plaintiff and Mr. Crossan in fact occasionally used the kitchen, the statement at issue ("the kitchen was unusable") is materially true so long as the kitchen was in a condition that would render it substantially unusable.  And the photographs clearly show that the condominium's kitchen was in fact in such a condition on October 20, 2005.  Here again, plaintiff's argument to the contrary simply ignores the plain import of the photographs.[3]

      **7. "Though researchers have just begun to study [hoarding] and its association with mental illness, brain dysfunction and obsessive-compulsive disorders, they**

---

[3] It is revealing in this regard that plaintiff does not challenge the truth of other statements in the June 18, 2006 article describing the condition of the kitchen: "The floor and counters were covered with legal documents from one of his cases.  'If one were to actually use the stove or oven,' the county wrote, 'it would certainly [engulf] the unit in flames.'"  Ex. 1 (alteration in original).  Plaintiff notes that the stove "had been disconnected years before and thus could not provide any degree of heat, yet alone result in flames."  Shipkovitz Decl. ¶ 16, at 46.  But that only underscores that the kitchen was "unusable."

7

**estimate that 1.4 million Americans—and that might be a gross underestimation—cannot stop themselves."** Plaintiff does not contend that this statement is false. Instead, he says that this statement, as well as the headline and content of the June 18, 2006 article ("Fighting to Remain Engulfed in Junk: As Task Forces Move in, Hoarders Strike Back in Court") falsely imply that plaintiff is mentally ill. Opp. 10, 19. That is not so. The June 18 article merely reports the true fact that the association between hoarding and mental illness is unclear, and is careful not to endorse any conclusions about the association between hoarding and mental illness.[4] The D.C. Circuit has cautioned that courts considering claims of defamation by implication like plaintiff's "must be vigilant not to allow an implied defamatory meaning to be manufactured from words not reasonably capable of sustaining such meaning." *White v. Fraternal Order of Police*, 909 F.2d 512, 519 (D.C. Cir. 1990). Plaintiff has pointed to absolutely nothing in either of the challenged articles that is "reasonably capable of sustaining" the implied meaning that plaintiff is mentally ill. *Id.*

To be sure, the statements to which plaintiff cites (the headline, the use of the term "hoarder") could be read to imply that plaintiff is a hoarder, though plaintiff does not appear to press that argument in his opposition to defendants' motion for summary judgment. But that implication cannot give rise to a defamation claim because it is not false. Rather, the undisputed evidence shows that plaintiff meets the common understanding of "hoarding": acquiring and keeping objects that have limited or no value. Exs. 14, 15. The photographs show such objects throughout the condominium—there are newspapers (Exs. H, P, U, EE, II); lamps, electrical cords, telephones and computer equipment (Exs. G, R, EE, II); old opened boxes of

---

[4] By contrast, plaintiff's *own evidence* does endorse such a conclusion. The first page of Exhibit 1 to plaintiff's opposition, labeled "Attachment 1: Hoarding Referral Criteria," expressly states, "Hoarding is a symptom of an underlying mental illness."

8

consumer goods (Exs. D, T, BB); and piles of bags and boxes stuffed with paper (Exs. A, H, P, Q, S, T, EE, HH) everywhere. These items overwhelm the kitchen (Exs. A, B), bathroom (Exs. Y, BB) and sleeping area (Exs. EE, II), and are stacked nearly to the ceiling throughout the condominium (Exs. E, I, M, R, S, FF, JJ).

Plaintiff does not appear to dispute that he meets this definition of "hoarding." Instead, he maintains that the proper definition of "hoarding" is the one used by the Arlington County Hoarding Task Force, which plaintiff says limits hoarding to the "collection of used food, vegetation, organic material, pets, pat [*sic*] matter, pet excrement, wreaths, and living/dead matter." Opp. 5; *see also* Opp. 12 ("*Nonneatness shown in the photos is unrelated to 'hoarding' (collection of organic matter).*") (emphasis in original); Opp. 20 ("The Defendant[s] and Plaintiff differ as to the definition of 'hoarding.'"). On this point, plaintiff simply misreads his own evidence. The Arlington County Interdepartmental Hoarding Task Force Case Management Procedure, which appears at page 2 to Exhibit 1 of plaintiff's opposition, sets forth the same definition of "hoarding" offered by defendants in their motion to dismiss, and cites precisely the same source:

> Hoarding behavior is defined as "the acquisition of and failure to discard things that are useless or of no value, living spaces cluttered enough to prevent the activity that the space was designed for and sufficient distress or impairment in functioning (may include impending eviction, financial hardship due to excessive buying, risk of removal of children by authorities) caused by the hoarding." (Frost and Hartl).

Pl.'s Ex. 2, at 2. *Compare* Defs.' Mem. in Supp. Mot. for Summ. J. 9 & n.5 (Oct. 22, 2007) (*quoting* Randy O. Frost & Tamara L. Hartl, *A Cognitive-Behavioral Model of Compulsive Hoarding*, 34 Behav. Res. Ther. 341 (1996) (Ex. 15)). Moreover, Attachment Three to the Case Management Procedure (which appears at page 6 of Exhibit 1 to plaintiff's opposition), entitled

9

"Hoarding Severity Ratings," explains that "moderate" hoarding exists when "utilities are generally operative and the client can move about even if through narrow pathways, code and fire violations exist, most living surfaces are covered with items and are unusable for their intended purposes, and home requires professional heavy house cleaners and large dumpsters to clean up." Pl.'s Ex. 1, at 6. It is beyond dispute that plaintiff meets these definitions of "hoarding."

Plaintiff's confusion appears to stem from Attachment One to the Case Management Procedure (which appears at pages 1 and 4 of Exhibit 1 to plaintiff's opposition), entitled "Hoarding Referral Criteria." That document states, "Typically, a person referred to APS would have hoarding *and some of the following characteristics*," which include "[a]nimal hoarding," "human waste," and "rotting food." Pl.'s Ex. 1, at 4 (emphasis added). Plaintiff appears to argue that this document defines "hoarding" to mean the collection of "human waste," "rotting food," organic matter, etc. That is obviously not so. Those are some of the characteristics that would typically be found, *in addition to hoarding,* in a case that is referred to "APS."[5] They are not presented as part of any definition of the term "hoarding." And, as discussed above, the other documents in plaintiff's Exhibit 1 offer the very same definition (and cite the very same source) as The Post defendants' summary judgment motion.

In sum, there is no genuine dispute as to the definition of "hoarding," and the undisputed evidence shows that plaintiff clearly meets that definition. Accordingly, even if the June 18, 2006 article can be read to suggest that plaintiff is a hoarder, the article still does not support a claim for defamation by implication because there can be no dispute that the suggestion is true.

---

[5] Plaintiff's exhibit does not identify the agency to which "APS" refers.

**8. "After six weeks, Crossan's family hired a lawyer, refused to allow Shipkovitz back into the condominium and hired a moving company to haul his things to a storage facility in Fairfax County, where they still sit."** Plaintiff does not dispute that Mr. Crossan's brother "hired a lawyer, refused to allow" plaintiff "back into the condominium and hired" someone "to haul his things to a storage facility in Fairfax County." Instead, plaintiff maintains that this statement is substantially false and defamatory because *only* Mr. Crossan's brother, and not the rest of the family, did these things, and that he did them with the help of a "home improvement and painting contractor," rather than a moving company. Opp. 11, 21. This contention is frivolous. The discrepancies alleged by plaintiff, even if true, amount to nothing more than "[m]inor inaccuracies" that do not affect "the gist" of the statement. *Masson*, 501 U.S. at 517 (quotations omitted). Plaintiff says that these differences are material because Mr. Crossan's brother is "dishonest" and took these actions "to ensure that only he could inherit" Mr. Crossan's "property." Opp. 11. But even if that were true, it is still undisputed that some member of Mr. Crossan's family took the actions that are attributed to "Mr. Crossan's family" in the statement. The fact that the article does not specify which member of the family actually took these actions does not make the statement materially false, regardless of the particular family member's motives.[6]

**9. "Shipkovitz's court filings are typed single-spaced or handwritten on 100 percent recycled paper."** Plaintiff says this statement is "mostly false" because only one of his

---

[6] To the extent plaintiff's opposition could be read to suggest that the article *implies* that the actions described in the statement were justified, and that this implication is false because the actions were actually taken by a family member who had an ulterior motive, *cf.* Opp. 21, plaintiff's argument suffers from the same flaw as his other defamation by implication argument addressed above—the statement at issue is "not reasonably capable of sustaining such" a meaning, and plaintiff points to nothing in the article suggesting that the author intended such an inference. *White*, 909 F.2d at 519-20.

11

court papers was handwritten and none were on 100 percent recycled paper.  Plaintiff labors to find defamatory meaning in what is at most a minor inaccuracy—he says the statements imply that he is "a 'green extremist—i.e., a 'green nut.'"  Opp. 11.  Here again, plaintiff attempts to create a disputed issue of material fact by "manufactur[ing]" an implied defamatory meaning from "words not reasonably capable of sustaining such meaning."  *White*, 909 F.2d at 519.  There is absolutely nothing in the article that could even arguably be read to suggest that plaintiff is a "green extremist"—nowhere does the article attribute any environmental views to plaintiff, or suggest that he is any kind of environmental activist, let alone an activist extreme enough to be considered a "green nut."

**10. "Now, a federal judge has dismissed [plaintiff's] case.  County officials, stung by the publicity Shipkovitz's hoarding case generated, hailed the decision.  'Every count was found to be without merit,' Arlington spokeswoman Mary Curtius said."**  It is undisputed that plaintiff's lawsuit against several Arlington County officials and other individuals in the United States District Court for the Eastern District of Virginia was dismissed.  Ex. 12.  Plaintiff nevertheless maintains that this statement is defamatory because the order dismissing his complaint does not actually state that the counts were "without merit," and "[a]ccusing an attorney of filing papers that are 'without merit' is defamatory *per se*."  Opp. 22.  That is incorrect.  In legal parlance, the term "without merit" means simply that the claim did not prevail, not that it was frivolous or sanctionable, and courts routinely describe arguments made by attorneys as "without merit."  *See, e.g.*, cases cited in Defs.' Mem. in Supp. Mot. for Summ. J. 14 n.7.  Obviously, the many hundreds of cases describing claims as "without merit" do not thereby "destroy[] a professional's/attorney's reputation," as plaintiff maintains.  Opp. 7.  And plaintiff's suggestion that there is a material difference between dismissing a claim and

12

describing a claim as "without merit" simply finds no support in the common usage of the phrase. Indeed, plaintiff has not identified a single count in his *Crossan* complaint that he alleges is *not* without merit, and it is difficult to see how he could, given the *Crossan* court's disposition of his lawsuit.

**11. "Mental health workers visited Crossan daily. It was one of those workers who in October became alarmed at the massive amount of junk in the condo— paper, boxes, bags, newspapers, trash—and called the fire marshal."** As discussed above, the photographs attached to defendants' summary judgment motion clearly show "paper, boxes, bags, newspapers," and "trash" in the condominium. Plaintiff contends that this statement is false because "there was no trash in the unit." Opp. 12. The undisputed evidence, however, is to the contrary—the photographs show that the condominium was filled with old newspapers, bags and trash cans stuffed with paper and piled atop one another, electrical cords, lamps, phones, etc. Indeed, plaintiff himself has admitted to telling Ms. Schulte that his condominium had "piles of business and technical sections of newspapers," looked "like the back office of Jones Day," and was not "neat[]." Shipkovitz Decl. ¶¶ 11, 13, at 45. To the extent plaintiff contends this statement is false because there is some difference between the items piled in the condominium and "trash," that difference is nothing more than a "[s]light inaccurac[y] of expression" that is "immaterial" for defamation purposes. *Moldea*, 22 F.3d at 318.

**12. "By December, Crossan's family had become involved, asking fire marshals to stop letting Shipkovitz in. In February, the family hired a moving company to relocate Shipkovitz's junk to two storage units."** Though he does not discuss this allegation in his opposition, plaintiff alleges in his complaint that this statement is false because these actions were taken by Mr. Crossan's *brother* rather than his entire family, and it was a home

13

improvement contractor, rather than a "moving company," that was hired to do the work. Compl. ¶ 20.C. As discussed above, these are "[m]inor inaccuracies" that "do not amount to falsity." *Masson*, 501 U.S. at 517.[7]

## II.     THE ARTICLES ARE PROTECTED BY THE FAIR REPORT PRIVILEGE.

Even if plaintiff could demonstrate a disputed issue of material fact as to falsity, which he cannot, The Post defendants would still be entitled to summary judgment because the articles at issue were privileged as fair and accurate reports of official acts. In particular, Ms. Schulte's articles were a fair abridgement of two official proceedings: the official action of Arlington County officials closing the condominium for violations of fire and building codes, and the judicial proceedings initiated by plaintiff in the *Crossan* case challenging those actions.

In his opposition, plaintiff argues that the fair report privilege does not apply because the allegedly defamatory statements "were not quotes from an official proceeding, just made-up defamatory fabrications about Plaintiff *personally*," and "are only minimally about the" *Crossan* case. Opp. 34. Plaintiff is incorrect. Most of the allegedly defamatory statements concern the condition of the condominium as of October 20, 2005. And the condition of the condominium was central to the official actions taken by Arlington County in closing the condominium. Indeed, the first paragraph of the June 18, 2006 article describes the steps taken by county officials to close the condominium, and the paragraphs of the story containing the allegedly defamatory statements about the condition of the condominium explain why the county officials took those steps. Even the photographs submitted as Exhibit 4 to The Post defendants' summary judgment motion were taken in the course of those official actions. Plaintiff's

---

[7] Plaintiff's repeated allegations in his opposition as to Ms. Schulte's reporting methods, *see, e.g.*, Opp. 1-2, 5, 6, are not relevant to the substantial truth of the challenged statements.

14

contention that the statements at issue in this case are about him "personally" may be true, insofar as the statements describe his personal living conditions. But once those living conditions became the subject of an official proceeding, a fair and accurate report of those proceedings is privileged.

Moreover, several of the allegedly defamatory statements are directly related to plaintiff's lawsuit in the Eastern District of Virginia. For example, the statement that the condominium "from floor to ceiling, was crammed with 'rubbish, debris, paper, boxes, bags and all manner of containers'" is a direct quote from the Arlington County defendants' pleadings in that lawsuit.[8] Similarly, the statement that "'[e]very count was found to be without merit'" is a direct quote from an Arlington official about the outcome of the lawsuit. Once again, although these statements may be about plaintiff "personally," plaintiff made his personal living conditions the subject of an official proceeding when he himself filed a lawsuit challenging the actions of the county officials in closing the condominium. There can be no question that these statements constitute reports of official proceedings, and therefore are protected by the fair report privilege.[9]

---

[8] Plaintiff's contention that the condition of the condominium was "not discussed in the" *Crossan* lawsuit, Opp. 7, is thus incorrect.

[9] Though he does not expressly make this argument, plaintiff's opposition could be read to suggest that the fair report privilege does not apply because the statements at issue are false, and therefore the articles are not "fair and accurate" reports. As explained above, however, the statements are substantially true. And even if they were not, falsity would not defeat the fair report privilege so long as the statements fairly and accurately reported on the official proceedings. *See* Restatement (Second) of Torts § 611 cmt. a (1977). Thus, for example, even if it were not true that the condominium was "crammed with 'rubbish, debris, paper, boxes, bags and all manner of containers,'" this statement would still be privileged so long as it fairly and accurately characterized the Arlington county defendants' position in the *Crossan* lawsuit. And plaintiff nowhere alleges that the statements at issue did not fairly and accurately characterize the official proceedings at issue. Plaintiff's citation to a different section of the Restatement is inapposite—that section deals with the doctrine of "fair comment," under which expressions of

15

### III. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S INVASION OF PRIVACY CLAIM.

In his Complaint, plaintiff attempts to state a claim for false light invasion of privacy based on (1) the statements discussed above and (2) the publication of an allegedly "illegally taken photograph" in connection with the June 18, 2006 article. The Post defendants have moved for summary judgment on this claim as well, on the grounds that the statements at issue are not substantially false, and that the photograph was lawfully acquired by The Post—indeed, it was given to Ms. Schulte by plaintiff himself—and therefore cannot support an invasion of privacy claim.

As discussed above, plaintiff's opposition does not demonstrate a disputed issue of material fact as to the truth of the challenged statements. And plaintiff does not respond to The Post's argument that it acquired the published photograph lawfully and therefore cannot be held liable for its publication under *Bartnicki v. Vopper*, 532 U.S. 514 (2001).[10] Accordingly, The Post defendants are entitled to summary judgment on this claim as well.

### IV. PLAINTIFF'S RULE 56(f) DECLARATION IS INSUFFICIENT.

In a last-ditch effort to avoid summary judgment, plaintiff inserts in the middle of his opposition a short declaration asserting that "discovery is necessary to prove at least one element of my case, and to responsibly or reasonably or even adequately respond to [The Post

---

opinion on a matter of public concern are protected. Opp. 27 (*quoting* Restatement (Second) of Torts § 566 (1977))).

[10] Plaintiff admits that he e-mailed the photograph to Ms. Schulte, but contends that the photograph "was to be for proof of the 'JonesDay backroom' condition and was not agreed to be published." Opp. 6. But the law of false light invasion of privacy does not require The Post to obtain plaintiff's express consent before publishing a lawfully-acquired photograph.

16

defendants'] Motion For Summary Judgment." Opp. 28. This declaration is insufficient to forestall summary judgment.

Federal Rule of Civil Procedure 56(f) provides that if a party opposing a summary judgment motion "shows by affidavit that, for specified reasons, it cannot present by affidavit facts essential to justify its opposition," then the court may deny the motion or order a continuance for further discovery. Nothing in plaintiff's two-sentence "Rule 56(f) Declaration" warrants such relief. Plaintiff's opposition does not identify even one area of factual dispute on which further discovery would be warranted, let alone offer "specified reasons" as to why affidavits are inadequate. And the interrogatories to which Plaintiff refers in the "declaration" are relevant only to the issue of fault, not to the substantial truth of the statements at issue.

In reality, plaintiff's sole argument in opposition to The Post defendants' motion for summary judgment is that the undisputed evidence—*i.e.*, the photographs, County and court records, the comments made by plaintiff to Ms. Schulte—does not establish the substantial truth of the statements at issue. Such a determination is perfectly suited to summary judgment, as no further discovery is needed to decide whether The Post defendants or plaintiff are correct on this point. And plaintiff cannot avoid this fact with a conclusory assertion that more discovery is needed on unspecified issues.

*    *    *    *    *

This is the unusual defamation case in which the substantial truth of the challenged statements can be decided at the summary judgment stage. Before the Court is a significant amount of undisputed evidence—the photographs taken by the Arlington County officials and the comments that plaintiff admits he made to Ms. Schulte. No reasonable juror looking at that undisputed evidence could conclude that any of the statements identified in the

17

Complaint is substantially false.  On the contrary, the undisputed evidence substantially corroborates everything in Ms. Schulte's stories.  And plaintiff cannot avoid summary judgment simply by ascribing unreasonable meanings to the challenged statements and by asserting clearly incorrect interpretations of the undisputed evidence.  Accordingly, The Post defendants are entitled to summary judgment.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment should be granted.

Respectfully submitted,

WILLIAMS & CONNOLLY LLP

By: /s/ Kevin T. Baine
    Kevin T. Baine (Bar No. 238600)
    Jonathan Kravis (Bar No. 973780)

725 Twelfth Street, N.W.
Washington, DC  20005
(202) 434-5000

February 11, 2008

*Attorneys for Defendants The Washington Post Company, WP Company LLC, and Brigid Schulte*

**CERTIFICATE OF SERVICE**

I, Jonathan Kravis, hereby certify that on this 11th day of February, 2008, I caused copies of the foregoing Reply Memorandum in Support of Motion for Summary Judgment to be served on the following via First Class Mail:

Samuel Shipkovitz
5829 Nicholson Street
Pittsburgh, PA 15217

Samuel Shipkovitz
P.O. Box 2961
Arlington, VA 22202


Ara L. Tramblian, Deputy County Attorney
2100 Clarendon Boulevard, Suite 403
Arlington, VA 22201

        /s/ Jonathan Kravis
        Jonathan Kravis (D.C. Bar No. 973780)